## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WEST PALM BEACH POLICE PENSION
FUND, derivatively on behalf of Nominal
Defendant, AMTRUST FINANCIAL
SERVICES, INC.,

Plaintiff,

v.

BARRY D. ZYSKIND, GEORGE
KARFUNKEL, LEAH KARFUNKEL,
ABRAHAM GULKOWITZ, DONALD T.
DECARLO, SUSAN C. FISCH, RAUL
RIVERA, and RONALD E. PIPOLY, JR.,

Defendants,

- and -

AMTRUST FINANCIAL SERVICES, INC.,

Nominal Defendant.

Case No.

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## TABLE OF CONTENTS

I.      NATURE AND SUMMARY OF THE ACTION ................................................................1

II.     JURISDICTION AND VENUE ........................................................................................7

III.    PARTIES .........................................................................................................................7

        A.      Plaintiff ................................................................................................................ 7

        B.      Nominal Defendant.............................................................................................. 7

        C.      Officer Defendants.............................................................................................. 8

        D.      Director Defendants ............................................................................................ 9

        E.      Relevant Non-Parties ........................................................................................ 11

                1.      Non-Party Michael Karfunkel and the Company's Related-Party
                        Transactions ..............................................................................................11

                2.      The Michael Karfunkel Family 2005 Trust ...............................................11

                3.      Maiden Holdings, Ltd. ...............................................................................12

                4.      ACP Re, Ltd...............................................................................................13

                5.      National General Holdings Corp. ..............................................................13

                6.      Other Related-Parties.................................................................................14

IV.     DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S
        INTERESTS AND COMPLY WITH APPLICABLE LAWS ..........................................14

        A.      Duties of All Defendants ................................................................................... 14

        B.      Conspiracy, Aiding and Abetting, and Concerted Action ................................... 16

        C.      The Company's Code of Business Ethics............................................................ 17

        D.      The Board's Audit Committee............................................................................ 18

V.      DEFENDANTS BOTH ENCOURAGED AND FAILED TO ADDRESS THE
        FRAUDULENT ACCOUNTING SCHEME ...................................................................20

        A.      Defendants Consciously Disregarded the Fraud.................................................. 21

                1.      GEO Investing December 2013 Article.......................................................21

|  | 2. | *Barron's* February 2014 Article ................................................. | 21 |
|  | 3. | *Barron's* May 2014 Article.......................................................... | 23 |
|  | 4. | The Alistair Capital Letter ......................................................... | 25 |
|  | 5. | *Barron's* April 2016 Article ...................................................... | 29 |
| B. | | Defendants Knowingly Issued Materially False and Misleading Statements....... | 30 |
|  | 1. | First Quarter 2014 Financial Results ........................................... | 30 |
|  | 2. | Second Quarter 2014 Financial Results........................................ | 32 |
|  | 3. | Third Quarter 2014 Financial Results.......................................... | 33 |
|  | 4. | Fourth Quarter and Full Year 2014 Financial Results............................... | 34 |
|  | 5. | 2015 Proxy Statement............................................................... | 36 |
|  | 6. | First Quarter 2015 Financial Results ........................................... | 36 |
|  | 7. | Second Quarter 2015 Financial Results........................................ | 37 |
|  | 8. | Third Quarter 2015 Financial Results.......................................... | 38 |
|  | 9. | Fourth Quarter and Full Year 2015 Financial Results............................... | 39 |
|  | 10. | 2016 Proxy Statement............................................................... | 40 |
|  | 11. | First Quarter 2016 Financial Results ........................................... | 40 |
|  | 12. | Second Quarter 2016 Financial Results........................................ | 42 |
|  | 13. | Third Quarter 2016 Financial Results.......................................... | 43 |
| C. | | The Fraud Is Revealed ............................................................. | 44 |
|  | 1. | February 27, 2017 Press Release ................................................. | 44 |
|  | 2. | February 27, 2017 Conference Call............................................. | 45 |
|  | 3. | March 16, 2017 Press Release .................................................... | 45 |
|  | 4. | April 4, 2017 Disclosures .......................................................... | 46 |
|  | 5. | Wall Street Journal April 11, 2017 Article .................................... | 47 |

VI.     THE DIRECTOR DEFENDANTS VIOLATED SECTION 14(a) OF THE
        EXCHANGE ACT AND SEC RULE 14a-9, AND BREACHED THEIR
        FIDUCIARY DUTIES BY CAUSING THE COMPANY TO FILE
        MATERIALLY MISLEADING PROXY STATEMENTS ..............................................48

        A.      Numerous Director Defendants Caused AmTrust to Issue the Materially False and

                Misleading 2015 Proxy Statement ....................................................................... 49

        B.      Numerous Director Defendants Caused AmTrust to Issue the Materially False and

                Misleading 2016 Proxy Statement ....................................................................... 51

VII.    DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND
        SEC RULE 10b-5, AND BREACHED THEIR FIDUCIARY DUTIES, BY
        KNOWINGLY OR RECKLESSLY ISSUING MATERIALLY FALSE AND
        MISLEADING STATEMENTS DURING THE RELEVANT PERIOD ........................53

        A.      Defendants Caused AmTrust to Conduct a Massive Stock Repurchase Program 54

        B.      The Insider Selling Defendants Unlawfully Profited at AmTrust's Expense By

                Selling Back Shares to the Company at Artificially Inflated Prices ...................... 55

        C.      In Repurchasing Stock, AmTrust relied on Defendants' False or Misleading

                Statements ............................................................................................................. 58

        D.      Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrine Apply

                to Defendants' Misrepresentations ....................................................................... 60

        E.      The Group Pleading Doctrine Applied to Defendants' Misstatements and

                Omissions .............................................................................................................. 61

        F.      Defendants' Misstatements and Omissions Caused Damages to AmTrust .......... 62

VIII.   DEMAND ON THE AMTRUST BOARD WOULD HAVE BEEN FUTILE ................63

        A.      Demand Is Excused Because the Director Defendants' Conduct Did Not

                Constitute a Valid Exercise of Business Judgment ............................................... 63

|  | B. | Demand Is Excused Because the Director Defendants Face a Substantial |  |
|--|----|----|--|
|  |  | Likelihood of Liability Due to Their Knowledge or Conscious Disregard of Facts |  |
|  |  | Relating to the Illicit Accounting Scheme | 65 |
|  | C. | Demand is Futile Because the Control Group Dominated the Board | 69 |
|  | D. | Additional Reasons Why Demand is Futile | 71 |
| IX. | CLAIMS FOR RELIEF | | 73 |
|  | COUNT I | | 73 |
|  | COUNT II | | 76 |
|  | COUNT III | | 76 |
|  | COUNT IV | | 77 |
|  | COUNT V | | 79 |
|  | COUNT VI | | 82 |
|  | COUNT VII | | 83 |
|  | COUNT VIII | | 84 |
|  | COUNT IX | | 84 |
| X. | PRAYER FOR RELIEF | | 85 |
| XI. | JURY TRIAL DEMANDED | | 87 |

Plaintiff West Palm Beach Police Pension Fund ("Plaintiff"), a shareholder of AmTrust

Financial Services, Inc. ("AmTrust" or the "Company"), brings this action on AmTrust's behalf

seeking relief under federal and state law for the misconduct perpetrated against the Company by

the current and former officers and directors identified below (collectively, "Defendants") arising

from the long-running, systemic and fraudulent practice of understating the Company's loss

reserves, overstating its revenue and net income, and misrepresenting its loss reserve practices

and financial results.[1]  Plaintiff, through its counsel, has conducted an investigation into the facts

supporting the allegations in this Complaint and believes discovery will elicit further evidentiary

support for its allegations.[2]

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This shareholder derivative action arises from Defendants' remarkable and

disturbing breach of the trust reposed in them by the Company and AmTrust's shareholders.

Since 1998, when brothers George Karfunkel ("G. Karfunkel") and Michael Karfunkel ("M.

Karfunkel") founded the Company, AmTrust has functioned as a personal piggy bank for

members of the Karfunkel family.  From at least December 12, 2013 to the present (the

"Relevant Period"), Defendants knew or consciously disregarded that AmTrust was

manipulating its financials through an array of complicated maneuvers that included chronic

underreserving of liabilities and inconsistent reporting of ceded losses in reinsurance agreements

---

[1] While AmTrust is named as a nominal defendant, any reference to "Defendants" does not
encompass the Company.

[2] Plaintiff's investigation included a review of: (i) filings by AmTrust with the U.S. Securities
and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other
publications disseminated by certain of the Defendants and other related non-parties; (iii) review
of news articles, shareholder communications, conference call transcripts, and postings on
AmTrust's website concerning the Company's public statements; and (iv) review of other
publicly available information concerning AmTrust and the Defendants.

1

between the Karfunkels' web of family-controlled businesses. As a result of Defendants' illicit conduct, AmTrust is now the subject of three government investigations and has been named as a defendant in four putative securities fraud class actions. Defendants' misconduct also caused the Company to restate nearly three years of financial results and tarnished shareholder value by causing AmTrust to repurchase over 8 million shares at artificially inflated prices.

      2.      Questions surrounding AmTrust's accounting and the adequacy of the Company's reserves have been the focus of media speculation and scrutiny for years. Indeed, various articles published by *Barron's* and other news organizations have suspected accounting irregularities and abuse of family control at AmTrust since at least 2013. These same suspicions were reiterated to AmTrust's Board of Directors (the "Board") in alarming detail and specificity by Alistair Capital Management, L.L.C. ("Alistair Capital"), an investment advisory firm, in December 2014.

      3.      On February 8, 2014, financial publication *Barron's* issued the first of three scathing articles about AmTrust's accounting, suggesting that management is using "complicated" accounting schemes to "make the business look much better than it really is." According to *Barron's*, AmTrust's management uses an intricate "web of related-party deals with the Karfunkels" to mask insurance losses, and boosts profits by "deferring costs more aggressively than the matching revenues."

      4.      On May 31, 2014, *Barron's* once again questioned AmTrust's accounting, including the adequacy of its reserves, suggesting that AmTrust selects unusually low estimates for its eventual losses. *Barron's* explained that AmTrust paid out a higher percentage of its original estimate for losses on accidents in the years 2006 through 2012 than its peers in the workers' compensation insurance industry. This explains why the Company's premium revenue

2

as of March 31, 2014 was more than five times tangible book value, an exorbitant rate considering the industry average is 1.4. Beth Malone, AmTrust's head of investor relations, denied these accusations, stating that "AmTrust is more than adequately reserved."

5.      Then, on December 18, 2014, Alistair Capital delivered a letter (the "Alistair Capital Letter") to the members of the Board's Audit Committee alerting them to "numerous instances of improper accounting and indications of material weaknesses in internal controls over financial reporting" at the Company.   Alistair Capital, citing the aforementioned *Barron's* articles and reports published by the independent research firm Off Wall Street, urged the Board's Audit Committee to conduct an independent investigation to ensure that the Company's financial controls were effective and that its accounting practices were in compliance with U.S. Generally Accepted Accounting Principles ("GAAP").

6.      The Alistair Capital Letter called into question: (i) the efficacy of AmTrust's internal accounting controls for financial reporting; (ii) AmTrust's accounting for deferred acquisition costs; (iii) AmTrust's valuation of life settlement contracts; (iv) the sizable difference between balance sheet accounts reported by AmTrust and the amounts reported by a related-party for the corresponding accounts in its financial statements; (v) AmTrust's accounting for Luxembourg Reinsurance Captives; and (vi) AmTrust's accounting for loss and loss adjustment reserves in conjunction with acquisitions.

7.      On April 23, 2016, after continued inaction and silence by AmTrust's Board, *Barron's* once again questioned the adequacy of AmTrust's reserves and its accounting, asserting that "[t]he insurance filings of its subsidiaries show that the cost of settling claims for policies issued in the seasoned years 2007-13 have climbed hundreds of millions of dollars above the reserves that AmTrust initially set aside." *Barron's* further noted that even analysts at

3

AmTrust's investment banker, Keefe, Bruyette & Woods, Inc. ("KBW"), wondered in various notes whether the insurer's underwriting margins were overstated. The Board not only failed to meaningfully acknowledge the red flags raised in the *Barron's* articles and Alistair Capital Letter, but instead vehemently attacked their credibility and decided against proactively investigating these potential issues.

8.      In response to repeated questions regarding its accounting and adequacy of its reserves, AmTrust consistently responded that its processes were rigorous and that it was more than adequately reserved. Even worse, rather than investigating the myriad of issues outlined in the *Barron's* articles, the Board unconscionably approved an increase in the Company's stock buyback program by $200 million in April 2016 instead. AmTrust proceeded to engage in a massive buying spree of Company stock at tremendously inflated prices over the next four months, purchasing nearly 5.5 million shares at a cost of $135 million from April to July 2016.

9.      As was inevitable, on February 27, 2017, AmTrust finally disclosed a litany of accounting issues in its fourth quarter 2016 press release, including inadequate reserves, material weaknesses in its internal controls and the need to make adjustments to previously issued financial statements. For Q4 2016, AmTrust reported financial results that fell well short of Wall Street expectations in large part because of a $65 million reserve charge primarily related to strengthening of prior-year loss and loss-adjustment reserves in its "Specialty Program" segment. AmTrust also indicated it would be unable to timely file its annual report and that it had identified material weaknesses in its internal controls over financial reporting that existed as of December 31, 2016. The internal control deficiencies relate to the Company's ineffective risk assessment and insufficient corporate accounting and corporate financial reporting resources. The Company not only warned that additional adjustments and/or material weaknesses could be

4

identified, but disclosed a multitude of accounting errors dating back to at least 2012 pertaining to improperly accrued bonuses, incorrect foreign exchange calculations, and wrongfully booked revenue.

10.     In reaction to these disclosures, AmTrust's share price plummeted $5.32 per share, or 19%, from $27.66 per share on Friday, February 24, 2017 to $22.34 per share on Monday, February 27, 2017—wiping out over $900 million in Company market capitalization in one trading day.

11.     Just weeks later, on March 16, 2017, AmTrust disclosed that it needed additional time to complete its consolidated financial statements for fiscal year 2016. The Company revealed that its consolidated financial statements for fiscal years 2014 and 2015 (including for each of the four quarters of 2015) as well as for the first three quarters of 2016 needed to be restated and should no longer be relied upon. The Form 10-K filing delay and the restatements largely relate to the timing of recognition of revenue.

12.     Investors were stunned by these disclosures and AmTrust's share price was punished anew as a result, dropping $4.03 per share, or 18.6%, from $21.61 per share on Thursday, March 16, 2017 to $17.58 per share on Friday, March 17, 2017—wiping out over $686 million in Company market capitalization.

13.     On April 4, 2017, the Company filed its 2016 Annual Report on Form 10-K which included restated financial statements for 2014 and 2015. The restated financials reduced 2014 and 2015 net income by 7.2% and 11.2%, respectively.

14.     Then, on April 11, 2017, *The Wall Street Journal* reported that the SEC, the Federal Bureau of Investigations ("FBI"), and the New York Department of Financial Services ("NYDFS"), are each probing AmTrust's accounting practices. According to *The Wall Street*

5

*Journal*, a former BDO USA LLP ("BDO") auditor-turned-whistleblower casually walked around BDO's offices in 2014 striking up conversations with colleagues about BDO's audits of AmTrust. Unknown to his colleagues, the whistleblower was recording all conversations for the FBI. The whistleblower claims to be in possession of documents demonstrating that AmTrust shifted $277 million in losses to an "offshore affiliate from 2009 to 2012, bolstering AmTrust's operating income by that amount." Although the FBI's investigation is focused on whether BDO tried to bury poor accounting practices in its AmTrust audits, the SEC's investigation is ultimately centered on AmTrust's accounting practices.

15.     In reaction to *The Wall Street Journal* article, AmTrust's shares declined $3.57 per share, or 18.9%, from $18.87 per share on Monday, April 10, 2017 to $15.30 per share on Tuesday, April 11, 2017.

16.     On May 2, 2017, KBW analyst Meyer Shields emphasized that the only way AmTrust can rebuild investor confidence is by taking a reserve charge in the hundreds of millions of dollars and committing to improve future disclosures. Shields noted being "very uncomfortable" with AmTrust's reserves, and recommended that the Company increase the size of the Board, revamp the Audit Committee, and appoint investor-facing senior executives.

17.     In short, Defendants failed—repeatedly and brazenly—to serve the best interests of AmTrust and its shareholders. Despite overwhelming and specific warnings about the Company's accounting, internal controls and related-party dealings, including a letter written directly to the Board's Audit Committee, Defendants not only failed to properly investigate but damaged the Company by recklessly engaging in a massive stock repurchase program at inflated prices just months before ultimately revealing the very issues the Board was on notice about. As a result of their misconduct, Defendants are liable to the Company under Sections 10(b), 14(a),

6

20A, and/or 29(b) of the Securities Exchange Act of 1934 ("Exchange Act"), as well as for breaches of their fiduciary duties and other violations of state and federal law.

## II.   JURISDICTION AND VENUE

18.   The claims asserted herein arise under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

19.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

20.   Venue is proper in this District because AmTrust is incorporated in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.   In addition, pursuant to AmTrust's Amended and Restated By-Laws, all derivative proceedings brought on behalf of the corporation shall be litigated in a "state or federal court located within the State of Delaware."

## III.   PARTIES

### A.   Plaintiff

21.   Plaintiff West Palm Beach Police Pension Fund is a current shareholder of AmTrust.  Plaintiff has continuously held AmTrust common stock since August 2014.

### B.   Nominal Defendant

22.   Nominal Defendant AmTrust Financial Services, Inc. is a Delaware corporation with its principal executive offices located at 59 Maiden Lane, 43rd Floor, New York, NY 10038. AmTrust's shares trade on the NASDAQ under the ticker symbol "AFSI."

23.   AmTrust was founded in 1998 by brothers George and Michael Karfunkel. Defendant Barry Zyskind ("Zyskind"), son-in-law of the late Michael Karfunkel, and members of the Karfunkel family collectively own approximately 50% of AmTrust's common stock.

7

24. AmTrust, through its subsidiaries, operates through three business segments: Small Commercial Business Insurance, Specialty Program Business Insurance, and Specialty Risk and Extended Warranty.

25. The Company's Small Commercial Business segment provides worker's compensation to small businesses that operate in low and medium hazard classes, such as restaurants, retail stores, physicians and other professional offices.

26. The Company's Specialty Program Business Insurance segment provides workers' compensation, general liability, commercial auto liability, excess surplus lines insurance programs and other specialty commercial property and casualty insurance through managing general agents.

27. The Company's Specialty Risk and Extended Warranty segment provides custom designed coverage, such as accidental damage plans and payment protection plans sold in connection with the sale of consumer and commercial goods in the United States and Europe.

C.   **Officer Defendants**

28. Defendant Barry D. Zyskind has served as a director on the Company's Board since 1998 and as the Chairman of the Board since May 2016. Zyskind has also served as Chief Executive Officer ("CEO") and President of AmTrust since 2000. As of March 24, 2017, Zyskind beneficially owned 44,876,575 shares of AmTrust common stock, approximately 26.2% of the Company's issued and outstanding shares. Zyskind is a founding stockholder of the Company and is son-in-law of director Leah Karfunkel ("L. Karfunkel"). Zyskind signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period. For the fiscal year ended December 31, 2015, Zyskind received $13,942,205 in compensation from the Company, including $1,012,500 in salary, $3,000,015 in stock awards,

8

$9,900,000 in non-equity incentive plan compensation, and $29,690 in other compensation. As acknowledged by the Company, Zyskind is not an independent director under the NASDAQ listing rules.

29.     Defendant Ronald E. Pipoly, Jr. ("Pipoly") has served as Executive Vice President and Chief Financial Officer ("CFO") of AmTrust since 2005. As of March 24, 2017, Pipoly beneficially owned 593,358 shares of AmTrust common stock. For the fiscal year ended December 31, 2015, Pipoly received $3,215,181 in compensation from AmTrust.

30.     Defendants Zyskind and Pipoly are referenced collectively in this Complaint as the "Officer Defendants."

**D.     Director Defendants**

31.     Defendant George Karfunkel has served as a director on the Company's Board since 1998. G. Karunkel is a founding stockholder of the Company. According to the Definitive Proxy Statement filed on Schedule 14A with the SEC on April 11, 2017 ("2017 Proxy Statement"), G. Karfunkel beneficially owns 32,438,408 shares of the Company's common stock, approximately 19.0% of the Company's issued and outstanding shares. G. Karfunkel is the brother-in-law of Leah Karfunkel. G. Karfunkel is not considered an independent director under the NASDAQ listing rules. G. Karfunkel signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period.

32.     Defendant Leah Karfunkel has served as a director since May 2016. According to the 2017 Proxy, L. Karfunkel beneficially owns 22,252,098 shares of AmTrust common stock, approximately 13.0% of the Company's issued and outstanding shares. L. Karfunkel is the sister-in-law of G. Karfunkel and the mother-in-law of Zyskind. She is also the widowed wife of

9

M. Karfunkel. L. Karfunkel is not considered an independent director under the NASDAQ listing rules.

33. Defendants Zyskind, G. Karfunkel, and L. Karfunkel (together, the "Control Group") effectively act as a controlling group of the Company, as they collectively owned approximately 50% of the Company's outstanding shares as of March 24, 2017. As such, Zyskind, G. Karfunkel, and L. Karfunkel filed a Schedule 13D/A with the SEC on November 3, 2016 indicating that each was a member of a "group" for purposes of reporting beneficial ownership under Section 13 of the Exchange Act.

34. Defendant Abraham Gulkowitz ("Gulkowitz") has served as a director on the Company's Board since 2006. At all relevant times, Gulkowitz has served as a member and the Chair of the Board's Audit Committee. He is also a director of several of AmTrust's subsidiaries. Gulkowitz signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period.

35. Defendant Susan C. Fisch ("Fisch") has served as a director on the Company's Board since 2010. At all relevant times, Fisch has served as a member of the Board's Audit Committee. She also currently serves as a member on the Board's Compensation Committee and Nominating and Corporate Governance Committee. Fisch signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period.

36. Defendant Donald T. DeCarlo ("DeCarlo") has served as a director on the Company's Board since 2006. At all relevant times, DeCarlo has served as a member of the Board's Audit Committee. DeCarlo signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period.

37. Defendant Ronald Rivera ("Rivera") has served as a Company director since August 2016.

38. Defendants Zyskind, G. Karfunkel, L. Karfunkel, Gulkowitz, Fisch, DeCarlo, and Rivera are collectively referred to hereinafter as the "Director Defendants." In addition, Defendants Pipoly, Gulkowitz, and DeCarlo comprise the "Insider Selling Defendants."

E.    Relevant Non-Parties

    1.    Non-Party Michael Karfunkel and the Company's Related-Party Transactions

39. M. Karfunkel co-founded AmTrust in 1998 and served as the Company's Chairman of the Board from 1998 until his death in April 2016. According to the Definitive Proxy Statement filed on Schedule 14A with the SEC on March 29, 2016 ("2016 Proxy Statement"), as of March 23, 2016, M. Karfunkel beneficially owned 2,192,824 shares of AmTrust common stock, approximately 1.3% of the Company's issued and outstanding shares. The Company also disclosed in the 2016 Proxy Statement that M. Karfunkel was not considered an independent director under the NASDAQ listing rules. During the Relevant Period, and before his death, M. Karfunkel was involved in at least thirteen separate related-party transactions involving AmTrust and other entities he was affiliated with or owned in part, as outlined further herein.

40. According to the 2016 Proxy Statement, M. Karfunkel was also a member of the controlling stockholder group, along with Zyskind, G. Karfunkel, and L. Karfunkel. He was the husband of L. Karfunkel, brother to G. Karfunkel, and father-in-law to Defendant Zyskind.

    2.    The Michael Karfunkel Family 2005 Trust

41. As of March 27, 2017, the Michael Karfunkel Family 2005 Trust (the "Karfunkel Trust") held 15,504,562 shares of the Company's common stock, which represents

11

approximately 9.06% of the Company's total shares of common stock. The shares held by the Karfunkel Trust are beneficially owned and effectively controlled by L. Karfunkel and Zyskind. Defendants Zyskind and L. Karfunkel are co-trustees of the Karfunkel Trust, with the ultimate beneficiaries of the Karfunkel Trust being M. Karfunkel's children, one of whom is married to Defendant Zyskind.

42.     The Karfunkel Trust is involved in several related-party transactions concerning AmTrust, as described below.

### 3.     Maiden Holdings, Ltd.

43.     Maiden Holdings, Ltd. ("Maiden") is a publicly held Bermuda insurance holding company that has various reinsurance and service agreements with AmTrust. Maiden was formed by M. Karfunkel and Defendants G. Karfunkel and Zyskind. As of December 31, 2015, Defendant G. Karfunkel owned or controlled approximately 4.4% of the issued and outstanding capital stock of Maiden. As of December 31, 2016, Defendants L. Karfunkel and Zyskind owned or controlled approximately 7.9% and 7.5%, respectively, of the issued and outstanding capital stock of Maiden. Defendant Zyskind serves as chairman of Maiden's board of directors.

44.     Defendants Zyskind, L. Karfunkel, and G. Karfunkel are thus involved and interested in any related-party transactions involving the Company and Maiden. For instance, in 2007, AmTrust and Maiden entered into a reinsurance agreement that required a Bermuda subsidiary of AmTrust to retrocede an amount equal to 40% of the its premiums written for certain lines of business (net the cost of unaffiliated inuring reinsurance) to a Bermuda subsidiary of Maiden. According to the 2017 Proxy, AmTrust recorded approximately $595.7 million of ceding commission under this agreement, which is effective until June 2019.

45.     Additionally, there are at least four more related-party transactions involving Maiden and AmTrust, which are referenced on pages 42-44 of the 2017 Proxy Statement, and incorporated by reference herein.

**4.     ACP Re, Ltd.**

46.     The Karfunkel Trust owns ACP Re, Ltd. ("ACP"), a privately held Bermuda reinsurance holding company that operates 10 insurance companies in Bermuda and the U.S. Defendants Zyskind and L. Karfunkel are thus involved and interested in any related-party transactions involving the Company and ACP. In addition, AmTrust and its subsidiaries have at least eight separate related-party transactions with ACP, which are referenced on pages 46-48 of the 2017 Proxy Statement and are incorporated by reference herein.

**5.     National General Holdings Corp.**

47.     AmTrust has an approximately 12% ownership interest in National General Holdings Corp. ("NGHC"). NGHC is a publicly held specialty personal lines insurance holding company that provides a variety of insurance products, including homeowners, umbrella, personal and commercial automobile. The two largest shareholders of NGHC are the Karfunkel Trust and a grantor retained annuity trust controlled by L. Karfunkel. M. Karfunkel served as NGHC's chairman and CEO until his death in April 2016. M. Karfunkel's son, NGHC president Barry Karfunkel, replaced him as CEO.

48.     Defendants Zyskind and L. Karfunkel are thus involved and interested in any related-party transactions involving the Company and NGHC. For instance, AmTrust, pursuant to a master services agreement, provides NGHC and its affiliates with information technology services in connection with the development and licensing of a policy management system, as

well as additional administrative services in connection with the same. In 2016, AmTrust earned

over $46 million in fees related to the master services agreement with NGHC.

49.     Additionally, there are at least five more related-party transactions involving

NGHC and AmTrust, which are referenced on pages 44-45 of the 2017 Proxy Statement, and

incorporated by reference herein.

### 6.     Other Related-Parties

50.     AmTrust and certain other parties referenced on pages 50-51 of the 2016 Proxy

Statement, which is incorporated by reference herein, are involved in related-party transactions

concerning the leasing of corporate office space, equity investments in limited partnerships, and

the use of Company aircraft.  Some of these parties directly or indirectly include G. Karfunkel,

Zyskind, ACP, NGHC, and Maiden.

## IV.     DEFENDANTS WERE OBLIGATED TO SAFEGUARD THE COMPANY'S INTERESTS AND COMPLY WITH APPLICABLE LAWS

### A.     Duties of All Defendants

51.     By reason of their positions as officers or directors of AmTrust and because of

their ability to control the business, corporate, and financial affairs of the Company, Defendants

owed AmTrust and its shareholders the duty to exercise due care and diligence in the

management and administration of the affairs of the Company, including ensuring that AmTrust

operated in compliance with all applicable federal and state laws, rules, and regulations.

Defendants were and are required to act in furtherance of the best interests of AmTrust and its

shareholders so as to benefit all shareholders equally and not in furtherance of Defendants'

personal interest or benefit.  Each director and officer owes to AmTrust and its shareholders the

fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

52.     Because of their positions of control and authority as directors or officers of AmTrust, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts detailed in this Complaint. Due to their positions with AmTrust, Defendants had knowledge of material non-public information regarding the Company.

53.     To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Company. By virtue of such duties, the officers and directors of AmTrust were required to, among other things:

a) Manage, conduct, supervise, and direct the employees, businesses, and affairs of AmTrust in accordance with laws, rules, and regulations, as well as the charter and by-laws of AmTrust;

b) Ensure that AmTrust did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

c) Remain informed as to how AmTrust was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

d) Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by AmTrust, and to examine and evaluate any reports of examinations or investigations concerning the practices, products, or conduct of officers of the Company;

e) Preserve and enhance AmTrust's reputation as befits a public corporation;

f) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business; and

g) Refrain from unduly benefiting themselves and other AmTrust insiders at the expense of the Company.

54.     Defendants also owed to AmTrust and its shareholders the duty of loyalty, mandating that each favor AmTrust and shareholders' interests over their own while conducting the affairs of the Company and refrain from using their positions, influence or knowledge of the affairs of the Company to gain personal advantage.

55.     Because of their advisory, executive, managerial, and directorial positions with the Company, Defendants had access to adverse, non-public information about the Company.

56.     Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AmTrust.

**B.     Conspiracy, Aiding and Abetting, and Concerted Action**

57.     In committing the wrongful acts complained of herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective fiduciary duties.

58.     During all times relevant hereto, Defendants, collectively and Officerly, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was manipulating its financial metrics, including loss reserves, revenue, and net income; (ii) facilitate Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 10(b) and 14(a) of the Exchange Act; (iii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls;

16

and (iv) artificially inflate the AmTrust's stock price while the Company repurchased its own stock and the Insider Selling Defendants engaged in lucrative insider sales.

59.     Defendants engaged in a conspiracy, common enterprise, and/or course of conduct during the Relevant Period. During this time, Defendants concealed the true fact that AmTrust was misrepresenting its financial results.

60.     Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by reviewing, participating in, and/or allowing the Company to purposefully or recklessly engage in an improper and illegal course of conduct. Because the actions described herein occurred under the authority of the Board, each of the Director Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise and/or common course of conduct alleged herein.

61.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## C.     The Company's Code of Business Ethics

62.     The Company's Code of Business Conduct and Ethics (the "Code of Ethics") "applies to all AmTrust employees, officers, directors and contractors" and "sets out the values and principles to guide all employees, directors and officers."

63.     Specifically, with regard to "maintaining accurate books and records," the Code of Ethics states, in pertinent part:

> We are required to maintain accurate books and records in accordance with the securities and accounting laws of the U.S. the countries in which our subsidiaries

17

are incorporated, as well as the countries in which we operate. These documents form the basis of our earning statements, financial reports and other public disclosures and should be maintained accurately, completely, and in a timely and understandable manner. In addition, they guide our Company's business actions and decisions. Each of us is responsible for keeping accurate records. In addition, we must comply with AmTrust's system of internal controls for financial reporting.

We may never make a false representation in our Company's books or otherwise mischaracterize such information. This means we cannot:

- Intentionally distort or disguise the true nature of a transaction in any accounting entries;

- Make a representation, whether in a document or verbally, that is not fully accurate;

- Establish any undisclosed or unrecorded funds or assets, such as "slush funds," for any purpose.

64.     Defendants, however, violated the Company's Code of Ethics by affirmatively adopting, implementing, and condoning a business strategy based on deliberate and widespread violations of applicable laws.

**D.     The Board's Audit Committee**

65.     The Board's Audit Committee is currently comprised of Defendants DeCarlo (Chair), Fisch, and Gulkowitz. According to the Audit Committee Charter, the Committee shall provide assistance to the Board with respect to its oversight of:

- the accounting and financial reporting processes of AmTrust and its subsidiaries and the audits of its financial statements;

- the independent auditor's qualifications and independence;

- the performance of the Company's internal audit function and independent auditors; and

- the Company's compliance with legal and regulatory requirements.

18

66.     Moreover, the Audit Committee is responsible for preparing the audit committee

reports in the Company's annual proxy statements that, among other things, stated the Audit

Committee recommended to the Board that the audited financial statements of the Company be

included in the Annual Report on Form 10-K for each year during the Relevant Period.

67.     The Audit Committee is also tasked with the obligation to oversee and monitor

the Company's compliance with laws and regulations. The Audit Committee Charter in effect

during the Relevant Period specifically provides that the Audit Committee "shall be directly

responsible for the compensation and oversight of the work of the independent auditor . . . for the

purpose of preparing or issuing an audit report or related report." With respect to financial

statements and disclosure matters, the Audit Committee Charter explicitly requires the Audit

Committee to:

a) Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

b) Review and discuss annually reports from the independent auditors on:

i.      All critical accounting policies and practices to be used in the audit.

ii.     All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

iii.    Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

c) Review and discuss with management and the independent auditor any major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles, any significant financial reporting issues and judgments

made in connection with the preparation of the Company's financial statements, and the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

d) Discuss with the independent auditor the matters required to be discussed by Public Accounting Oversight Board ("PCAOB") Auditing Standard No. 1301 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

e) Review disclosures made to the Audit Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal control over financial reporting or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

f) To consider questions of possible conflicts of interest; to review, approve and oversee all related party transactions as defined in applicable rules of the national securities exchange on which the Company's securities are listed; to discuss with the independent auditor significant related party transactions, and the auditor's evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties, as required by PCAOB Auditing Standard No. 2410; and to develop policies and procedures for the Committee's approval of related party transactions.

## V.   DEFENDANTS BOTH ENCOURAGED AND FAILED TO ADDRESS THE FRAUDULENT ACCOUNTING SCHEME

68.   Throughout the Relevant Period, Defendants knew or consciously disregarded that AmTrust was manipulating its financials through an array of complicated maneuvers that included chronic underreserving of liabilities and inconsistent reporting of ceded losses in reinsurance agreements between the Karfunkel family's businesses. Notwithstanding their significant obligations as members of the Board or as corporate officers, and (for some Defendants) as members of committees charged with overseeing AmTrust's corporate

governance and other critical aspects of the Company's business and operations, Defendants failed to disclose the illicit accounting scheme or its significant impact on the Company.

## A. Defendants Consciously Disregarded the Fraud

### 1. GEO Investing December 2013 Article

69. On December 12, 2013, GEO Investing ("GEO") published an article accusing AmTrust of inflating earnings and net equity through the use of offshore entities.[3] According to GEO, from 2009-2012, AmTrust failed to disclose a total of $276.9 million in losses ceded to Luxembourg subsidiaries. Moreover, GEO accused the Company of improperly valuing its life settlement contracts "by using egregiously aggressive assumptions relative to peers despite lawsuit documents showing [AmTrust] holds many policies which are probably worthless." GEO estimates that using industry standard discount rates to value the life settlement contracts would result in a $90-$135 million impairment.

70. In reaction to the GEO article, AmTrust's shares dropped $2.32, or 12%, from a close of $19.15 on December 11, 2013 to a close of $16.83 on December 12, 2013. Defendant Zyskind responded to GEO's allegations, affirming that the Company has "never been stronger" and was being targeted by short sellers looking to profit from a decline in AmTrust's share price.

### 2. *Barron's* February 2014 Article

71. On February 8, 2014, *Barron's* published an article questioning whether AmTrust's profits were the result of smart management or aggressive accounting.[4] The article asserted that AmTrust's bookkeeping was likely not as sound as it appeared, noting that even one

---

[3] The GEO article was titled "AmTrust Financial Services: A House of Cards?"

[4] *Barron's* February 8th article was titled "An Insurer's Feat: Turning Losses Into Gains" and subtitled "Insurer AmTrust has a key earnings call on Thursday. Can it persuade investors its profits result from smart management, and not aggressive accounting? Watch the stock."

21

of the Company's own investment bankers, FBR Capital Markets, was confused about AmTrust's accounting practices. The concerns expressed in the article were raised after "long interviews with AmTrust executives" left Bill Alpert, the article's author, "with questions about some cost deferrals and reinsurance maneuvers that [other] critics highlighted."

72.     The article explored AmTrust's intricate web of deals with related-parties involving members of the Karfunkel family. Specifically, *Barron's* discussed the streamlined commissions AmTrust received from Tower Group International, NGHC, and Maiden, as well as the Karfunkel family's ownership interest in each entity. Because of AmTrust's various arrangements with these related-parties, certain AmTrust critics expressed serious doubts as to whether AmTrust's businesses were performing as well as the Company reported them to be: "We think that they're using a grab bag of ways to make the business look much better than it really is," says Mark Roberts, head of Off Wall Street.

73.     *Barron's* illustrated one example of the Company's questionable accounting scheme:

> Before AmTrust cedes business to outside reinsurers like Maiden, it sends premiums and losses to its wholly owned captive reinsurer in Bermuda called AmTrust International Insurance. This captive in turn sends some losses to other reinsurance captives that AmTrust has in Luxembourg, where tax benefits can be gained by charging those losses against a particular kind of reserve that's not available under U.S. accounting rules.

74.     Through these "unusual" arrangements, AmTrust used the Luxembourg tax benefits to lower the Company's reported operating expenses by roughly $28 million from 2010 through 2012, a tactic that increased its pretax profits by half a percent. The accounting irregularity, *Barron's* noted, stems from the fact that the profits from these transactions appear in AmTrust's financial statements, while the Company's corresponding losses ceded to its Luxembourg subsidiaries do not. AmTrust argued that "those losses are inflated 'artificially' or

22

'synthetically' and don't reflect the real world claims on its primary insurance subsidiaries."
Defendant Zyskind further justified this practice as "a way to draw down theses reserves," and
that "[t]hey are self-created losses within our organization, so they get completely eliminated in
consolidation."

75. While AmTrust contended that this arrangement is proper under U.S. and
Luxembourg accounting rules, in reality the Company is reporting "loss numbers to auditors and
insurances commissioners that it acknowledges aren't authentic." The article also expressed
concerns with the way AmTrust calculates its profits by deferring costs more aggressively than
its matching revenues. *Barron's* claimed that the corresponding accounting ratios for these
variables should be "more or less steady across time and comparable business—but in the years
following AmTrust's IPO, its ratio of deferred acquisition costs to unearned premiums . . . has
climbed from a below-average 17% to as high as 41%."

### 3. *Barron's* May 2014 Article

76. On May 31, 2014, *Barron's* published another article questioning "AmTrust's
capital footing."[5] The article, in relevant part, asserted:

> Multimillion-dollar incongruities appear in AmTrust's various securities and
> insurance filings, for example, in inconsistent loss reserves that have the effect of
> flattering earnings and capital. That's worrisome, because poorly controlled
> reserving can prove to be a snakebite to an insurer if growth slows–triggering a
> double whammy as underwriting losses demand new capital while rendering
> earnings less attractive to investors. If AmTrust's accounting is found wanting, its
> tangible book multiple could drop back to the industry average of 1.4, bringing
> shares down below $15.

\* \* \*

---

[5] *Barron's* May 31st article was titled "Balance-Sheet Risk Makes AmTrust Shares Vulnerable"
and subtitled "Property and casualty insurer AmTrust has shone by growing faster with
seemingly better margins than rivals. But its accounting raises questions."

23

Questions about whether the company is underreserved arise because of some puzzling accounting disparities: AmTrust and Maiden Holdings show a $400 million difference in their accounting for the same reinsurance activities; AmTrust's numbers for acquired reserves differ by $50 million in different parts of its financial reports; while the latest 10-K's tabulation of loss reserves leaves AmTrust with negative reserves for some years—an impossible accounting that would mean that policyholders would actually pay AmTrust millions for claims in those periods.

77.     According to *Barron's*, AmTrust's head of investor relations, Beth Malone, emphasized that "AmTrust is more than adequately reserved."

78.     *Barron's* also questioned AmTrust's relationship with Maiden, the publicly traded insurer controlled by the Karfunkel family. The reinsurance relationship between AmTrust and Maiden is substantial, with the Company steering 40% of its premiums and losses to Maiden. However, AmTrust's year-end balance sheet showed approximately $1.9 billion in assets receivable from Maiden, whereas Maiden's balance sheet showed that the liabilities due to AmTrust were less than $1.5 billion. According to *Barron's*, "[t]hat $400 million variance seems to lie mainly in the companies' different reserve estimates for policyholder losses not yet reported to the insurers. But such a large disagreement invites the question of whether Maiden is understating its liabilities or AmTrust is overstating its assets."

79.     *Barron's* May 31, 2014 article also accused the Company of manipulating its financials by funneling losses through its subsidiaries, three of which had triggered multiple warning flags in the IRIS:

State insurance filings of AmTrust units show that the Bermuda captive has lost about $400 million under its reinsurance agreements with its AmTrust counterparts in the last five years. The Bermuda unit's regulatory capital fell last year from $499 million to $416 million, a level just over two-times the minimum required for "solvency" under Bermuda's relatively lenient standards. By contrast, Maiden ended the year with more than four times Bermuda's capital requirement.

24

AmTrust's Bermuda unit is more than adequately capitalized, says Malone, and its numbers shouldn't be compared with those of any other reinsurer. That's because it reinsures only stable, predictable risks, she says.

In its 2013 10-K, AmTrust disclosed that three of the company's U.S. subsidiaries have triggered four or more warning flags in the IRIS database operated by the National Association of Insurance Commissioners. IRIS readings indicate abnormal financial ratios at those insurers, which AmTrust attributed to its reinsurance structure.

AmTrust clearly has its own ways of counting. As *Barron's* previously reported ("An Insurer's Feat: Turning Losses Into Gains," Feb. 10, 2014), AmTrust and its sister company National General have enhanced their operating margins by making more than $200 million in underwriting losses go unreported to investors. It did that by sending the losses to wholly-owned Luxembourg reinsurance companies. After our story, the AmTrust restated its past financials to remove the operating profit boost. Before National General's recent initial public offering, the Securities and Exchange Commission challenged its accounting for the Luxembourg transactions and National General restated its financials, while admitting in its SEC correspondence that its unusual Luxembourg accounting was "counterintuitive." Businesses designed to lose money, like the Luxembourg reinsurers, had never been "contemplated by the accounting literature," the insurer told the SEC.

Perhaps AmTrust and its sibling companies are just smarter than everyone else in the business.

80.     In reaction to *Barron's* May 31, 2014 article, AmTrust's stock price dropped $0.60 per share, or 2.81%, over the next two trading days, from $21.35 per share on Friday, May 30, 2014 to $20.75 per share on Tuesday, June 3, 2014.

### 4.     The Alistair Capital Letter

81.     On December 18, 2014, Alistair Capital sent a letter to Defendants Gulkowitz, DeCarlo, and Fisch alerting them to "numerous instances of improper accounting and indications of material weaknesses in internal controls over financial reporting" at AmTrust. The letter highlighted both of *Barron's* 2014 articles, as well as several reports published by the independent research firm Off Wall Street, raising "serious questions with respect to AmTrust's accounting practices." In Alistair Capital's view, "management's responses to these articles

have done little to refute the troubling assertions set forth therein. In fact, the Company's responses appear to corroborate the detailed and specific allegations that AmTrust's accounting is severely flawed." Instead of refuting these allegations, AmTrust has opted to "pursue litigation scare tactics designed to silence those who raise difficult questions about the Company's practices." Given the "lengths to which management has gone in an attempt to silence its critics, one has to wonder what the Company is hiding. As members of AmTrust's Board of Directors, and specifically its Audit Committee, we believe it is your duty to find out."

82. The Alistair Capital Letter called into question: (i) the efficacy of AmTrust's internal accounting controls for financial reporting; (ii) AmTrust's accounting for deferred acquisition costs; (iii) AmTrust's valuation of life settlement contracts; (iv) the sizable difference between balance sheet accounts reported by AmTrust and the amounts Maiden reports for the corresponding accounts in its financial statements; (v) AmTrust's accounting for Luxembourg Reinsurance Captives; and (vi) AmTrust's accounting for loss and loss adjustment reserves in conjunction with acquisitions.

83. Alistair Capital questioned the efficacy of AmTrust's internal controls over financial reporting for a number of reasons. First, Alistair Capital was "concerned about the frequent and material differences between amounts reported in AmTrust's Forms 8-K . . . and amounts reported to the SEC in the Company's Forms 10-K and 10-Q." Second, Alistair Capital believed that the Company's "loss reserve triangles indicate that either accident years 2008 and 2009 are woefully deficient (the reserve triangles negative remaining services) or, more likely, AmTrust's disclosures reflect flawed data that validate [Alistair Capital's] skepticism of the Company's reported financial statements." Third, Alistair Capital noticed that "amounts disclosed in AmTrust's balance sheets, cash flow statements, and purchase price allocations 'for

Case 1:17-cv-00553-MN   Document 1   Filed 05/11/17   Page 32 of 93 PageID #: 32

Accrued Expenses and Other Liabilities' appear to be irreconcilable." Lastly, the Alistair Capital Letter noted that, during Defendant Pipoly's tenure as CFO of Maiden, PricewaterhouseCoopers concluded that Maiden had material weaknesses in its internal controls over financial reporting.

84.    The Alistair Capital Letter further highlighted that "AmTrust appears to understate its expense ratio, and therefore overstate its net income, as a result of a mismatch in the Company's recognition of acquisitions costs and premiums in a way that may violate U.S. GAAP." When questioned by *Barron's* about this specific issue, AmTrust's management provided a misleading answer.

85.    Moreover, Alistair Capital informed the Audit Committee that AmTrust is improperly valuing its life settlement contracts "by ignoring readily available information about the inputs market participants use to value life settlement contracts." AmTrust purportedly applies a significantly lower discount rate than industry peers to estimate the fair value of its life settlement contracts, thereby overvaluing the contracts.

86.    Another significant deficiency with respect to AmTrust's accounting, in Alistair Capital's view, "related to the sizeable differences between balance sheet accounts reported in AmTrust's financial statements and the amounts Maiden reports for the corresponding accounts in its financial statement." As set forth in the chart below, there is a significant variance between AmTrust's Reinsurance Recoverable and Maiden's Unpaid Loss and LAE Reserves:

27

| Description | Amount (mm)[31] |
|---|---|
| AmTrust Reinsurance Recoverable (vis-à-vis Maiden) | $ 1,144.2 |
| Maiden Unpaid Loss & LAE Reserves (AmTrust Q.S. Segment) | $ 796.0 |
| **Difference in Loss & LAE Reserves Ceded (Assumed)** | **$ 348.2** |
| AmTrust Prepaid Reinsurance Premiums (vis-à-vis Maiden) | $ 739.7 |
| Maiden Unearned Premiums (AmTrust Q.S. Segment) | $ 687.4 |
| **Difference in Unearned Premiums Ceded (Assumed)** | **$ 52.4** |
| AmTrust Ceded Reinsurance Premiums Payable (vis-à-vis Maiden) | $ (393.9) |
| Maiden Reinsurance Balance Receivable (AmTrust Q.S. Segment) | $ (278.6) |
| **Difference in Ceded Premiums Payable (Assumed)** | **$ (115.4)** |
| AmTrust Net Assets (vis-à-vis Maiden) | $ 1,489.9 |
| Maiden Net Liabilities (AmTrust Q.S. Segment) | $ 1,204.8 |
| **Difference in Unearned Premiums Ceded (Assumed)** | **$ 285.2** |

87. The Alistair Capital Letter accentuated that "[i]f AmTrust is over-estimating the amount it will recover from Maiden in proportion to AmTrust's gross reserves, then AmTrust's equity is directly over-stated by a material amount, particularly relative to tangible equity." The Company would also be in violation of U.S. GAAP if its reinsurance recoverables and gross reserves are inconsistent. Alistair Capital urged the Audit Committee to investigate this discrepancy in light of the important quota share agreement between the two companies and the related-party nature of its relationship – Defendant Zyskind is the Chairman of Maiden's Board of Directors.

88. Alistair Capital further asserted that AmTrust's accounting for loss and loss adjustment reserves assumed in conjunction with its acquisitions was problematic given the $102 million irreconcilable difference between AmTrust's reserve reconciliation disclosure ($807.6 million) and its purchase price allocation disclosures ($705.3 million).

| Loss & LAE Reserves Assumed in Conjunction with Acquisitions | Gross Loss & LAE Reserves | Reinsurance Recoverable (Paid & Unpaid) | Net Loss & LAE Reserves | Source: |
|---|---|---|---|---|
| Purchase Price Allocation ("PPA") | $    761.3 | $    56.0 | $    705.3 | From Above |
| Financial Stmt Comparison | $    764.2 | $    63.8 | $    700.4 | From Above |
| Inorganic (Acquired) per Reserve Reconciliation | * | ** | $    807.6 | 2013 Form 10-K, Footnote 9 |
| Minimum Difference in Acquired Reserves | * | ** | $    102.3 | Calculation |

*While the Reserve Reconciliation does not provide an amount for Gross Loss & LAE Reserves acquired, there should be no difference across methodologies.

**Because the Reserve Reconciliation references unpaid losses only, it could slightly understate reinsurance recoverables. With that said, even if one were to assume that all Reinsurance Recoverables acquired (max: $63.8 million) related to losses already paid by AmTrust, one still would not be able to bridge the $104.8 million minimum difference in Net Loss & LAE calculated above.

## 5. *Barron's* April 2016 Article

89. On April 23, 2016, *Barron's* once again challenged the adequacy of AmTrust's reserves and its accounting, asserting that "[t]he insurance filings of its subsidiaries show that the cost of settling claims for policies issued in the seasoned years 2007-13 have climbed hundreds of millions of dollars above the reserves that AmTrust initially set aside."[6] As such, *Barron's* explained that the Company "has had to increase substantially its estimates of the cost of settling claims, in contrast with the decreases enjoyed by P&C insurance leaders like Chubb (CB) and Travelers (TRV)." *Barron's* further noted that even analysts at AmTrust's investment banker, KBW, wondered whether the insurer's underwriting margins were overstated.

90. The article also reexamined the Luxembourg accounting transactions. Specifically, the article asserted that even though the Company's insurance losses that were ceded to AmTrust's Luxembourg "netted more than $900 million since 2008, according to AmTrust's filings with insurance regulators, [those losses] aren't reflected in the consolidated financials that AmTrust files" with the SEC.

91. In reaction to *Barron's* April 23 article, AmTrust's stock price dropped $1.22 per share, or 5%, from $26.01 per share on Friday, April 22, 2016 to $24.79 per share on Monday, April 25, 2016.

---

[6] *Barron's* April 23rd article was titled "Is AmTrust Stock Worth the Premium?" and subtitled "The property & casualty insurer has grown rapidly. But questions persist about its reserve adequacy and accounting."

92.     Defendants were unquestionably aware of the *Barron's* articles, as the Company publicly responded to the May 31, 2014 and April 23, 2016 articles.  In addition, AmTrust's management provided written responses to ten questions posed by *Barron's* in 2014.[7]

**B.     Defendants Knowingly Issued Materially False and Misleading Statements**

93.     Throughout the Relevant Period, Defendants, in violation of GAAP and AmTrust's own internal policies, failed to properly estimate its loss reserves, account for bonuses paid, adjust foreign currency transaction gains and losses, and recognize revenue. Instead of properly and conservatively reserving for its losses as it had repeatedly claimed, Defendants fraudulently failed to adequately reserve for losses in its Specialty Program segment.

94.     AmTrust's press releases, investor presentations and public filings with the SEC included material misstatements and/or omissions concerning the Company's financial results, which included consistently touting that it was adequately reserved.  These false and misleading statements created a false impression concerning AmTrust's business and operational status and future growth prospects, and caused AmTrust to repurchase $227 million worth of stock at artificially inflated prices.

**1.     First Quarter 2014 Financial Results**

[7] On May 18, 2016, the Southern Investigative Reporting Foundation published a report, entitled "Barry Zyskind's High Stakes Three Card Monte Game," that further highlighted Zyskind and the Karfunkel family's persistent desire to navigate financial regulations for their own personal gain.  The report stated that Zyskind, in an attempt to avoid massive tax liabilities and simultaneously maintain his substantial ownership stake in the Company, transferred over $378 million of AmTrust stock to a purportedly phantom charitable foundation in 2016.  According to the report, a transfer of this magnitude, when taken together with the current AmTrust holdings of other charitable foundations, would violate IRS rules and require Zyskind and the Karfunkel family to sell over 23 million shares of AmTrust stock.  The report's author contacted various AmTrust representatives but no further investigation by the Company ensued.

95.     On May 1, 2014, the Company issued a press release announcing its first quarter
2014 earnings results ("Q1 2014"). The Company reported revenue of $954.0 million, an
increase of $450.1 million, or 89.3%, from $503.9 million in the first quarter 2013. Net income
came in at $99.9 million, or $1.27 per diluted share, an increase of 19.0% from $83.9 million, or
$1.08 per diluted share, in the first quarter 2013. Gross written premium was $1.67 billion, an
increase of $722.3 million, or 76.5%, from $943.9 million in the same period a year ago. The
Company also reported loss and loss expense reserves of $4.75 billion.

96.     On May 12, 2014, the Company filed its Form 10-Q for Q1 2014 with the SEC,
which was signed and certified by the Officer Defendants and reiterated AmTrust's previously
reported financial results.

97.     In addition, the Q1 2014 Form 10-Q (and each of AmTrust's subsequent quarterly
and annual reports filed with the SEC described herein) contained certifications signed by
Defendants Zyskind and Pipoly pursuant to §302 of the Sarbanes-Oxley Act of 2002 ("SOX")
attesting that the financial information contained in the filing was true, did not omit material
facts, and that the Company's internal and disclosure controls were effective.

98.     For example, Defendants Zyskind and Pipoly certified in the Q1 2014 Form 10-Q
(and each of AmTrust's subsequent quarterly and annual reports filed with the SEC described
herein) that:

[T]his report does not contain any untrue statement of a material fact or omit to
state a material fact necessary to make the statements made, in light of the
circumstances under which such statements were made, not misleading with
respect to the period covered by this report.

99.     With respect to AmTrust's reported financial information, Defendants Zyskind
and Pipoly certified in the Q1 2014 Form 10-Q that:

31

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

100.    With respect to AmTrust's internal controls, Defendants Zyskind and Pipoly certified in the Q1 2014 Form 10-Q (and each of AmTrust's subsequent quarterly and annual reports filed with the SEC described herein) that they were personally: (i) responsible for establishing and maintaining disclosure controls and procedures; (ii) designed or caused AmTrust's controls or procedures to be designed to ensure that material information relating to AmTrust and its consolidated subsidiaries was made known to them by others within those entities; (iii) designed or caused AmTrust's controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; (iv) evaluated the effectiveness of AmTrust's disclosure controls and procedures, and (v) presented in AmTrust's quarterly and annual filings their conclusions about the effectiveness of the disclosure controls and procedures.

## 2.    Second Quarter 2014 Financial Results

101.    On August 7, 2014, AmTrust issued a press release announcing its second quarter 2014 earnings results ("Q2 2014"). The Company's reported revenue was $1.01 billion, an increase of $361.6 million, or 55.7%, from $649.3 million in the second quarter 2013. Net income for the second quarter came in at $106.3 million, or $1.33 per diluted share, an increase of 48.8% from $71.4 million, or $0.93 per diluted share, in the second quarter 2013. In addition, "[l]oss and loss adjustment expense totaled $587.2 million in the second quarter 2014, compared to $364.1 million in the second quarter 2013 and resulted in a loss ratio of 67.1% compared with 67.9% for the second quarter 2013." Loss and loss adjustment expense reserves were

32

approximately $5.08 billion as of June 30, 2014.

102. On August 7, 2014, the Company held a conference call to discuss its financial results for the second quarter of 2014, wherein Defendants Pipoly and Zyskind discussed 2014 loss reserves:

**Ron Pipoly**

You know 2014, we evaluate our loss reserves in all of our lines of business on a monthly basis and we're certainly encouraged about the trends that we see in prior excellent years as low as the current excellent year at seven month of valuation period. We'd encouraged about the trends we see in frequency, trends we see in average severity. We are holding steady with our loss picks. And, again we evaluate it on a monthly basis and have a lot of internal discussion about direction and the trends that we see and look to take advantage of the market.

**Barry Zyskind**

Just to add to it, as I said it in some previous call. 12, obviously, we started seeing a lot of approval in the 12 compare to the 11 year, 13 was much improved over 12 and I would say 14 is tracking very similar to 13 and may be in some cases even better. So we're looking at the trends, we're seeing now for the 13, 14 and the 12 year and really we see very solid performance and again we think very conservative and discipline where we have to pick but we think that the performance is very, very solid and we think there's a lot of profitability in those lines.

103. On August 11, 2014, the Company filed its Form 10-Q for Q2 2014 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results. The Q2 2014 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP. The Q2 2014 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting. The Q2 2014 Form 10-Q included Defendants Zyskind and Pipoly's certification pursuant to SOX, identical in all material aspects to the certifications quoted in ¶¶98-99.

### 3. Third Quarter 2014 Financial Results

104.     On November 3, 2014, AmTrust issued a press release announcing its third

quarter 2014 earnings results ("Q3 2014"). For the quarter, AmTrust reported $1.07 billion in

revenue, an increase of $343.4 million, or 47.1%, from $728.3 million in the third quarter 2013.

Net income came in at $156.6 million, or $1.97 per diluted share, an increase of 168.9% from

$58.2 million, or $0.74 per diluted share, in the third quarter 2013. In addition, "[l]oss and loss

adjustment expense totaled $609.4 million in the third quarter 2014, compared to $410.6 million

in the third quarter 2013 and resulted in a loss ratio of 66.6% compared with 66.9% for the third

quarter 2013." As of September 30, 2014, loss and loss adjustment expense reserves totaled

$5.298 billion.

105.     On November 10, 2014, the Company filed its Form 10-Q for Q3 2014 with the

SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's

previously reported financial results. The Q3 2014 Form 10-Q represented that AmTrust's

financial results were accurate and presented in accordance with GAAP. The Q3 2014 Form 10-

Q also represented that the Company's internal controls were effective and disclosed any

material changes to the Company's internal controls over financial reporting. The Q3 2014

Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical

in all material aspects to the certifications quoted in ¶¶98-99.

### 4.     Fourth Quarter and Full Year 2014 Financial Results

106.     On February 11, 2015, AmTrust issued a press release announcing its fourth

quarter and full year 2014 earnings results ("Q4 2014"). For the quarter, AmTrust reported

$1.05 billion in revenue, an increase of $231.4 million, or 28.3%, from $816.4 million in the

fourth quarter 2013. Net income came in at $71.6 million, or $0.88 per diluted share, an increase

of 10.6% from $64.7 million, or $0.82 per diluted share, in the fourth quarter 2013. In addition,

"[l]oss and loss adjustment expense totaled $587.5 million in the fourth quarter 2014, compared

to $470.4 million in the fourth quarter 2013 and resulted in a loss ratio of 64.7% compared with 66.5% for the fourth quarter 2013." As of December 31, 2014, loss and loss adjustment expense reserves totaled $5.66 billion.

107.    Total revenue for full year 2014 was $4.08 billion, an increase of $1.39 billion, or 51.4%, from $2.70 billion in 2013.  The Company also reported net income attributable to AmTrust shareholders of $447 million, an increase of 58.39% when compared to full year 2013 net income of $282 million.

108.    On February 11, 2015, AmTrust held a conference call with analysts and investors to discuss Q4 and full year 2014 financial results.  During the call, Defendant Zyskind commented on AmTrust's loss reserves:

Again, I think, you get kind of the fourth quarter as if you think about exiting the year 2014, I am not suggesting that a 12-month period makes it a seasoned book of business but you start to see trends emerging in terms of loss cost and claim focus of ratio and the thing that as you move through the year, you get more comfortable from a loss pick perspective. So I think that the fourth quarter benefits on a quarterly basis from any revisions you make during that quarter. So I really think when you look at the loss ratios, I think that the year is more reflective of our overall view of where we're at, but again we as I mentioned we continue to look at our reserves on a monthly basis. *We like where we are from a -- think we're very conservative from actuarial pick perspectives, as I mentioned we've added over $800 million of net reserves.* Our IBNR is really nearly 50% of our gross reserves as we sit here at December 31st 2014. Again I think things are encouraging thought price environment continues to remain firm. We like the trends that we see in comp package some of our other commercial products specialty risk and extended warranty, so I think 2015 is shaping up to be a very solid year from a loss pick perspective.

109.    On March 2, 2015, the Company filed its Annual Report on Form 10-K for the period ending December 31, 2014, which was signed and certified by Defendants and reiterated AmTrust's previously reported financial results.   The 2014 Form 10-K represented that AmTrust's financial results were accurate and presented in accordance with GAAP.  The 2014 Form 10-K also represented that the Company's internal controls were effective and disclosed

any material changes to the Company's internal controls over financial reporting. The 2014 Form 10-K included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certifications quoted in ¶¶98-99.

### 5.    2015 Proxy Statement

110.    On March 31, 2015, AmTrust filed its Definitive Proxy Statement on Schedule 14A with the SEC ("2015 Proxy Statement"). The statements made in the 2015 Proxy Statement were materially false and misleading and failed to disclose that: (1) AmTrust had ineffective assessment of the risks associated with its financial reporting; (2) the Company had an insufficient complement of corporate accounting and corporate financial reporting resources within the organization; (3) in turn, the Company lacked effective internal controls over financial reporting; (4) the Company maintained inadequate loss reserves; and (5) AmTrust enhanced earnings by ceding insurance losses to its subsidiaries.

### 6.    First Quarter 2015 Financial Results

111.    On May 5, 2015, AmTrust issued a press release announcing its first quarter 2015 earnings results ("Q1 2015"). For the quarter, AmTrust reported $1.11 billion in revenue, an increase of $0.16 billion, or 16.6%, from $0.95 billion in the first quarter 2014. Net income came in at $154.7 million, or $1.85 per diluted share, an increase of 54.9% from $99.9 million, or $1.27 per diluted share, in the first quarter 2014. In addition, "[l]oss and loss adjustment expense totaled $613.3 million in the first quarter 2015, compared to $558.6 million in the first quarter 2014, and resulted in a loss ratio of 64.6% compared with 67.4% for the first quarter 2014." As of March 31, 2015, loss and loss adjustment expense reserves totaled $5.886 billion.

112.    On May 5, 2015, AmTrust held a conference call with analysts and investors to discuss Q1 2015 financial results. During the conference call, Defendant Zyskind commented on the Company's loss reserves, stating in pertinent part:

I don't think there is any one event or anything. I think we do believe they are based on where we are now, that it's definitely, in our opinion, cash flowing positive. *And as we mentioned in the last call, we think we have sufficient, if not, excess reserves in terms of a lot of reserves we've put up against contestability in these things.* So we think we're in very good position on the portfolio.

113. During the May 5 conference call, Defendant Pipoly also emphasized AmTrust's conservative approach in estimating loss reserves: "Well, yes, I think at the end of the day, when you look at reserves and consistent with our practice over the years, we've taken a conservative approach as we enter these new accident years."

114. On May 11, 2015, the Company filed its Form 10-Q for Q1 2015 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results. The Q1 2015 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP. The Q1 2015 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting. The Q1 2015 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certifications quoted in ¶¶98-99.

### 7. Second Quarter 2015 Financial Results

115. On August 4, 2015, AmTrust issued a press release announcing its second quarter 2015 earnings results ("Q2 2015"). For the quarter, AmTrust reported $1.11 billion in revenue, an increase of $0.10 billion, or 10%, from $1.01 billion in the second quarter 2014. Net income came in at $70.7 million, or $0.84 per diluted share, compared to $106.3 million, or $1.33 per diluted share, in the second quarter 2014. In addition, "[l]oss and loss adjustment expense totaled $638.5 million in the second quarter 2015, compared to $587.2 million in the second quarter 2014, and resulted in a loss ratio of 65.9% compared with 67.1% for the second quarter

2014." As of June 30, 2015, loss and loss adjustment expense reserves totaled $6.38 billion.

116.    On August 10, 2015, the Company filed its Form 10-Q for Q2 2015 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results. The Q2 2015 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP. The Q2 2015 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting. The Q2 2015 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶¶98-99.

### 8.    Third Quarter 2015 Financial Results

117.    On November 3, 2015, AmTrust issued a press release announcing its third quarter 2015 earnings results ("Q3 2015"). For the quarter, AmTrust reported $1.23 billion in revenue, an increase of $0.16 billion, or 15%, from $1.07 billion in the third quarter 2014. Net income came in at $182.7 million, or $2.17 per diluted share, compared to $156.6 million, or $1.97 per diluted share, in the third quarter 2014. In addition, "[l]oss and loss adjustment expense totaled $709.6 million in the third quarter 2015, compared to $609.4 million in the third quarter 2014, and resulted in a loss ratio of 67.9% compared with 66.6% for the third quarter 2014." As of September 30, 2015, loss and loss adjustment expense reserves totaled $6.69 billion.

118.    On November 9, 2015, the Company filed its Form 10-Q for Q3 2015 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results. The Q3 2015 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP. The Q3 2015 Form 10-Q also represented that the Company's internal controls were effective and disclosed any

38

material changes to the Company's internal controls over financial reporting. The Q3 2015 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶¶98-99.

### 9.    Fourth Quarter and Full Year 2015 Financial Results

119.    On February 10, 2016, AmTrust issued a press release announcing its fourth quarter and full year 2015 earnings results. For the quarter, AmTrust reported $1.21 billion in revenue, an increase of $0.16 billion, or 16%, from $1.05 billion in the fourth quarter 2014. Fourth quarter 2015 net income attributable to common stockholders was $63.9 million, or $0.37 per diluted share, compared to $71.6 million, or $0.44 per diluted share, in the fourth quarter 2014. In addition, "[l]oss and loss adjustment expense totaled $720.8 million in the fourth quarter 2015, compared to $587.5 million in the fourth quarter 2014, and resulted in a loss ratio of 68.1% compared with 64.7% for the fourth quarter 2014." As of December 31, 2015, loss and loss adjustment expense reserves totaled $7.2 billion.

120.    Total revenue for full year 2015 was $4.66 billion, an increase of $580.0 million, or 14%, from $4.08 billion in 2014. The Company also reported net income attributable to AmTrust shareholders of $472 million, an increase of 8.69% when compared to full year 2014 net income of $434 million.

121.    On February 10, 2016, AmTrust held a conference call with analysts and investors to discuss Q4 and full year 2015 financial results. During the call, Defendant Pipoly discussed "loss picks for 2016":

> *But I think we are talking a conservative view at where we are on the trend.* And I think that's really reflected in the fact that as we sit here at December 31, 2015, 53.3% of our total gross reserves were in IBNR, which is up over 4% from year-end 2015. *So I think we are taking a conservative view towards loss picks for 2016.* But we continue to be encouraged by the trends that we see and discuss on a monthly basis.

39

122.    On February 29, 2016, the Company filed its Annual Report on Form 10-K for the period ending December 31, 2015, which was signed and certified by Defendants and reiterated AmTrust's previously reported financial results.    The 2015 Form 10-K represented that AmTrust's financial results were accurate and presented in accordance with GAAP.    The 2015 Form 10-K also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.    The 2015 Form 10-K included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶¶98-99.

## 10.    2016 Proxy Statement

123.    On March 29, 2016, AmTrust filed its 2016 Proxy Statement with the SEC.    The statements made in the 2016 Proxy Statement were materially false and misleading and failed to disclose that: (1) AmTrust had ineffective assessment of the risks associated with its financial reporting; (2) the Company had an insufficient complement of corporate accounting and corporate financial reporting resources within the organization; (3) in turn, the Company lacked effective internal controls over financial reporting;    (4) the Company maintained inadequate loss reserves; and (5) AmTrust enhanced earnings by ceding insurance losses to its subsidiaries.

## 11.    First Quarter 2016 Financial Results

124.    On May 3, 2016, AmTrust issued a press release announcing its first quarter 2016 earnings results ("Q1 2016").    For the quarter, AmTrust reported $1.28 billion in revenue, an increase of $0.16 billion, or 15%, from $1.11 billion in the first quarter 2015.    Net income was $100.3 million, or $0.56 per diluted share, compared to $154.7 million, or $0.93 per diluted share, in the first quarter 2015.    In addition, "[l]oss and loss adjustment expense totaled $715.1 million in the first quarter 2016, compared to $613.3 million in the first quarter 2015, and

40

resulted in a loss ratio of 66.6% compared with 64.6% for the first quarter 2015." As of March

31, 2016, loss and loss adjustment expense reserves totaled $7.516 billion.

125. On May 3, 2016, AmTrust held a conference call with analysts and investors to

discuss Q1 2016 financial results. During the call, Defendant Pipoly expressed that AmTrust

was taking "a conservative view on our current accident year," and discussed AmTrust's

combined ratio:

**Adam Klauber**

Thank you, we are also very sorry about loss of Michael. A couple of questions,
when we look at the overall combined ratio was closer to 89 in the first half of last
year, was up to 92 in the back half of last year, now it's at 91, could you just
describe the dynamics of those change?

**Ron Pipoly**

I think at the end of the day and maybe the commentary we gave on the third
quarter call and the fourth quarter call last year, hopefully would have led to this
kind of idea of somewhere in the low 90s from a combined ratios. If you think
about any reserve movement that you may have within a truncated period whether
from the third quarter, fourth quarter of last year, I mean expect those loss ratios
in that quarter, so I think what you see is really stabilizing of the overall loss ratio
and I think that reflects where we think we are at from a pricing environment not
only in US workers comp, but in Italian med mal. So I think we are very
comfortable at the 66.6% loss ratio we are able to achieve and I think expenses
remain virtually unchanged at 24.6 which really is consistent with you know there
hasn't been a significant shift in business mix.

126. On May 10, 2016, the Company filed its Form 10-Q for Q1 2016 with the SEC,

which was signed and certified by the Officer Defendants and reiterated AmTrust's previously

reported financial results. The Q1 2016 Form 10-Q represented that AmTrust's financial results

were accurate and presented in accordance with GAAP. The Q1 2016 Form 10-Q also

represented that the Company's internal controls were effective and disclosed any material

changes to the Company's internal controls over financial reporting. The Q1 2016 Form 10-Q

included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all

41

material aspects to the certification quoted in ¶¶98-99.

## 12. Second Quarter 2016 Financial Results

127. On August 2, 2016, AmTrust issued a press release announcing its second quarter 2016 earnings results ("Q2 2016"). For the quarter, AmTrust reported $1.39 billion in revenue, an increase of $0.28 billion, or 25%, from $1.11 billion in the second quarter 2015. Net income was $134.8 million, or $0.78 per diluted share, compared to $70.7 million, or $0.42 per diluted share, in the second quarter 2015. In addition, "[l]oss and loss adjustment expense totaled $784.4 million in the second quarter 2016, compared to $638.5 million in the second quarter 2015, and resulted in a loss ratio of 66.4% compared with 65.9% for the second quarter 2015." As of June 30, 2016, loss and loss adjustment expense reserves totaled $9.097 billion.

128. On August 2, 2016, AmTrust held a conference call with analysts and investors to discuss Q2 2016 financial results. During the call, Defendant Zyskind touted AmTrust's ability to properly calculate loss reserves:

> Again on an overall basis I think we do a very good job of setting reserves at adequate levels in order to take the claims to conclusion. I mean you'll see pockets of movements within Officer lines of business on an aggregate basis, there was no any material adverse development related to prior accident years.

129. On August 9, 2016, the Company filed its Form 10-Q for Q2 2016 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results. The Q2 2016 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP. The Q2 2016 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting. The Q2 2016 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶¶98-99.

## 13.   Third Quarter 2016 Financial Results

130.    On November 3, 2016, AmTrust issued a press release announcing its second quarter 2016 earnings results ("Q3 2016"). For the quarter, AmTrust reported $1.41 billion in revenue, an increase of $181.3 million, or 15%, from $1.23 billion in the third quarter 2015. Net income was $103.6 million, or $0.60 per diluted share, compared to $182.7 million, or $1.09 per diluted share in the third quarter 2015. In addition, "[l]oss and loss adjustment expense totaled $811.0 million in the third quarter 2016, compared to $709.6 million in the third quarter 2015, and resulted in a loss ratio of 67.8% compared with 67.9% for the third quarter 2015." As of September 30, 2016, loss and loss adjustment expense reserves totaled approximately $9.428 billion.

131.    On November 14, 2016, the Company filed its Form 10-Q for Q3 2016 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results. The Q3 2016 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP. The Q3 2016 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting. The Q3 2016 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in ¶¶98-99.

132.    The statements referenced in ¶¶95-131 were materially false and/or misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business and operations, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) AmTrust had ineffective assessment of the risks associated with its financial reporting; (2) the Company had an insufficient complement of corporate accounting and

43

corporate financial reporting resources within the organization; (3) in turn, the Company lacked effective internal controls over financial reporting; (4) the Company maintained inadequate loss reserves; (5) AmTrust enhanced earnings by ceding insurance losses to its subsidiaries; and (6) as a result of the foregoing, AmTrust's public statements were materially false and misleading at all relevant times. As a result of this fraudulent scheme, Defendants were able to artificially inflate the Company's financials throughout Relevant Period.

## C.     The Fraud Is Revealed

### 1.      February 27, 2017 Press Release

133.    On February 27, 2017, AmTrust reported fourth quarter 2016 earnings that fell well short of Wall Street expectations due, in large part, to a $65 million reserve charge primarily related to strengthening of prior year loss and loss adjustment reserves in its "Specialty Program" segment. The Company also identified and corrected errors during the three months ended December 31, 2016 related to prior periods in 2015 and 2016. These errors included accruing for bonuses paid (which also impacted prior periods), adjusting foreign currency transactions gains and losses and deferring a portion of warranty contract revenue associated with administration services previously recognized upfront. AmTrust also disclosed that it expected to make corrections "to errors in its financial statements for fiscal years ended December 31, 2015 and 2014 and certain financial information for fiscal years ended December 31, 2013 and 2012 for inclusion in the Form 10-K and these processes have not been completed."

134.    The February 27, 2017 press release also revealed that AmTrust would be unable to timely file its annual report and that it had identified material weaknesses in its internal controls over financial reporting that existed as of December 31, 2016 relating to its ineffective assessment of the risks associated with the financial reporting and an insufficient complement of

44

corporate accounting and corporate financial reporting resources within the organization. The Company also warned that additional adjustments and/or material weaknesses could be identified.

## 2. February 27, 2017 Conference Call

135. On February 27, 2017, the Company held a conference call with analysts and investors to discuss its financial results for the fiscal quarter ended December 31, 2016. During the conference call, Defendant Pipoly discussed AmTrust's internal controls over financial reporting:

> Additional time is needed for us to conclude our consolidated financial statements and assess internal controls over financial reporting for fiscal year 2016. And as a consequence for KMPG to complete its audit procedures and to audit the consolidated financial statements included in Form 10-K we will need a little additional time. As such, we expect to file our 10-K on or before March 16th, which we can still be considered a timely filer for SEC reporting purposes.

> In addition as part of our year-end close work, we've reviewed our internal controls of our financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002 and identify material weaknesses in our internal control structure over financial reporting.

> These specifically relate to ineffective assessment of risk associated with financial reporting in an insufficient complement of corporate accounting and corporate financial reporting resources within the organization.

> We expect to complete the remaining work quickly and file the 10-K within allot 15 day expansion period. We've started the process to improve our internal controls over financial reporting. We are expanding and enhancing our senior financial leadership team so we have the expertise and resources AmTrust need.

136. In reaction to these disclosures, AmTrust's stock plummeted $5.32 per share, or 19.23%, from $27.66 per share on Friday, February 24, 2017 to $22.34 per share on Monday, February 27, 2017—wiping out over $900 million in Company market capitalization in one trading day.

## 3. March 16, 2017 Press Release

137.    On March 16, 2017, after the close of the financial markets, the Company announced that it would need additional time to complete its consolidated financial statements and assessment of internal controls over financial reporting for the fiscal year ended December 31, 2016. The Company also disclosed that its consolidated financial statements for 2014 and 2015 (including for each of the four quarters of 2015) as well as for the first three quarters of 2016 needed to be restated and should no longer be relied upon. The press release stated that the Form 10-K filing delay and restatement "largely relate to the timing of recognition of revenue . . . in the Company's service and fee business." These errors related to the upfront recognition of a portion of warranty contract revenue and bonuses that were expended in the year paid but that should have been accrued in the year earned.

138.    On this news, AmTrust's share price fell $4.03, or almost 19%, from $21.61 per share on Thursday, March 16, 2017 to $17.58 per share on Friday, March 17, 2017.

### 4.    April 4, 2017 Disclosures

139.    On April 4, 2017, AmTrust informed investors that the impact of the restatements, which primarily involve the timing of recognition of revenue in the Company's service and fee business, "to net income attributable to common stockholders in 2014 and 2015 was a decline of 7.2% and 11.2%, respectively. Net income attributable to common stockholders in fiscal years 2014, 2015, and 2016, was $402.9 million, $419.1 million, and $363.1 million, respectively."

140.    On that same date, the Company filed its 2016 Annual Report on Form 10-K with the SEC explaining "the impact of the Restatement on the Consolidated Statements of Income primarily resulted in decreased service and fee income, increased acquisition costs and other underwriting expenses, and decreased interest expense, which ultimately resulted in decreases to net income." With regards to the Company's balance sheets, the restatements "resulted in an

increase of premiums receivable and other assets, a reduction of deferred policy acquisition costs and property plant and equipment, an increase in accrued expenses and other liabilities, and a decrease in shareholders' equity." The restatements also decreased previously reported stockholders' equity by $88.4 million as of December 31, 2013.

141.    As part of the restatements, AmTrust made adjustments to correct errors in: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.

### 5.    Wall Street Journal April 11, 2017 Article

142.    On April 11, 2017, *The Wall Street Journal* reported that the FBI, SEC, and NYDFS were probing AmTrust's accounting practices. One of AmTrust's prior auditors is assisting the FBI in its investigation. Although the status of the FBI probe, which is focused on whether BDO tried to bury poor practices in AmTrust's audits, is unclear, the SEC's investigation into AmTrust's accounting scheme is ongoing.

143.    According to the former BDO auditor quoted by *The Wall Street Journal*, "AmTrust has overstated its profits and financial health by understating what it may need to pay policyholders in the future." In that regard, *The Wall Street Journal* article asserted:

To mask this, they contend, the company has used complicated financial maneuvers, some involving related offshore companies.

In a 2013 submission to the SEC, which has been reviewed by the Journal, the group claimed it used internal documents gathered by the whistleblower to calculate that $277 million in losses had been shifted to an offshore affiliate from 2009 to 2012, bolstering AmTrust's operating income by that amount. This accounted for 38% of net income in 2012 alone, the group calculates.

> In a presentation that the group says it gave to the FBI and federal prosecutors in 2014, Mr. Markopolos's team called one set of alleged accounting moves "The Washing Machine" for its purported cleansing effect on the bottom line, and another "The Loss Cemetery," for its alleged effectiveness in burying losses in offshore affiliated entities.

In reaction to *The Wall Street Journal* article, AmTrust's shares declined $3.57 per share, or 18.9%, from $18.87 per share on Monday, April 10, 2017 to $15.30 per share on Tuesday, April 11, 2017.

### 6. Keefe, Bruyette & Woods' May 2017 Note

144.    On May 2, 2017, KBW stressed that investor conference in AmTrust could only be rebuilt if the Company takes a reserve charge in the hundreds of millions of dollars and commits to providing more in-depth disclosures. KBW analyst Meyer Shields noted that he was "very uncomfortable" with AmTrust's reserves because its 2016 underwriting results seem inconsistent with management's guidance. Shields further asserted that a review of loss triangles suggest a substantial deficiency, meaning that AmTrust will likely have to strengthen reserves in the near future.

145.    KBW also recommended that AmTrust increase the size of its Board, reconstitute the Audit Committee, and select an investor friendly management team.

## VI.    THE DIRECTOR DEFENDANTS VIOLATED SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14a-9, AND BREACHED THEIR FIDUCIARY DUTIES BY CAUSING THE COMPANY TO FILE MATERIALLY MISLEADING PROXY STATEMENTS

146.    The Director Defendants also violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing AmTrust to issue proxy statements that failed to disclose the illicit accounting scheme or the seriously deficient internal and disclosure controls that allowed the

scheme to begin and helped perpetuate it. The Director Defendants' failure to disclose those material facts likewise constitutes a breach of their fiduciary duties.

## A. Numerous Director Defendants Caused AmTrust to Issue the Materially False and Misleading 2015 Proxy Statement

147. On March 31, 2015, Defendants Zyskind, G. Karfunkel, Gulkowitz, Fisch, and DeCarlo caused AmTrust to file the 2015 Proxy Statement in connection with the 2015 annual stockholders meeting to be held on May 20, 2015. In the 2015 Proxy Statement, these Defendants solicited stockholder votes to (i) re-elect themselves to the Board; and (ii) approve executive compensation. With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

148. According to the 2015 Proxy Statement, the Board's Audit Committee plays a central role in overseeing the Company's financial, accounting and reporting processes, system of internal accounting and financial controls, and compliance with legal and regulatory requirements. As part of its endeavors, the Audit Committee retains and oversees AmTrust's independent auditors, and is tasked with reviewing complaints "regarding questionable accounting or auditing matters." The Audit Committee's role also includes meeting with management and AmTrust's independent auditors to review the Company's quarterly and annual financial statements.

149. The 2015 Proxy Statement stressed that the Audit Committee "reviewed and discussed the audited financial statements with management and with [AmTrust's] independent auditors." The Audit Committee also met with the Company's independent auditors to discuss the results of their examinations, their evaluation of AmTrust's internal controls, and the overall quality of the Company's financial reporting. As a result, the Audit Committee "***recommended***

*to [the] Board that the audited financial statements of the Company be included in the Annual Report on Form 10-K for the year ended December 31, 2014 for filing with the SEC."*

150.    The 2015 Proxy Statement further asserted that "[a]ll directors, officers, and employees must act ethically at all times and in accordance with our Code of Business Conduct and Ethics." In addition, the Board highlighted that executive compensation levels "are competitive" in order to dissuade executives from taking "unnecessary and excessive risks." After reviewing the Company's material compensation policies and practices, the Compensation Committee "concluded that these policies and practices do not create risks that are reasonably likely to have a material adverse effect on" AmTrust.

151.    Those statements conveyed that the Board (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; (iii) had policies to deter unnecessary or excessive risk taking, including compensation and ethics policies; and (iv) maintained effective risk management practices.

152.    The 2015 Proxy Statement omitted any disclosures regarding AmTrust's (i) ineffective assessment of the risks associated with its financial reporting; (ii) insufficient complement of corporate accounting and corporate financial reporting resources within the organization; (iii) material weaknesses in its internal controls over financial reporting; (iv) inadequate loss reserves; and (v) artificially inflated financial results.

153.    The 2015 Proxy Statement harmed AmTrust by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors. As a result of the false or misleading statements in the 2015 Proxy Statement, AmTrust stockholders voted to re-elect Defendants Zyskind, G. Karfunkel, Gulkowitz, Fisch, and DeCarlo to the Board.

**B.     Numerous Director Defendants Caused AmTrust to Issue the Materially False and Misleading 2016 Proxy Statement**

154.    On March 29, 2016, Defendants Zyskind, G. Karfunkel, Gulkowitz, Fisch, and DeCarlo caused AmTrust to file the 2016 Proxy Statement in connection with the 2016 annual stockholders meeting to be held on May 19, 2016. In the 2016 Proxy Statement, these Defendants solicited stockholder votes to, among other things, (i) re-elect themselves to the Board; (ii) approve executive compensation; and (iii) approve an amendment to AmTrust's Amended and Restated Certificate of Incorporation. With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

155.    According to the 2016 Proxy Statement, the Board's Audit Committee plays a central role in overseeing the Company's financial, accounting and reporting processes, system of internal accounting and financial controls, and compliance with legal and regulatory requirements. As part of its endeavors, the Audit Committee retains and oversees AmTrust's independent auditors, and is tasked with reviewing complaints "regarding questionable accounting or auditing matters." The Audit Committee's role also includes meeting with management and AmTrust's independent auditors to review the Company's quarterly and annual financial statements.

156.    The 2016 Proxy Statement emphasized that the Audit Committee "reviewed and discussed the audited financial statements with management and with [AmTrust's] independent auditors." The Audit Committee also met with the Company's independent auditors to discuss the results of their examinations, their evaluation of AmTrust's internal controls, and the overall quality of the Company's financial reporting. As a result, the Audit Committee "*recommended to [the] Board that the audited financial statements of the Company be included in the Annual Report on Form 10-K for the year ended December 31, 2015 for filing with the SEC.*"

157.    The 2016 Proxy Statement further asserted that "[a]ll directors, officers, and employees must act ethically at all times and in accordance with our Code of Business Conduct and Ethics."   In addition, the Board stressed that executive compensation levels "are competitive" in order to dissuade executives from taking "unnecessary and excessive risks." After reviewing the Company's material compensation policies and practices, the Compensation Committee "concluded that these policies and practices do not create risks that are reasonably likely to have a material adverse effect on" AmTrust.

158.    Those statements conveyed that the Board (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; (iii) had policies to deter unnecessary or excessive risk taking, including compensation and ethics policies; and (iv) maintained effective risk management practices.

159.    The 2016 Proxy Statement omitted any disclosures regarding AmTrust's (i) ineffective assessment of the risks associated with its financial reporting; (ii) insufficient complement of corporate accounting and corporate financial reporting resources within the organization; (iii) material weaknesses in its internal controls over financial reporting; (iv) inadequate loss reserves; and (v) artificially inflated financial results.

160.    The 2016 Proxy Statement harmed AmTrust by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors. As a result of the false or misleading statements in the 2016 Proxy Statement, AmTrust stockholders voted to re-elect Defendants Zyskind, G. Karfunkel, Gulkowitz, Fisch, and DeCarlo to the Board.

## VII. DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5, AND BREACHED THEIR FIDUCIARY DUTIES, BY KNOWINGLY OR RECKLESSLY ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

161.    In breach of their fiduciary duties to AmTrust and its shareholders, and in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, Defendants issued, and caused the Company to issue, statements that, in light of the illicit accounting scheme detailed above, were materially false or misleading when made.    Defendants' misrepresentations artificially inflated the price of AmTrust shares, causing the Company to purchase shares at artificially inflated prices, through its significant stock repurchase program.[8]

162.    Defendants' misconduct had two aims, both of which were realized:

*First*, by causing AmTrust to conduct share repurchases, Defendants signaled to investors their purported belief that AmTrust shares were trading at a discount, which caused investors to purchase shares and thereby drive the price up.    Further, and relatedly, the Company's repurchasing of shares artificially inflated its financial metrics such as earnings per share, as the repurchases resulted in fewer outstanding shares.    The artificial inflation of AmTrust shares was both financially beneficial to Defendants, as numerous Defendants' compensation was tied to the Company's financial performance, and helped mask the illicit accounting scheme (and thus helped perpetuate it).

*Second*, as detailed below, as a result of the artificial inflation of the price of AmTrust shares, the Insider Selling Defendants sold shares at higher prices, and in some instances sold them to the Company—and thus reaped greater proceeds—than they would have absent the artificial inflation.

---

[8] Defendants' materially false and misleading statements throughout the Relevant Period are documented in ¶¶95-131.

53

A.     **Defendants Caused AmTrust to Conduct a Massive Stock Repurchase Program**

163.    AmTrust's Board periodically authorizes the Company to repurchase its own shares of common stock. The Board authorized a series of share repurchases during the Relevant Period that, collectively, were substantially higher than any other repurchases in the Company's history.

164.    In December 2013, AmTrust's Board of Directors approved a $150 million share repurchase program. In April 2016, the Board of Directors approved an increase of $200 million to the Company's existing stock repurchase authorization. As detailed in the chart below, between June 2014 and August 2016, AmTrust repurchased approximately 8,045,787 shares of its stock, paying over $227 million for them:

| Month/Year of Repurchase | Shares Repurchased[9] | Weighted-Average Price | Amount |
|---|---|---|---|
| June 2014 | 266,886 | $41.08 | $10,963,677 |
| August 2014 | 1,771 | $42.50 | $75,268 |
| September 2014 | 841,131 | $39.83 | $33,502,248 |
| October 2014 | 367,379 | $39.69 | $14,581,273 |
| December 2014 | 92,448 | $56.25 | $5,200,200 |
| January 2015 | 10,505 | $55.00 | $577,775 |
| February 2015 | 37,783 | $55.60 | $2,100,735 |
| December 2015 | 184,898 | $30.79 | $5,693,009 |
| February 2016 | 658,552 | $24.90 | $16,397,945 |
| March 2016 | 5,539 | $24.96 | $138,253 |

[9] Includes shares that were withheld to satisfy tax withholding amounts due from certain employees upon the vesting of previously issued restricted shares.

| Month/Year of Repurchase | Shares Repurchased[9] | Weighted-Average Price | Amount |
|---|---|---|---|
| April 2016 | 2,096,017 | $24.79 | $51,960,261 |
| May 2016 | 448,506 | $25.93 | $11,629,761 |
| June 2016 | 1,031,337 | $24.57 | $25,339,950 |
| July 2016 | 1,899,645 | $24.39 | $46,332,342 |
| August 2016 | 103,390 | $24.34 | $2,516,513 |
| Total | 8,045,787 | | $227,009,210 |

165. After the April 11, 2017 *Wall Street Journal* article, the price per share of AmTrust stock fell to $15.30. This reflected the true price per share of AmTrust stock had Defendants not engaged in the illicit accounting scheme detailed herein. Therefore, any repurchases by the Company should have been made valuing their common stock at $15.30. As such, during the Relevant Period, AmTrust overpaid for repurchases of its own stock by approximately $104 million.

166. In conducting share repurchases, Defendants falsely signaled to the public that they believed AmTrust's shares were undervalued and that the repurchases were the best use of the Company's cash. The share repurchases also had the effect of growing the Company's earnings per share—as share repurchases lower the number of shares outstanding, on which earnings per share are based—as well as its return on assets, return on equity, and other metrics. Together, these actions helped inflate AmTrust's share price.

B.    **The Insider Selling Defendants Unlawfully Profited at AmTrust's Expense By Selling Back Shares to the Company at Artificially Inflated Prices**

167. During the Relevant Period, the Insider Selling Defendants (Pipoly, Gulkowitz, and DeCarlo) took advantage of the artificial inflation of AmTrust's shares caused by

Defendants' false or misleading statements.  These Defendants collectively sold or otherwise disposed of over $5,625,000 in AmTrust stock during that time, all while in the possession of material, non-public information.  The Company's share price was also lifted during that time by the share repurchase program, which was approved despite Defendants' knowledge or reckless disregard of the unlawful practices detailed in this Complaint.

168.   As detailed in the chart below, Defendant Pipoly sold or otherwise disposed of 89,780 shares of AmTrust common stock for a total of $3,152,561:

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 02/15/2014 | 2,045 | $33.33 | $68,160 |
| 02/15/2014 | 1,959 | $33.33 | $65,293 |
| 03/05/2014 | 1,812 | $38.16 | $69,146 |
| 03/22/2014 | 378 | $38.87 | $14,693 |
| 01/02/2015 | 14,393 | $56.029 | $806,425 |
| 01/02/2015 | 481 | $56.6358 | $27,242 |
| 02/15/2015 | 2,841 | $55.60 | $157,960 |
| 02/15/2015 | 2,770 | $55.60 | $154,012 |
| 03/05/2015 | 2,238 | $53.87 | $120,561 |
| 03/05/2015 | 2,288 | $53.87 | $123,255 |
| 01/04/2016 | 2,000 | $60.154 | $120,308 |
| 02/04/2016 | 4,000 | $27.3534 | $109,414 |
| 02/15/2016 | 3,970 | $25.05 | $99,449 |
| 03/04/2016 | 4,000 | $25.605 | $102,420 |
| 03/05/2016 | 4,475 | $25.73 | $115,142 |

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 03/05/2016 | 4,575 | $25.73 | $117,715 |
| 03/05/2016 | 3,241 | $25.73 | $83,391 |
| 04/04/2016 | 4,000 | $26.4044 | $105,618 |
| 05/04/2016 | 4,000 | $25.6055 | $102,422 |
| 01/03/2017 | 4,000 | $27.1845 | $108,738 |
| 02/03/2017 | 4,000 | $26.7312 | $106,925 |
| 03/03/2017 | 4,000 | $22.6708 | $90,683 |
| 03/05/2017 | 3,210 | $23.03 | $73,926 |
| 03/05/2017 | 3,282 | $23.03 | $75,584 |
| 03/05/2017 | 2,325 | $23.03 | $53,545 |
| 03/05/2017 | 3,497 | $23.03 | $80,536 |
| **Total** | **89,780** | | **$3,152,563[10]** |

169.    As detailed in the chart below, Defendant Gulkowitz sold or otherwise disposed

of 22,251 shares of AmTrust common stock for a total of $859,600:

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 11/24/2015 | 7,125 | $61.84 | $440,610 |
| 12/20/2016 | 15,126 | $27.70 | $418,990 |
| **Total** | **22,251** | | **$859,600[11]** |

---

[10] As of April 11, 2017, Defendant Pipoly's ownership interest in AmTrust was worth $5,085,077.

[11] As of April 11, 2017, Defendant Gulkowitz's ownership interest in AmTrust was worth $595,445.

170.    As detailed in the chart below, Defendant DeCarlo sold or otherwise disposed of 46,673 shares of AmTrust common stock for a total of $1,613,795:

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 05/21/2014 | 21,689 | $44.4438 | $963,942 |
| 09/15/2016 | 2,200 | $26.5299 | $58,366 |
| 10/03/2016 | 3,114 | $26.1925 | $81,563 |
| 11/01/2016 | 3,200 | $25.8859 | $82,835 |
| 12/01/2016 | 3,420 | $25.7497 | $88,064 |
| 01/03/2017 | 4,620 | $27.1896 | $125,616 |
| 02/01/2017 | 4,830 | $26.6686 | $128,809 |
| 03/01/2017 | 3,600 | $23.50 | $84,600 |
| **Total** | **46,673** | | **$1,613,795[12]** |

171.    At the time of these stock transactions, the Insider Selling Defendants knew about or recklessly disregarded material, non-public information regarding the illicit accounting scheme, but nonetheless sold or otherwise disposed of AmTrust common stock on the basis of that information.

C.    **In Repurchasing Stock, AmTrust relied on Defendants' False or Misleading Statements**

172.    In repurchasing shares in connection with the stock repurchase program, AmTrust relied on Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co.*

---

[12] As of April 11, 2017, Defendant DeCarlo's ownership interest in AmTrust was worth $1,711,121.40.

*v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

173.    Throughout the Relevant Period, AmTrust justifiably expected Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC.  AmTrust would not have repurchased its securities at artificially inflated prices had Defendants disclosed all material information then known to them, as detailed in this Complaint.    Thus, reliance by AmTrust should be presumed with respect to Defendants' omissions of material information as established under the *Affiliated Ute* presumption of reliance.

174.    Additionally, the "fraud on the market" presumption applies to Defendants' misstatements of material fact or failures to disclose material facts.

175.    At all relevant times, the market for AmTrust's common stock was efficient, for the following reasons, among others:

> a)    AmTrust's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;
>
> b)    As a regulated issuer, AmTrust filed periodic reports with the SEC and the NASDAQ;
>
> c)    AmTrust regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
>
> d)    AmTrust was followed by numerous securities analysts employed by major brokerage firms, who wrote reports that were distributed to those brokerage firms' sales force and certain customers, and each of those reports was publicly available and entered the public market place; and
>
> e)    The market price of AmTrust's stock reacted rapidly to new information entering the market.

176. As a result of the foregoing, the market for AmTrust's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of AmTrust's stock. The foregoing facts indicate the existence of an efficient market for trading of AmTrust stock and support application of the fraud-on-the-market doctrine.

177. AmTrust relied on the integrity of the market price for the repurchase of its stock and is entitled to a presumption of reliance with respect to Defendants' misstatements and omissions alleged in this Complaint.

178. Had AmTrust known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, the Company would not have repurchased AmTrust stock at artificially inflated prices.

**D.      Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrine Apply to Defendants' Misrepresentations**

179. Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded in this Complaint. None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about AmTrust's present financial condition and its internal controls, among other things.

180. Alternatively, to the extent any of the false or misleading statements pleaded in this Complaint could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false or misleading statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of AmTrust or a Defendant who knew the statement was materially false or misleading when made.

## E.    The Group Pleading Doctrine Applied to Defendants' Misstatements and Omissions

181.    While this Complaint identifies Defendant signatories or speakers with respect to the false or misleading statements identified above (*see* ¶¶95-131), the group pleading doctrine also applies to render Defendants responsible for statements as to which they are not explicitly identified as the speaker or signatory. Defendants participated in the drafting, preparation, or approval of the various shareholder and investor reports and other communications concerning AmTrust identified in this Complaint, and were aware of or recklessly disregarded the misstatements contained in those reports and other communications as well as the omissions from them, and were aware of their materially false and misleading nature. Each Defendant, by virtue of his or her position(s) at AmTrust, had access to adverse undisclosed information about the Company's business prospects and financial condition and performance as alleged in this Complaint, and knew or recklessly disregarded that those adverse facts rendered the subject statements materially false or misleading when made.

182.    Defendants, because of their positions of control and authority as officers or directors of AmTrust, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Relevant Period. Each Defendant was provided with copies of the documents alleged in this Complaint to be false

or misleading prior to or shortly after their issuance, or had the ability or opportunity to prevent their issuance or to cause them to be corrected. Accordingly, each Defendant is responsible for the accuracy of the public reports, releases, and other statements detailed in this Complaint and is therefore primarily liable for the misrepresentations in them or misleading omissions from them.

## F.    Defendants' Misstatements and Omissions Caused Damages to AmTrust

183.    Throughout the Relevant Period, the price of AmTrust's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above. Defendants engaged in a scheme to deceive the market and a course of conduct that operated as a fraud or deceit on AmTrust, which repurchased shares at artificially inflated prices.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of AmTrust stock fell as the prior artificial inflation dissipated. As a result of its purchases of AmTrust shares during the Relevant Period, the Company suffered damages under the federal securities laws. *See* ¶¶163-66.

184.    The decline in AmTrust's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to the market.  The timing and magnitude of the decline in the Company's share price negates any inference that the losses suffered by AmTrust were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

185.    On May 8, 2017, AmTrust held a conference call with analysts and investors to discuss Q1 2017 financial results.  During the call, Defendants Zyskind and Pipoly each stated that AmTrust incurred estimated costs of $17 million associated with the Company's restatement of its financials during the first quarter of 2017.  These additional costs for professional services

were a direct result of the Defendants' misconduct described herein and have damaged the Company as a result.

## VIII.  DEMAND ON THE AMTRUST BOARD WOULD HAVE BEEN FUTILE

186.    Plaintiff has not made a demand on the Board to institute this action against Defendants because, for the reasons detailed above and as further set forth below, any such demand would be a futile and useless act.

187.    At the time of the filing of this action, the Board consists of the following seven directors:  Defendants Zyskind, G. Karfunkel, L. Karfunkel, Gulkowitz, Fisch, Rivera and DeCarlo.  Plaintiff only needs to allege that demand is excused as futile as to four of the seven Board members at the time this action was commenced.

188.    The facts detailed in this Complaint demonstrate that the Director Defendants (i) affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of applicable law, which is not a legally protected business decision and can in no way be considered a valid exercise of business judgment; and/or (ii) consciously disregarded numerous red flags of misconduct throughout the Relevant Period, subjecting them to a substantial likelihood of liability as to Plaintiff's claims against them in this action. Accordingly, demand on the Board is excused.

### A.    Demand Is Excused Because the Director Defendants' Conduct Did Not Constitute a Valid Exercise of Business Judgment

189.    Plaintiff did not make a demand on the AmTrust Board prior to instituting this action because the wrongful acts complained of in this Complaint evidence a pattern of conduct showing a wholesale abandonment of the Director Defendants' fiduciary duties.  Those acts, detailed above, include:

a)      allowing AmTrust insiders—Defendants DeCarlo, Gulkowitz, and Pipoly—to engage in insider selling while in possession of material, non-public information relating to the illicit accounting scheme (*see* ¶¶167-71);

b)      perpetuating woefully inadequate controls over the Company's financial reporting and corporate governance, which allowed the illicit accounting scheme to begin and persist for years and allowed the Company to purchase millions of dollars' worth of AmTrust stock at prices that were artificially inflated due to Defendants' misconduct (*see* ¶¶69-92);

c)      causing AmTrust to file materially false and misleading SEC filings (*see* ¶¶95-131); and

d)      approving a share repurchase program through which AmTrust bought back millions of shares of stock at artificially inflated prices (*see* ¶¶163-66).

190.    These acts, and the other improper acts set forth in this Complaint, which demonstrate a pattern of misconduct, were not the product of a valid or good faith exercise of business judgment, nor could they have been.

191.    The Director Defendants' misconduct at the heart of this case constitutes the direct facilitation of violations of federal and state law, including knowingly and consciously presiding over the Company's systematic deficiencies and unsound practices of maintaining inadequate loss reserves, engaging in related-party transactions to artificially inflate financial results, and concealing the illicit accounting irregularities and their corresponding effects on AmTrust's financial results. Among other things, the Director Defendants made, or caused

AmTrust to make, materially false or misleading statements (such as in AmTrust's Form 10-Ks filed with the SEC during the Relevant Period).

192.    The Director Defendants' blatant and repeated disregard of their responsibility to safeguard the Company against wrongdoing indicate they knowingly adopted, endorsed, or condoned the repeated dissemination of false and misleading financial statements, which cannot be considered a legitimate exercise of business judgment.  Demand is therefore excused.

B.    **Demand Is Excused Because the Director Defendants Face a Substantial Likelihood of Liability Due to Their Knowledge or Conscious Disregard of Facts Relating to the Illicit Accounting Scheme**

193.    Demand is also excused because the Director Defendants face a substantial likelihood of liability for the claims alleged against them in this Complaint, given their awareness or conscious disregard of significant red flags relating to the Company's illicit accounting practices.

194.    The Director Defendants' challenged misconduct at the heart of this case constitutes the direct facilitation of violations of federal securities laws, including knowingly and consciously presiding over the Company's systematic and deficient accounting practices, as well as actively covering up this misconduct through the Director Defendants' participation in the materially misleading SEC filings.  As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of applicable law.  Breaking the law is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

195.    Moreover, under the Audit Committee Charter, Defendants DeCarlo, Fisch, and Gulkowitz, as members of that Committee, owed specific duties to AmTrust that related directly

to the misconduct alleged in this Complaint. Pursuant to the Audit Committee Charter, the Audit Committee is required to regularly report to the Board and "discuss with management and the independent auditor any correspondence with regulators or government agencies and any published reports, which raise material issues regarding the Company's financial statements or accounting practices."

196.     The Audit Committee's Charter also tasks the Audit Committee with the obligation to oversee and monitor the Company's compliance with laws and regulations, as well as monitoring the accounting and financial reporting practices of the Company and its subsidiaries. As such, the Audit Committee failed to meet their obligations as provided in the Audit Committee Charter, in addition to their duties imposed by law, because they did not cause AmTrust to remediate the Company's accounting irregularities and deficiencies, despite the numerous publications and direct correspondences highlighting reasons for concern with the Company's fundamental accounting practices. Instead, Defendants opted to pursue litigation scare tactics designed to silence those that questioned the Company's practices.

197.     Specifically, the Audit Committee was made aware of these public concerns and the appearance of severe accounting irregularities within the Company in the Alistair Capital Letter and still failed to investigate, as required by the Audit Committee Charter. The Alistair Capital Letter was directly addressed to Audit Committee members Gulkowitz, Fisch, and DeCarlo. After *Barron's* published two in-depth articles articulating AmTrust's apparent accounting discrepancies and improper financial reporting in February and May 2014, Alistair Capital expressed, in painstaking detail, six major areas of concern with regard to AmTrust's financial reporting and accounting practices. Rather than investigating these assertions, the

Audit Committee, and in turn the Board, allowed AmTrust to continue furnishing false and misleading statements to shareholders in the Company's quarterly and annual SEC filings.

198. Even more troubling are the Company's responses to the *Barron's* and GEO Investing articles. Immediately after GEO's December 12, 2013 article, Defendant Zyskind assured investors that the Company has "never been stronger" and was the target of short seller reports hoping to devalue AmTrust's share price. Shortly after the May 2014 *Barron's* article was published, the Company issued a public response in an attempt to dispel the author's "significant factual inaccuracies," according to AmTrust. Because Zyskind was serving in multiple executive leadership positions with the Company and was a longstanding director of the Board at the time of the Company's public response, Zyskind was fully aware in June 2014 of the pointed allegations concerning the Company's accounting inadequacies that were raised in the May 2014 *Barron's* article. The Board, in turn, took no action.

199. The Company even admits in its June 2014 response that AmTrust provided *Barron's* writer Bill Alpert with certain written responses in preparation of the *Barron's* articles. The December 2013 GEO article and 2014 *Barron's* articles were the first set of red flags presented to the Board and placed a majority of the Board on notice of the accounting discrepancies that facilitated the Company's inflated stock price during the Relevant Period and the Company's damages once the irregularities were finally revealed. In the face of these red flags, Defendants consciously failed to investigate, regulate, and rectify the accounting improprieties that would later cause the Company to restate its financial statements with the SEC.

200. In addition to the 2014 *Barron's* articles that alerted the Board of the Company's inaccurate and misleading financial statements, *Barron's* published a third scathing article in

April 2016 that questioned AmTrust's accounting practices yet again. The Company once again attempted to refute the assertions in the article in a public response issued shortly after the article's publication. Zyskind, who was then a member of the Board and AmTrust's CEO and President, was well-aware of the April 2016 *Barron's* article's factual assertions. In April 2016, Zyskind consciously disregarded his duty to address the accounting irregularities, and instead caused the Company to publicly refute *Barron's* allegations of improper accounting practices for a second time.

201.  During the Relevant Period, the Director Defendants were aware of multiple glaring red flags that should have caused them to investigate and alleviate the accounting irregularities raised in the GEO Investing article, the three *Barron's* articles and the Alistair Capital Letter to the Audit Committee. Because the Board consciously disregarded their duty to monitor these issues and deliberately failed to act in response, the Board faces a substantial likelihood of liability as a result of their misconduct allege herein. Demand is therefore excused.

202.  In addition, the Audit Committee members DeCarlo, Fisch, and Gulkowitz were further charged with assisting the Board in overseeing the integrity of the Company's financial statements and the adequacy and reliability of disclosures to its stockholders, which includes the maintenance of accurate books and records and the assurance the Company does not make a representation that is not fully accurate.

203.  But AmTrust's internal accounting and disclosure controls were neither reliable nor adequate.  Instead, the Company's financial statements and accounting records were deficient, causing AmTrust to issue materially false and misleading information regarding the Company's financial results and loss reserve liabilities.  The Audit Committee was directly responsible for approving the Company's materially false and misleading annual Forms 10-K

and quarterly Forms 10-Q, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," as well as the Company's earnings press releases during the Relevant Period. Each Audit Committee Defendant signed the Company's SEC Form 10-Ks during the Relevant Period.

204.   The Audit Committee's deliberate failure of oversight constituted breaches of their fiduciary duties to AmTrust and has resulted in significant harm to the Company.

205.   Accordingly, there is significant doubt that the Director Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties, including their duties of good faith, fair dealing, and loyalty, as well as other violations of law. These Defendants breached their fiduciary obligations to the Company, and therefore cannot impartially consider a demand to address the wrongdoing detailed in this Complaint.

206.   Given the combination of the Company's financial restatements and the Board's ultimate awareness of the Company's accounting improprieties—wrongful actions that resulted, among other things, in the Company's repurchase of hundreds of millions of dollars of inflated AmTrust common stock during the Relevant Period—it is clear the Board either deliberately or recklessly failed to take remedial action to rectify the illicit accounting errors the Company repeatedly furnished to its shareholders.

207.   For these reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint. Because a majority of the Board faces a substantial risk of liability, demand is futile.

## C.   Demand is Futile Because the Control Group Dominated the Board

208.   Demand is further excused because AmTrust and the Board are dominated and controlled by the Control Group (Zyskind, L. Karfunkel, and G. Karfunkel), which beneficially

owns approximately 50% of the Company's voting power. As such, the Control Group further illustrates the perpetual stronghold the Karfunkel family has maintained over AmTrust since founding the Company almost two decades ago. As of March 24, 2016, the Control Group beneficially owned over 86 million shares of AmTrust common stock, collectively worth over $1.5 billion. As such, the members of the Control Group are not considered independent directors under the NASDAQ listing rules and all face a substantial likelihood of liability from the misconduct alleged herein.

209.    Thus, the Control Group's substantial AmTrust stock holdings further incentivized them to keep the Company's stock price as high as possible during the Relevant Period. As of March 23, 2016, Zyskind beneficially owned over 37 million shares of AmTrust common stock (approximately 26.2% of the Company's outstanding shares), collectively worth over $965 million based on the Company's stock price before the fraud was exposed. In addition, Zyskind's compensation from the Company was over $22 million in 2014, $13.9 million in 2015, and $4.9 million in 2016.

210.    As of March 23, 2016, G. Karfunkel beneficially owned over 32 million shares of AmTrust common stock (approximately 18.5% of the Company's outstanding shares), collectively worth over $840 million based on the Company's stock price before the fraud was exposed.

211.    As of March 23, 2016, L. Karfunkel beneficially owned over 20 million shares of AmTrust common stock (approximately 13% of the Company's outstanding shares), collectively worth over $519 million based on the Company's stock price before the fraud was exposed.

212.    Zyskind and L. Karfunkel are further intertwined, as they serve as the only two trustees for the Karfunkel Trust. Zyskind and L. Karfunkel also jointly control over 15 million

common shares of AmTrust stock. Zyskind and L. Karfunkel are also involved with at least 21 distinct related-party transactions involving AmTrust and their other affiliated entities. Likewise, G. Karfunkel is involved in seven related-party transactions involving AmTrust and his own related entities.

213. Moreover, the Control Group maintains actual control over the Board, as evidenced by the events leading up to L. Karfunkel's appointment. At the 2016 Annual Meeting, shareholders voted to re-elect the Company's directors who were nominated for re-election. However, the vacancy left by M. Karfunkel's passing in April 2016 was not submitted to a shareholder vote at this meeting. Instead, on May 19, 2016, the same day as the 2016 Annual Meeting, M. Karfunkel's widow, L. Karfunkel, was simply elected by the Board without a shareholder vote. Thus, the Control Group is yet another manifestation of the Karfunkel family's unfettered stronghold over the Company.

214. The members of the Control Group are related members of the Karfunkel family who all face a substantial likelihood of liability from the misconduct alleged herein. Thus, the Control Group is beholden to each other by virtue of their close familial relationships and to the Company by way of their massive AmTrust stock holdings. Because of their lack of independence and disinterestedness, the Control Group is incapable of impartially considering a demand, and as a result, demand is futile.

**D.    Additional Reasons Why Demand is Futile**

215. The Board's lack of good faith and oversight exposed the Company to other increased risks, including (i) significant damages resulting from the Company's repurchases of stock at prices that were artificially inflated due to Defendants' materially false or misleading statements during the Relevant Period; (ii) loss of business; (iii) investigations by the SEC, FBI,

and NYDFS; (iv) exposure to lawsuits, including four shareholder putative class actions asserting federal securities claims against the Company; and (v) serious damage to the Company's reputation and goodwill.

216.    The Director Defendants' failure to meet their fiduciary obligations also allowed the Insider Selling Defendants to reap unlawful profits from selling or disposing of AmTrust shares at artificially inflated prices. Not only did the Board approve of the illegal insider transactions, it specifically authorized the Company's stock repurchase program to maintain the price of the Company's stock at artificially inflated levels while insiders were selling stock.

217.    In April 2016, the Board authorized the repurchase of $200 million AmTrust shares despite Defendants' knowledge that the Company had engaged in unlawful accounting practices exposing AmTrust to significant and material risks and liability. As such, Defendants knew that the Company's stock price was already artificially inflated when it authorized the share repurchases, causing AmTrust to overpay for repurchases of its own stock by approximately $104 million during the Relevant Period.

218.    The repurchase program, accordingly, caused AmTrust to buy back stock at inflated prices from Gulkowitz, DeCarlo, and Pipoly. *See* ¶¶167-71. All of the Director Defendants failed to exercise any oversight over Gulkowitz, DeCarlo, and Pipoly with respect to their significant insider transactions. Accordingly, a clear majority of the Board is unable to consider a demand to investigate Plaintiff's allegations that the Defendants engaged in illegal insider transactions of Company stock, committed other wrongdoing in violation of their fiduciary duties, and artificially inflated the Company's stock price for their own personal gain. The Director Defendants cannot investigate allegations of Defendants' wrongdoing in a disinterested and independent manner.

219.   In light of the foregoing facts, the Director Defendants face a substantial likelihood of liability in this case, thus rendering demand on them futile.

## IX.   CLAIMS FOR RELIEF

**COUNT I**
**Breach of Fiduciary Duty**
**(Against All Defendants)**

220.   Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

221.   Each of the Defendants owed and owe fiduciary duties to AmTrust and its stockholders. By reason of their fiduciary relationships, Defendants specifically owed and owe AmTrust the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

222.   Each of the Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to AmTrust and its stockholders in at least the following ways:

    a)   Overseeing and endorsing management's illicit accounting practices;

    b)   Ignoring or consciously disregarding the many red flags related to the
         accounting manipulation;

    c)   Allowing AmTrust insiders to conduct insider sales and dispositions of
         Company stock while in the possession of material, adverse, non-public
         information;

    d)   Approving the Company's repurchase of AmTrust shares at a time when
         the shares were artificially inflated;

e)   Allowing AmTrust's financial statements to be false and misleading due to the illicit accounting scheme, which also resulted in the artificial inflation of the Company's share price;

e)   Allowing for inadequate risk controls over the Company's policies and practices, which allowed Company employees to fraudulently understate its loss reserves, overstate its revenue and net income, and misrepresent its loss reserve practices and financial results; and

f)   Engaging in abuse of control and gross mismanagement of AmTrust's assets and business through a failure to prevent the illicit accounting scheme.

223.   Defendants, individually and in concert, engaged in the above referenced conduct in intentional, reckless, or grossly negligent breaches of the fiduciary duties they owed to AmTrust to protect its rights and interests.

224.   In breach of their fiduciary duties owed to AmTrust, Defendants willfully participated in misrepresentations related to the Company's accounting practices, risk controls, and internal and disclosure controls, failed to correct the Company's public statements, and failed to fully inform themselves prior to making decisions as directors and officers, rendering them personally liable to the Company for breaching their fiduciary duties.

225.   Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its financial condition and they failed to correct the Company's public statements.  Defendants had actual knowledge of the misstatements and omissions of material facts set forth in this Complaint, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were

74

available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AmTrust's securities.

226. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

227. Additionally, Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the Code of Conduct and the charters of various Board committees that, had they been discharged in accordance with Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

228. Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their positions in the Company.

229. Accordingly, to the extent AmTrust's exculpatory provision applies to the Director Defendants' acts or omissions while acting in their capacity as directors, it cannot immunize them from (i) any non-monetary liability, (ii) monetary liability for their breaches of the duty of loyalty, (iii) monetary liability for acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law, or (iv) monetary liability in connection with any transaction from which they derived an improper personal benefit. As detailed in this Complaint, the Director Defendants' misconduct with respect to the illicit accounting scheme (i) involved breaches of their duty of loyalty; (ii) involved acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law; and (iii) at least with respect to the Insider Selling Defendants, occurred in connection with a transaction from which those Defendants derived improper personal benefits. AmTrust's exculpatory provision therefore

cannot immunize the Director Defendants from liability for that misconduct. Additionally, Zyskind and Pipoly are not entitled to claim any immunity under Section 102(b)(7) to the extent this claim is asserted against them in their capacity as officers of the Company.

230.    Defendants' actions as detailed in this Complaint were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

231.    As a direct and proximate result of Defendants' breaches of their fiduciary obligations, AmTrust has sustained and continues to sustain significant damages. As a result of the misconduct alleged in this Complaint, Defendants are liable to the Company.

## COUNT II
## Unjust Enrichment
## (Against All Defendants)

232.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

233.    During the Relevant Period, Defendants received bonuses, stock options, stock, or similar compensation from AmTrust that was tied to the Company's financial performance, or otherwise received compensation that was unjust in light of Defendants' bad faith conduct, violation of the Company's code of ethics, and self-dealing.

234.    Plaintiff, as a shareholder and representative of AmTrust, seeks restitution from Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation—including any salary, options, performance-based compensation, and stock—obtained by Defendants due to their wrongful conduct alleged in this Complaint.

## COUNT III
## Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information
## (Against the Insider Selling Defendants)

235.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

236.    At the time of the stock sales set forth in ¶¶167-71 above, the Insider Selling Defendants—Pipoly, Gulkowitz, and DeCarlo—knew or recklessly disregarded the information described in this Complaint regarding the illicit accounting scheme and sold AmTrust common stock on the basis of that information.

237.    The information described above was proprietary non-public information concerning the Company's unlawful conduct associated with its accounting. The information was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold AmTrust common stock.

238.    The Insider Selling Defendants' sales of AmTrust common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

239.    Because the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

<u>COUNT IV</u>
**Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**(Against the Director Defendants)**

240.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth in this paragraph, except to the extent those allegations plead knowing or reckless conduct by the Director Defendants. This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

241.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the

Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy
> statement form of proxy, notice of meeting or other communication, written or
> oral, containing any statement which, at the time and in the light of the
> circumstances under which it is made, is false or misleading with respect to any
> material fact, or which omits to state any material fact necessary in order to make
> the statements therein not false or misleading or necessary to correct any
> statement in any earlier communication with respect to the solicitation of a proxy
> for the same meeting or subject matter which has become false or misleading.

242.    The Director Defendants negligently issued, caused to be issued, and participated

in the issuance of materially misleading written statements to stockholders that were contained in

the 2015 and 2016 Proxy Statements. The 2015 and 2016 Proxy Statements contained proposals

to AmTrust's stockholders urging them to re-elect the members of the Board and approve

executive compensation. The Proxy Statements, however, misstated or failed to disclose that: (1)

AmTrust had ineffective assessment of the risks associated with its financial reporting; (2) the

Company had an insufficient complement of corporate accounting and corporate financial

reporting resources within the organization; (3) in turn, the Company lacked effective

internal controls over financial reporting; (4) the Company maintained inadequate loss

reserves; and (5) AmTrust enhanced earnings by ceding insurance losses to its subsidiaries. By

reasons of the conduct alleged in this Complaint, the Director Defendants violated Section 14(a)

of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of the Director

Defendants' wrongful conduct, AmTrust misled or deceived its stockholders by making

misleading statements that were an essential link in stockholders heeding AmTrust's

recommendation to re-elect the current Board and approve certain executive compensation.

243.    The misleading information contained in the 2015 and 2016 Proxy Statements

was material to AmTrust's stockholders in determining whether or not to elect the Director

Defendants and approve certain executive compensation. This information was also material to the integrity of the directors that were proposed for election to the Board. The proxy-solicitation process in connection with the Proxy Statements was an essential link in (i) the re-election of nominees to the Board and (ii) the approval of the executive compensation plan.

244. Plaintiff, on behalf of AmTrust, thereby seeks relief for damages inflicted upon the Company based on the misleading 2015 and 2016 Proxy Statements in connection with the improper re-election of the members of the Board and approval of executive compensation.

245. This action was timely commenced within three years of the date of each Proxy Statement and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## COUNT V
### Violations of Section 10(b) of the Exchange Act
### and SEC Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

246. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against all Defendants.

247. During the Relevant Period, in connection with AmTrust's repurchases of AmTrust shares, Defendants disseminated or approved false or misleading statements about AmTrust, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

248. At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by Defendants, Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to Defendants' false or misleading statements. Defendants engaged in a scheme to defraud

79

AmTrust by causing the Company to purchase at least $227 million in shares of AmTrust stock at artificially inflated prices.

249.    Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon AmTrust in connection with the Company's purchases of AmTrust stock during the Relevant Period.

250.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of AmTrust stock, which were intended to, and did, (a) deceive AmTrust regarding, among other things, its accounting practices, the Company's internal controls and compensation practices, and the Company's financial statements; (b) artificially inflate and maintain the market price of AmTrust stock; and (c) cause AmTrust to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the Relevant Period, Defendants were in possession of material, adverse non-public information regarding the illicit accounting scheme.

251.    Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

252.    As described above, Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this Complaint were either known to Defendants or were so obvious that Defendants should have been aware of them. Throughout the Relevant Period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

253.    Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock, both by the Company itself and by the Insider Selling Defendants.

254.    As a result of Defendants' misconduct, AmTrust has and will suffer damages in that it paid artificially inflated prices for AmTrust common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the illicit accounting scheme were disclosed beginning in February 2017. AmTrust would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Defendants' false or misleading statements.

255.    As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of AmTrust stock during the Relevant Period. By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

256.    Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

## COUNT VI
### Violation of Section 20A of the Exchange Act
### (Against the Insider Selling Defendants)

257.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

258.    The Insider Selling Defendants, by reason of their relationship with the Company as officers and directors of the Company, had access, directly or indirectly, to material information about the Company not available to the public.

259.    The Insider Selling Defendants knowingly traded on this material, non-public information about the Company.

260.    The Insider Selling Defendants sold AmTrust securities with actual knowledge that the value of these securities was inflated as a result of Defendants' false and misleading statements and other fraudulent activities detailed in this Complaint.

261.    As part of AmTrust's publicly disclosed share repurchase program, the Company purchased over 8 million shares of its common stock throughout the Relevant Period. AmTrust was a contemporaneous purchaser of AmTrust securities, pursuant to Section 20A of the Exchange Act, when the Insider Selling Defendants sold AmTrust securities, as set forth above.

262.    As a contemporaneous purchaser, AmTrust was damaged by the actions of the Insider Selling Defendants, as alleged in this Complaint, in that (i) in reliance on the integrity of the market, the Company paid artificially inflated prices as a result of the violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5; and (ii) the Company would not have purchased the securities at the prices it paid, or at all, had it been aware that the market prices had been artificially inflated by Defendants' false or misleading statements. At the time of the purchase of

the securities by the Company, the fair and true market value of the securities was substantially less than the price paid by the Company

## COUNT VII
### Violations of Section 29(b) of the Exchange Act
### (Against All Defendants)

263.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth in this paragraph.

264.     As a result of their conduct, as alleged in this Complaint, Defendants violated Sections 10(b) and 14(a) of the Exchange Act during the time they entered into contracts with AmTrust regarding their compensation.

265.     AmTrust has a compensation clawback policy that allows the Company to claw back compensation in certain circumstances.

266.     If AmTrust attempts to claw back compensation to Defendants, Defendants might assert a breach of contract claim.

267.     Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

268.     Defendants violated provisions of the Exchange Act while performing their duties arising under various employment and other contracts they entered into with AmTrust.

269.     AmTrust was and is an innocent party with respect to Defendants' Exchange Act violations.

270.     Plaintiff, on behalf of AmTrust, seeks rescission of the contracts between Defendants and AmTrust due to Defendants' violations of the Exchange Act while performing their job duties.

271.    Even if the contracts are not rescinded by the Court as a result of Defendants'

Exchange Act violations, the Court can and should award equitable remedies in the form of

injunctive relief barring Defendants from asserting breach of contract by AmTrust in any action

by Plaintiff on behalf of AmTrust to claw back compensation from Defendants.

272.    Plaintiff seeks only declaratory, injunctive, and equitable relief in this claim.

## COUNT VIII
### Corporate Waste
### (Against the Director Defendants)

273.    Plaintiff incorporates by reference and realleges each of the foregoing allegations

as though fully set forth in this paragraph.

274.    The Director Defendants have a fiduciary duty to protect AmTrust's assets from

loss or waste.

275.    By approving the stock repurchase program, the Director Defendants breached

this fiduciary duty and have caused AmTrust to waste its corporate assets on the repurchase of

stock at artificially inflated prices.

276.    As a result of the Director Defendants' corporate waste, the Company has

suffered damages.

## COUNT IX
### Contribution and Indemnification
### (Against the Officer Defendants)

277.    Plaintiff incorporates by reference and realleges each of the foregoing allegations

as though fully set forth in this paragraph.

278.    This claim is brought derivatively on behalf of the Company against Defendants

Zyskind and Pipoly for contribution and indemnification.

279.    AmTrust is named as a defendant in four putative shareholder class actions

asserting claims under the federal securities laws for, *inter alia*, issuing false and misleading

statements related to its accounting practices and the Company's financial reporting.[13]   In the event the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the Defendants as alleged herein. The Company is entitled to receive contribution from those Defendants in connection with the securities fraud class actions pending against the Company.

280.   Accordingly,   AmTrust   is   entitled   to   all   appropriate   contribution   or indemnification from Defendants.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands for a judgment as follows:

A. Determination that this action is a proper derivative action maintainable under the law and that demand was excused as futile;

B. Declaring that Defendants have breached their fiduciary duties to AmTrust;

C. Determining and awarding to AmTrust the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D. Directing AmTrust to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described in this Complaint, including putting forward for a stockholder vote resolutions for amendments to the Company's by-laws or articles of

---

[13] The first putative class action was filed on February 28, 2017 in the U.S. District Court for the Central District of California.  Three additional putative class actions were filed in the Southern District of New York.

incorporation, and taking such other actions as may be necessary to place before stockholders for a vote the following corporate governance policies:

1. a proposal to strengthen Board oversight and supervision of AmTrust's financial reporting procedures;

2. a proposal to strengthen the Company's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public;

3. a proposal to ensure that all Board members take appropriate action to rid the Company of its lawless culture; and

4. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board.

E. Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiff, on behalf of AmTrust, has an effective remedy;

F. Awarding to AmTrust restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants, including the proceeds of insider transactions made in violation of federal and state securities laws;

G. Ordering an accounting of all compensation awarded to the Officer Defendants during the Relevant Period;

H.  Increasing the size of AmTrust's Board of Directors and reconstituting the Audit Committee;

I.  Canceling the votes to re-elect the Director Defendants in connection with the annual shareholder meetings in 2015 and 2016, and ordering Defendants to disgorge to the Company all compensation they received for service on the Board following those invalid elections;

J.  Awarding to Plaintiff costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

K.  Granting such other and further relief as the Court deems just and proper.

## XI.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: May 11, 2017                          Respectfully Submitted,

**CHIMICLES & TIKELLIS, LLP**

By: /s/ *A. Zachary Naylor*
A. Zachary Naylor (Bar No. 4439)
zn@chimicles.com
Vera G. Belger (Bar No. 5676)
vgb@chimicles.com
222 Delaware Avenue, Suite 1100
P.O. Box 1035
Wilmington, DE 19899
Telephone: (302) 656-2500
Facsimile: (302) 656-9053

*Local Counsel for Plaintiff West Palm Beach Police Pension Fund*

**SAXENA WHITE P.A.**

Jonathan M. Stein
Jorge A. Amador
Adam D. Warden
Jordan D. Utanski
5200 Town Center Circle
Suite 601

Boca Raton, FL 33486
Telephone: (561) 394-3399
Facsimile:  (561) 394-3382
jstein@saxenawhite.com
jamador@saxenawhite.com
awarden@saxenawhite.com
jutanski@saxenawhite.com

-and-

Steven B. Singer
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
Telephone: (914) 437-8551
Facsimile:  (888) 631-3611
ssinger@saxenawhite.com

*Counsel for Plaintiff West Palm Beach Police Pension Fund*