# EXHIBIT A



Grant & Eisenhofer P.A.

123 Justison Street  Wilmington, DE 19801  Tel: 302-622-7000  Fax: 302-622-7100

485 Lexington Avenue
New York, NY 10017
Tel: 646-722-8500
Fax: 646-722-8501

30 N. LaSalle Street, Suite 2350
Chicago, IL 60602
Tel: 312-214-0000
Fax: 312-214-0001

Michael Barry
Director
Tel: +1-302-622-7065
mbarry@gelaw.com

May 16, 2017

**VIA OVERNIGHT MAIL**

Board of Directors
c/o Stephen B. Ungar, Esquire
Senior Vice President, General Counsel and Secretary
AmTrust Financial Services, Inc.
59 Maiden Lane, 6th Floor
New York, New York  10038

**Re:**   ***Demand for Inspection of Certain Books and Records***

Dear Mr. Ungar:

We represent the Pompano Beach Police & Firefighters' Retirement System ("Pompano") and have been retained in regard to Pompano's demand (the "Demand") to inspect certain books and records of AmTrust Financial Services, Inc. ("AmTrust" or the "Company") pursuant to 8 Del. C. § 220 ("Section 220"). Pompano is the beneficial owner of 23,593 shares of AmTrust common stock, and has held AmTrust common stock continuously since at least January 9, 2014. As evidence of Pompano's beneficial ownership, enclosed with this letter as Exhibit A is a true and correct copy of the Affidavit of Paul O'Connell, Pompano's Chairman, attaching proof of ownership as of May 8, 2017. A notarized and sworn power of attorney appointing the undersigned to act on behalf of Pompano is enclosed as Exhibit B.

As used herein, the "Board" means the full board of directors of AmTrust, any committee thereof, and/or any persons or entities representing or purporting to represent it or acting or purporting to act on its behalf.

As explained more fully below, the purpose of this Demand is to evaluate the suitability of current Board members to continue serving as directors of the Company and their ability to impartially consider whether the Company should initiate litigation against current members of Company management and/or the Board, and to investigate possible mismanagement by AmTrust's directors and/or officers in connection with the matters discussed in the grounds supporting this Demand set forth below:

(a)     the possibility of certain directors' and/or officers' breaches of fiduciary duty in connection with certain related party transactions, including (i) AmTrust's Credit Agreement with ACP Re, Ltd. ("ACP"), dated September 15, 2014, and the Restatement of the Credit Agreement, announced July 29, 2016 and entered into on September 20, 2016; (ii) AmTrust's Quota Share Reinsurance Agreement with Maiden Holdings, Ltd. ("Maiden"), in effect through June 30, 2019; (iii) AmTrust's Master Services Agreement with National General Holdings Corp. ("National General"); and (iv) AmTrust's transactions with privately held companies owned and/or controlled by Ms. Leah Karfunkel, including Worldwide TechServices, LLC and NA Advisors GP LLC (the "Related Party Transactions" as summarized in Section I below);

(b)     the possibility of certain directors' and/or officers' breaches of fiduciary duty in connection with the Company's agreements or financial arrangements with certain offshore entities, including subsidiaries in Bermuda, Luxembourg, Ireland, and the United Kingdom, and the Company's accounting practices relating to those entities (the "Offshore Agreements" as summarized in Section II below);

(c)     the possibility of certain directors' and/or officers' breaches of fiduciary duty in connection with weaknesses in internal controls and financial restatements announced in the Company's February 27, 2017 Form 8-K and April 4, 2017 Form 10-K (the "Financial Restatements" as summarized in Section III below);

(d)     the possibility of certain officers' breaches of fiduciary duty in connection with investigations by the Securities & Exchange Commission ("SEC") and New York Department of Financial Services into the Company's financial reporting and auditing processes (the "Government Investigations" as summarized in Section IV below);

(e)     the possibility of certain directors' and/or officers' breaches of fiduciary duty in connection with their role in transferring shares of AmTrust to and among various charitable trusts, including the Teferes Foundation, Gevurah, and the Hod Foundation (the "Charitable Trusts" as summarized in Section V below);

(f)     the possibility of certain directors' breaches of fiduciary duty in connection with their approval of the Company's decision to repurchase hundreds of millions of dollars' worth of AmTrust common stock in December 2013 and April 2016 when the Board knew or had reason to know the stock was artificially inflated (the "Stock Repurchase Program" as summarized in Section VI below); and

(g)     the independence and disinterest of the Board, and to determine whether a presuit demand is necessary or would be excused prior to commencing any derivative action on behalf of the Company.

A "credible basis" for believing "that there are legitimate issues of wrongdoing" with respect to each of these subject areas, *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 123

(Del. 2006), is furnished by the Board's utter failure to act in response to detailed, specific, and factually grounded allegations of pervasive accounting fraud made as early as December 2013 and as recently as April 2017.

On December 12, 2013, GeoInvesting reported, based on an extensive analysis of the Company's public financial reports, that from 2009-2012, the Company deleted losses totaling over $276 million by ceding certain risky policies to its offshore subsidiaries, and reporting the premiums but failing to recognize the losses.[1] The Company's only response (via CEO Barry Zyskind) was to dismiss the allegations as the unfounded speculation of short sellers. On February 8, 2014, *Barron's* published an article scrutinizing the Company's use of offshore subsidiaries and examining various transactions with other companies owned or controlled by the Company's own controlling stockholder group, the Karfunkel family.[2] Like the GeoInvesting article, the February *Barron's* article noted that the Company's use of offshore subsidiaries to bury losses raised legitimate suspicions about the accuracy of the figures it reported in its SEC filings. A subsequent *Barron's* article published in May 2014 pointed out accounting incongruities in the Company's insurance and securities filings which suggest that the Company may be under-reserving for underwriting losses, and identified additional concerns flowing from the Company's use of offshore subsidiaries designed to lose money, i.e., to absorb AmTrust's underwriting losses without realizing any associated credit or gain.[3] In December 2014, Alistair Capital provided a detailed analysis of numerous accounting improprieties at AmTrust, relying on the foregoing reports and the Company's public insurance and securities reporting.[4] Among other things, the Alistair Capital letter observed that discrepancies in reporting among AmTrust and Maiden with respect to ceded premiums and loss reserves suggest that AmTrust may be materially overstating the amounts Maiden will pay it. The Alistair Capital letter also reiterates many of the specific concerns highlighted by GeoInvesting and *Barron's*. In April 2016, *Barron's* published another article critical of AmTrust's accounting, which again questions the Company's use of offshore subsidiaries and noted that, since 2008, the Company appears to have deleted over $900 million in net losses through its web of captive reinsurance subsidiaries.[5]

These in-depth analyses and reports would have prompted any reasonable director to investigate the Company's accounting practices, related-party transactions with Karfunkel family-owned or -controlled companies, use of offshore reinsurance subsidiaries for loss elimination purposes, and possible weaknesses in internal controls over financial reporting, among other things. Yet it appears that the Board did virtually nothing in response to these reports. Had the Board investigated, it would have discovered what an SEC whistleblower has allegedly discovered: that the Company is losing money at a rapid pace, burying losses and inflating earnings through a complicated scheme of reinsurance agreements with captive subsidiaries, and that Karfunkel family members are pilfering the Company's treasury through illegitimate related-party transactions at the expense of the Company and its public stockholders. The analyses and reports discussed above patently gave rise to a duty to act, and it is well-settled

---

[1] *See* GeoInvesting, "AmTrust Financial Services: A House of Cards?" (Dec. 12, 2013).

[2] Bill Alpert, "An Insurer's Feat: Turning Losses into Gains," *Barron's* (Feb. 8, 2014).

[3] Bill Alpert, "Balance-Sheet Risk Makes AmTrust Shares Vulnerable" (May 31, 2014).

[4] Alistair Capital, Letter to AmTrust Financial (Dec. 18, 2014).

[5] Bill Alpert, "Is AmTrust Stock Worth the Premium?," *Barron's* (April 23, 2016).

that, under Delaware law, a board's failure to act in response to a known duty to act constitutes a breach of the duty of loyalty. *See, e.g., Rich v. Yu Kwai Chong*, 66 A.3d 693 (Del. Ch. 2013).

## I.  The Related Party Transactions

### i.  Credit Agreement and Restated Agreement with ACP

In September 2014, a subsidiary of ACP, a Bermuda corporation solely owned by the Michael Karfunkel 2005 Grantor Retained Annuity Trust ("Michael Karfunkel Trust"), acquired the Tower Group ("Tower"). As part of that transaction, AmTrust and a wholly-owned subsidiary thereof entered into the Credit Agreement with ACP and subsidiaries thereof, dated September 15, 2014, pursuant to which AmTrust agreed to provide ACP with a $125 million loan with a seven-year term and a fixed interest rate of 7% annually. In connection with this Agreement, AmTrust would receive fees for administrative services, including an annual fee of $30,000, plus reimbursement of costs, expenses, and other charges. National General and a subsidiary thereof entered into the Agreement on terms similar to AmTrust and its subsidiary, making a separate $125 million loan to ACP. ACP used the proceeds of the loans to finance its acquisition of Tower. As part of ACP's acquisition of Tower, it agreed to sell certain Tower assets to AmTrust and sell other Tower assets to National General. These transactions and certain conflicts of interest impairing the independence of the Company directors and officers overseeing and authorizing them are the subject of a derivative action currently pending in the Delaware Court of Chancery, *Cambridge Retirement System v. DeCarlo, et al.*, Case No. 10879 (Del. Ch.) (the "2014 Delaware Derivative Action").

On July 29, 2016, AmTrust announced that the Credit Agreement would be restated. AmTrust's Audit Committee created a Special Committee consisting of two directors (Abraham Gulkowitz and Susan Fisch) in connection with this restated agreement. An Amended and Restated Credit Agreement ("Restated Agreement") came into effect on September 20, 2016. In the Restated Agreement, the maturity date on AmTrust's loan to ACP was extended from seven to over 20 years, deferring the maturity date from September 15, 2021 to September 20, 2036. Additionally, in the Restated Agreement, the annual interest rate was reduced from 7% to 3.7%. As part of the Restated Agreement and in connection with the approval of a conservation plan under the supervision of the Commissioner of Insurance of the State of California, the Michael Karfunkel Trust and members of the Karfunkel family agreed to contribute $200 million to the successor of the acquired Tower entity (Castlepoint National Insurance Company or "CNIC").

AmTrust's Board is dominated by Karfunkel family members, including CEO Barry Zyskind, George Karfunkel, and Leah Karfunkel, and loyalists, including Donald DeCarlo, who is also a director of Karfunkel family-controlled National General, as well as Mr. Gulkowitz and Ms. Fisch, the sole members of the Subcommittee formed by AmTrust's Audit Committee which approved the $125 million loan to ACP at issue in the 2014 Delaware Derivative Action. The modifications to the Credit Agreement reflected in the Restated Agreement benefit the Karfunkel family members to the detriment of the Company. Zyskind, George and Leah Karfunkel, and DeCarlo stand to benefit personally, directly or indirectly, as a result of the Company's generous extension of the term and reduction of the interest rate of the ACP loan because ACP is wholly owned by the Michael Karfunkel Trust, of which the co-trustees are Zyskind and Leah Karfunkel

and the principal beneficiary is Leah Karfunkel. Although the Restated Agreement reportedly was approved by the Special Committee of the Audit Committee, the terms of the Restated Agreement are manifestly unfair to the Company, which suggests that the putatively independent directors approving it (Gulkowitz and Fisch) approved it for improper purposes in breach of their duty of loyalty. *In re Cornerstone Therapeutics, Inc. Stockholder Litig.*, 115 A.3d 1173, 1186-87 (Del. 2015) (where "seemingly independent directors approved a conflicted transaction for improper reasons ... those directors may have breached their duty of loyalty"). Moreover, both Ms. Fisch and Mr. Gulkowitz are beholden to the Karfunkel family, by whom they were nominated to the Board. This suggests that these directors are not as independent as the Board claims and may have approved the Restated Agreement for improper purposes. *See, e.g., Caspian Select Credit Master Fund, Ltd. v. Gohl*, 2015 WL 5718592, at *11 (Del. Ch. Sept. 28, 2015) (allegation that officer was beholden to controlling stockholder for appointment suffices to allege approval of conflicted transaction for improper purpose). Accordingly, the Company's agreement to dramatically extend the term of its large loan to ACP and to substantially reduce the rate of interest applicable to that loan raise serious questions about the Board's motives and loyalties, providing a "credible basis" for believing "that there are legitimate issues of wrongdoing." *Seinfeld*, 909 A.2d at 123.

Among other things, AmTrust has disclosed neither the current principal balance of the loan nor the payments received by AmTrust under the Credit Agreement or the Restated Agreement to date. In light of the high potential for conflicts associated with these complex related-party transactions involving interested directors, there are compelling grounds for believing AmTrust directors may have breached their fiduciary duties to AmTrust and its public stockholders, including Pompano.

ii.    Quota Share Reinsurance Agreement with Maiden

Under the Quota Share Reinsurance Agreement, AmTrust's Bermuda subsidiary retrocedes to Maiden 40% of the premium written for certain lines of business and 40% of losses. *See* AmTrust Financial Services, Inc., Form 10-K Annual Report, p. F-99 (April 4, 2017). This Agreement has been in place for approximately a decade and remains in effect through June 30, 2019, and will automatically renew for successive three-year terms thereafter. This is one of many reinsurance agreements involving AmTrust and other companies owned or controlled by Karfunkel family members through which commissions, fees, income, and losses are shifted among those entities. In this case, net premium figures reported by AmTrust and Maiden do not appear to be consistent. For 2016, for example, AmTrust reported ceding to Maiden $2.012 million in written premium (*see id.*, p. F-100), but Maiden reported $1.843 million in net premium earned under its "AmTrust Reinsurance" segment. *See* Maiden Holdings, Ltd., Form 10-K Annual Report, p. 4 (Mar. 16, 2017).

Maiden is plainly controlled by the Karfunkel family: Michael Karfunkel, George Karfunkel, and Barry Zyskind—who remains the Chairman of Maiden's board of directors—formed Maiden, and Zyskind and Leah Karfunkel own or control over 15% of Maiden's common stock. *See* AmTrust Form 10-K, p. F-99. Discrepancies in the financial reporting relating to transactions such as those authorized by the Quota Share Reinsurance Agreement are highly problematic, therefore, because they suggest that that Agreement, and similar reinsurance

agreements between AmTrust and other Karfunkel-controlled entities, may have become vehicles for abuse by self-interested Company directors or officers, evidencing, at the very least, a critical weakness in the Company's internal controls over related-party transactions and financial reporting relating thereto. Such discrepancies were called to the Board's attention in, *inter alia*, the Alistair Capital letter of December 2014, and so the Board has long been on notice of this concern.

The Company's Audit Committee Charter requires the Audit Committee to "review, approve and oversee all related party transactions." The Audit Committee must also "discuss with the independent auditor significant related party transactions, and the auditor's evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties." *See* AmTrust Financial Services, Inc., Audit Committee Charter, adopted May 23, 2013, p. 3, ¶ 6.[6] As Maiden is a related party, the Audit Committee is responsible for the review, evaluation, and approval of the Quota Share Reinsurance Agreement and any other transaction with Maiden. However, as AmTrust has not disclosed any substantive information about the Audit Committee's responsibilities, procedures, or criteria for assessing and approving related-party transactions, and as AmTrust's reporting of premium figures does not align with Maiden's, the Company clearly lacks an effective system of oversight. Viewed in conjunction with the other related-party transactions discussed in this Section I, and the reports and analyses published by GeoInvesting, *Barron's*, and Alistair Capital, the Company's failure to assure a reasonable information and reporting system exists with respect to the Maiden Quota Share Reinsurance Agreement and the transactions flowing from that agreement strongly suggest the Board has breached its fiduciary duty of oversight. *Stone v. Ritter*, 911 A.2d 362, 367-68 (Del. 2006) (citing *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 967 (Del. Ch. 1996)).

Additionally, AmTrust did not form a special committee to negotiate and approve the Quota Share Reinsurance Agreement or any other transactions flowing from that agreement with Maiden, as it did to review the Restated Agreement. *See* AmTrust Financial Services, Inc., Form DEF 14A Proxy Statement, p. 8 (April 11, 2017). Delaware law requires independent review of such transactions. *See* 8 Del. C. § 144; *In re Tyson Foods, Inc.*, 919 A.2d 563, 596 (Del. Ch. 2007) (directors have burden of showing entire fairness of related-party transactions "not sterilized by independent review"). The Company's failure to provide any meaningful information about the Audit Committee's supervision over related party transactions, and the lack of an independent special committee to review such dealings, further betray a lack of oversight over related party transactions in violation of AmTrust's Audit Committee Charter and corporate governance materials, as well as the financial reporting relating to such transactions.

### iii. Master Services Agreement with National General

National General, like Maiden, is undeniably under the control of the Karfunkel family. Barry Karfunkel, the son of Leah Karfunkel and brother-in-law of Barry Zyskind, serves as National General's Chief Executive Officer. National General's board of directors includes

---

[6] The Company's Proxy Statement refers investors to the Audit Committee Charter to ascertain "all of the Audit Committee's responsibilities." AmTrust Financial Services, Inc., Form DEF 14A Proxy Statement, p. 7 (April 11, 2017).

Zyskind (the chairman), Barry Karfunkel, Robert Karfunkel, and Donald DeCarlo. The two largest National General stockholders are trusts controlled by members of the Karfunkel family. *See* AmTrust Form 10-K, pp. F-100-101.

Under the Master Services Agreement with National General, AmTrust provides National General with information technology services for which it charges 1.25% of National General's gross written premium, plus AmTrust's costs for development and support services. *See* AmTrust Form 10-K, p. F-101. As a result of this Agreement, for 2016, AmTrust recorded $46.1 million in fee income, up from $25.6 million in 2014 and $35.9 million in 2015. *See id.*, p. F-101. These figures do not correspond to National General's financial reporting. For instance, for 2016, National General recorded $51.4 million in expenses related to the Master Services Agreement. *See* National General Holdings Corp., Form 10-K Annual Report, p. F-76 (Mar. 23, 2017).

As noted above with respect to the Maiden Quota Share Reinsurance Agreement, discrepancies in financial reporting pertaining to related party transactions furnish reasonable grounds for believing that AmTrust's directors or officers may have breached their fiduciary duties, suggesting that the Master Services Agreement and similar agreements between AmTrust and other Karfunkel-controlled entities may have become vehicles for abuse by self-interested Company directors or officers, and evidencing a critical weakness in the Company's internal controls over related-party transactions and financial reporting relating thereto. Like the Maiden Quota Share Reinsurance Agreement, the National General Master Services Agreement, as a related party transaction, was subject to review by the Audit Committee under AmTrust's Audit Committee Charter (p. 3, ¶ 6). As AmTrust has not disclosed any substantive information about the Audit Committee's responsibilities, procedures, or criteria for assessing and approving related-party transactions, and as AmTrust's reporting of fee income figures does not align with National General's reporting of expenses under the same agreement, the Company clearly lacks an effective system of oversight. Viewed in conjunction with the other related-party transactions discussed in this Section I, the Company's failure to assure a reasonable information and reporting system exists with respect to the Maiden Quota Share Reinsurance Agreement and the transactions flowing from that agreement strongly suggest the Board has breached its fiduciary duty of oversight. *Stone*, 911 A.2d at 367-68.

Moreover, AmTrust did not form a special committee (even of interested directors) to negotiate and approve the Master Services Agreement or any other transactions with National General, as it did to review the Restated Agreement. *See* AmTrust Financial Services, Inc., Form DEF 14A Proxy Statement, p. 8 (April 11, 2017). Delaware law requires independent review of such transactions. 8 Del. C. § 144; *In re Tyson*, 919 A.2d at 596. The Company's failure to provide any meaningful information about the Audit Committee's supervision over related party transactions, and the lack of an independent special committee to review such dealings, betray a lack of oversight over related party transactions in violation of AmTrust's Audit Committee Charter and corporate governance materials, as well as the financial reporting relating to such transactions.

        iv.    Transactions with privately held companies

AmTrust also has entered into a series of transactions and agreements with privately held companies that are owned or controlled by Karfunkel family members, including Leah Karfunkel. For example, in February 2015, AmTrust and National General each contributed $9.7 million to obtain equity stakes in North Dearborn Building Company, LP ("North Dearborn"), and in August 2015, the companies contributed $53.7 million each to obtain stakes in Illinois Center Building Company LP ("Illinois Center"). Both North Dearborn and Illinois Center are controlled by NA Advisors GP LLC ("NA Advisors"), which is controlled by Leah Karfunkel. As related party transactions, AmTrust's acquisition of ownership interests in these privately held companies controlled by Leah Karfunkel were subject to review by the Audit Committee under AmTrust's Audit Committee Charter (p. 3, ¶ 6). Nothing in AmTrust's disclosures, however, indicates that these transactions were reviewed, evaluated, or approved by the Audit Committee. Because a majority of the Board is dominated by the Karfunkel family, any transactions or agreements involving North Dearborn, Illinois Center, or NA Advisors, or other privately held companies owned or controlled by Karfunkel family members such as Worldwide TechServices, LLC, would require the approval of a majority of disinterested directors. *See* 8 Del. C. § 144; *In re Tyson*, 919 A.2d at 596. There is no evidence that any such approval was sought or obtained, strongly suggesting that "the[se] transaction[s] may have escaped oversight for a reason." *In re Tyson*, 919 A.2d at 596.

## II.    The Offshore Agreements

AmTrust has in place a complex internal reinsurance structure through which it cedes losses to offshore subsidiaries. The flow of funds into and out of AmTrust's captive offshore subsidiaries in Bermuda, Luxembourg, Ireland, and the United Kingdom is opaque. Numerous market and industry analysts have observed that AmTrust may be using these entities to eliminate and avoid reporting underwriting losses, thus enhancing its operating margins.

In December 2013, for example, GeoInvesting reported that AmTrust appeared to use its Luxembourg subsidiaries to conceal over $276 million in losses.[7] *Barron's* ran a series of articles questioning AmTrust's offshore reinsurance agreement structure and its accounting practices relating to that structure, among other things.[8] In December 2014, Alistair Capital noted in a letter to the Company's Audit Committee that the Loss and Loss Adjustment Expenses of AmTrust's Luxembourg subsidiaries do not reconcile with AmTrust's SEC reporting: "The difference appears to be related to Loss and Loss Adjustment Expenses assumed by [the Luxembourg Reinsurance Companies], which seem to be *excluded* from AmTrust's reported results in SEC filings, even though the SEC filings seem to *include* the benefit AmTrust International Insurance, Ltd. ("AII") receives."[9] In 2016, *Barron's* published an article about the opaque nature of the Company's "other assets," as identified on its balance sheet, which were

---

[7] *See* GeoInvesting, "AmTrust Financial Services: A House of Cards?" (Dec. 12, 2013).

[8] *See, e.g.*, Bill Alpert, "An Insurer's Feat: Turning Losses into Gains," *Barron's* (Feb. 8, 2014).

[9] *See* Alistair Capital, Letter to AmTrust Financial, p. 13 (December 18, 2014) (emphasis in original).

"more than half of the consolidated company's book value"—far higher than that for similar insurers.[10]

The exposé recently published by the *Wall Street Journal* on April 11, 2017 has further heightened public stockholder concern over AmTrust's utilization of, and accounting for, its offshore reinsurance structure.[11] Among other disclosures, the April 11 WSJ article explains that internal AmTrust documents obtained by a whistleblower with the Company's former outside auditor reveal that "$277 million in losses had been shifted to an offshore affiliate from 2009 to 2012, bolstering AmTrust's operating income by that amount." According to the article, this accounts for 38% of net income in 2012 alone. AmTrust's accounting techniques are allegedly designed to "bury[] losses in offshore affiliated entities." The whistleblower also observed that the Company, in order to overstate its financial health, used "complicated financial maneuvers, some involving related offshore companies," "unsupported adjustments to financial schedules by a senior AmTrust executive," and "'plugs,' or undocumented adjustments, in completing some financial schedules." These allegations are fully consistent with the reports issued by, among others, GeoInvesting, *Barron's*, and Alistair Capital in preceding years—reports that the Board dismissed, ignored, or to which it provided woefully inadequately responses falling far short of taking corrective action.

The concrete facts and detailed analyses presented in the GeoInvesting, *Barron's*, Alistair Capital, and *Wall Street Journal* pieces—among others—strongly suggest that these allegations are not fabricated, and they provide, at a minimum, a reasonable basis to believe that AmTrust's directors and officers may have breached their fiduciary duties to the Company and its public stockholders in connection with the Company's utilization of offshore reinsurance companies and its accounting related thereto. *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752 (Del. Ch. 2016) (granting Section 220 demand citing news reports where petitioner sought books and records concerning wrongdoing in connection with the hiring and termination of the respondent's chief operating officer); *Paul v. China MediaExpress Holdings, Inc.*, No. 6570-VCP, 2012 Del. Ch. LEXIS 3, *13-14 (Del. Ch. Jan. 5, 2012) (granting Section 220 demand due to petitioner's identification of "numerous third-party media reports alleging fraudulent conduct by [respondent's] officers and directors").

Indeed, the *New York Post* reported on March 20, 2017 that the "wheels are about to come off" AmTrust because the Company's restatements in March "are just the tip of the iceberg."[12] AmTrust's cooperation with this demand is imperative to satisfy its stockholders' fully justified concerns arising from the widely circulated reports of conflicts of interest and accounting improprieties at AmTrust. AmTrust's Board was clearly under an obligation to act in response to the many red flags analysts and others had thrown up since December 2013 with respect to the Company's utilization of offshore reinsurance subsidiaries to conceal losses. Stockholders are entitled to know why it did not act in the face of that duty.

---

[10] *See* Bill Alpert, "Is AmTrust Stock Worth the Premium?," *Barron's* (April 23, 2016).

[11] *See* "Secret Recordings Play Role in SEC Probe of Insurer AmTrust," *The Wall Street Journal* (April 11, 2017).

[12] *See* "The 'wheels are about to come off' this insurance company," *N.Y. Post* (March 20, 2017).

### III.    The Financial Restatements

AmTrust disclosed the existence of material weaknesses in its internal control structure over financial reporting on February 27, 2017 in a Form 8-K. The Company was unable to meet the March 2, 2017 deadline to timely file its Form 10-K. The deadline was extended to March 16, which AmTrust missed again, this time stating that it would need to restate three years' worth of financial statements because of improper accounting. The Form 10-K was finally filed on April 4, 2017. The restated financial statements reflected reductions in the Company's reported earnings of $31.3 million (7.2%) for 2014, $52.9 million (11.2%) for 2015, and $51.9 million (12.5%) for 2016. Thus, AmTrust disclosed that its reported earnings were overstated by more than $136 million over three years. The common stock price has fallen precipitously since February 27.

Overstatements of this magnitude are not likely to be accidental. *See King v. VeriFone Holdings, Inc.*, 12 A.3d 1140 (Del. 2011) (reversed denial of Section 220 demand against respondent which restated its reported earnings and net income for the prior three fiscal quarters); *Saito v. McCall*, No. 18553, 2001 Del. Ch. LEXIS 96, *14 (Del. Ch. July 10, 2001) (finding a "credible basis" for wrongdoing based in part on restatement of respondent's financials the corporation restated its financials by $325 million). At a minimum, the admitted material weaknesses in the Company's internal control structure over financial reporting indicate process-oriented deficiencies for which the Board of Directors is ultimately responsible. The Company's admissions that such weaknesses exist and have rendered several years' worth of consolidated financial reporting unreliable, and the magnitude of the financial restatements the Company has made as a result, provide compelling grounds for believing that the Company's directors and officers have breached their fiduciary duties to the Company and its public stockholders. *See Saito*, 2001 Del. Ch. LEXIS 96, at *14 (corporation publicly admitted to irregularities in restating financial results).

### IV.    The Government Investigations

The April 11 WSJ article disclosed the existence of a far-ranging SEC probe into the Company's financial reporting as well as a New York Department of Financial Services ("NYDFS") inquiry. From the available evidence (including the WSJ article), it appears that these investigations relate to the items addressed in Sections I, II, and III, above. The Company declined to comment on these investigations or even to confirm their existence.

In connection with these investigations, the SEC and NYDFS are reportedly working with employees or ex-employees of AmTrust's former auditor, BDO USA LLP ("BDO"). As the WSJ article reports, "At least twice, BDO formally signed off on its AmTrust audit before completing some important checks, the internal whistleblower claims. The whistleblower claims that BDO staffers allegedly covered for their lapse by loading unfinished documents into an internal software system to show the right time stamp, then returned later to complete some of the work." The article also reports that these wrongful practices became necessary because of, or were facilitated by, AmTrust management's failure to timely and completely provide the requisite materials to the auditor.

In addition to the points discussed in Sections I, II, and III, therefore, the public evidence suggests that AmTrust's officers may have breached their fiduciary duties to the Company and its stockholders by failing to take due care and/or to exercise adequate oversight with respect to its auditor, BDO. Because the Company has also restated its financial statements for 2016, a period in which KPMG replaced BDO as the Company's auditor (effective on or around April 1, 2016), the evidence suggests that AmTrust's officers may have breached their fiduciary duties to the Company and its stockholders by failing to take due care and/or to exercise adequate oversight with respect to KPMG as well.

## V.     The Charitable Trusts

The Teferes Foundation was founded and is managed by AmTrust CEO Barry Zyskind. In November 2014, it received a grant of over seven million AmTrust shares from a charitable trust controlled by Michael Karfunkel, the Hod Foundation. In 2015, the Teferes Foundation reported owning $74.3 million worth of AmTrust common stock (as well as $1.4 million of Maiden stock). In March 2016, Zyskind disclosed that he transferred 12.02 million shares of AmTrust from Teferes Foundation to a charitable organization called Gevurah. As a *Southern Investigative Reporting Foundation* article reports, no such organization seems to exist.[13] The Hod Foundation, as of 2016, reported owning nearly $16 million of AmTrust common stock. AmTrust shares owned by the Hod Foundation and the Teferes Foundation appear to have been granted (or sold) at much lower values than the foundations record as market values.

Significant concentrations of ownership of AmTrust common stock by charitable trusts controlled by Karfunkel family members present reasonable stockholder concerns. Similarly, transfers of large volumes of AmTrust shares—such as Zyskind's transfer of over 12 million shares from one charitable trust to another—present stockholder concerns because such activity is likely to attract regulatory scrutiny. In addition, such transactions threaten to impact AmTrust public stockholders because they may move the stock price. Any issuance or grant of common stock or options to charitable trusts run by Karfunkel family members present obvious problems for public stockholders, including dilution. Accordingly, in light of the reports above, there is a reasonable basis to believe that AmTrust's directors and officers may have breached their fiduciary duties to the Company and its public stockholders in connection with their knowledge and approval of activities carried out by Karfunkel family members in relation to their charitable trusts.

## VI.     Stock Repurchase Program

In December 2013, the Board approved a $150 million stock repurchase program. Pursuant to this program, the Company repurchased 266,886 shares in June 2014 ($10.96 million); 1,771 shares in August 2014 ($75,268); 841,131 shares in September 2014 ($33.50 million); 367,379 shares in October 2014 ($14.58 million); 92,448 shares in December 2014 ($5.20 million); 10,505 shares in January 2015 ($577,775); 37,783 shares in February 2015 ($2.10 million); 184,898 shares in December 2015 ($5.69 million); 658,552 shares in February

---

[13] *See* "Barry Zyskind's High Stakes Three Card Monte Game" (at www.sirf-online.org/2016/05/18/barry-zyskinds-high-stakes-three-card-monte-game/).

2016 ($16.39 million); and 5,539 shares in March 2016 ($138,253). In April 2016, the Board decided to increase the stock repurchase program by $200 million. Pursuant to this expansion, in April 2016, the Company repurchased 2,096,017 shares in April 2016 ($51.96 million); 448,506 shares in May 2016 ($11.62 million); 1,031,337 shares in June 2016 ($25.33 million); 1,899,645 shares in June 2016 ($46.33 million); and 103,390 shares in August 2016 ($2.51 million).

The Company spent over $220 million repurchasing its shares over this time period. This represents the most significant stock repurchase program in the Company's history. Moreover, during the same time period, certain directors engaged in significant disposals of AmTrust stock. For example, Mr. Gulkowitz sold or otherwise disposed of 22,251 shares, earning $859,600, in transactions carried out on November 24, 2015 and December 20, 2016; and Mr. DeCarlo sold or otherwise disposed of 46,673 shares, earning $1,613,795, in transactions carried out from May 21, 2014 to March 1, 2017.

The Board's decision to approve these substantial stock repurchase programs, despite the red flags plainly calling for further investigation into the Company's accounting practices and utilization of offshore reinsurance subsidiaries, is inexplicable. The Board could not ascertain the true value of the Company's common stock without investigating those issues, and yet it opted not only to approve but to significantly expand the scope (and expense) of the stock repurchase program as recently as April 2016. The Board has abdicated its fiduciary duties in approving the Company's repurchase of large amounts of stock, spending hundreds of millions of dollars on equities that amount to little more than a waste of corporate assets. The Board knew or had reason to know that the stock was artificially inflated and/or over-valued at all times since December 2013 through and including August 2016 as a result of the reports and analyses issued by GeoInvesting, *Barron's*, and Alistair Capital, among others. No business person of ordinary, sound judgment could conclude that the Company's acquisition of over $200 million of artificially inflated stock is a productive, non-wasteful expenditure. *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 748-49 (Del. Ch. 2005). Accordingly, there is a credible basis for believing the Board violated its fiduciary duties in approving and extending the share repurchase program. *Id.* (directors who commit waste violate fiduciary duties).

## VII. Section 220 Demand

Pursuant to Section 220 of the Delaware General Corporation Law, Pompano hereby demands the opportunity to inspect and copy, during the Company's usual hours for business, certain books and records. Under Section 220, a stockholder may inspect corporate books and records upon making a demand that meets the statute's form and manner requirements and is for "any proper purpose." 8 Del. C. § 220(b). "A proper purpose shall mean a purpose reasonably related to [the demanding stockholder's] interest as a stockholder." *Id.*

Pompano makes this demand for the purpose of evaluating the suitability of current Board members to continue serving as directors of the Company and their ability to impartially consider whether the Company should initiate litigation against current members of Company management and/or the Board, and investigating possible mismanagement and breach of fiduciary duties by AmTrust's directors and/or officers in connection with: (1) the Related Party Transactions; (2) the Offshore Agreements; (3) the Financial Restatements; (4) the Government

Investigations; (5) the Charitable Trusts, or (6) the Stock Repurchase Program, as discussed above. The investigation of breaches of fiduciary duty and/or corporate wrongdoing is a proper purpose under Section 220. *See Amalgamated Bank v. UICI*, No. 884-N, 2005 Del. Ch. LEXIS 82, *3 (Del. Ch. June 2, 2005) (finding that inspection of a corporation's books and records related to shareholder's investigation of potential breaches of fiduciary duty was allowed as "proper purpose"); *Melzer v. CNET Networks, Inc.*, 934 A.2d 912, 917 (Del. Ch. 2007) ("There is no shortage of proper purposes under Delaware law, but perhaps the most common 'proper purpose' is the desire to investigate potential corporate mismanagement, wrongdoing or waste.").

In addition, where corporate fiduciaries stand on both sides of a transaction with the corporation or its stockholders, Delaware law requires that corporate directors meet critical legal and practical requirements that a board must follow when considering an interested-party transaction. *See Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1988) ("Corporate directors must demonstrate their utmost good faith and the most scrupulous and inherent fairness of any transactions in which they possess financial, business or other personal interest which does not devolve upon the corporation or all stockholders generally.").

This heightened standard of "entire fairness" involves a two-part inquiry into whether a corporate transaction is the result of a fair process and results in a fair price. The initial burden of establishing a fair process and fair price rests with the directors defending the transaction. While many details regarding the process by which the Related Party Transactions and the Offshore Agreements were initiated, negotiated and approved are not public, the significant conflicts of interest and large values of the transactions (as detailed above) provide a credible and substantial basis to believe the Related Party Transactions and the Offshore Agreements are not entirely fair to AmTrust and its public stockholders.

Moreover, reports concerning potential misconduct pertaining to the Financial Restatements and Government Investigations made by the *Wall Street Journal* and *Barron's*, among others, resulted in significant drops in the Company's share price. A pending securities class action lawsuit alleging fraudulent accounting, auditing, financial reporting, and related misconduct in violation of the Securities Exchange Act of 1934 provides a further credible and reasonable basis for stockholders to believe that AmTrust's directors and/or officers may have breached their fiduciary duties in overseeing the Company's management. In addition, Company directors' involvement in transferring large numbers of AmTrust shares to and among the Charitable Trusts, as reported by outlets such as the *Southern Investigative Reporting Foundation*, could subject the Company to regulatory scrutiny, harming the Company and its public stockholders, and presents a credible and reasonable basis for stockholder concern as it may, due to the volume of the transfers, impact the stock price.

Pursuant to Section 220 of the Delaware General Corporation Law, Pompano hereby demands the right to inspect and copy the following books and records of AmTrust and its subsidiaries (unless otherwise specified the time period relating to this request is January 1, 2011 to the present):

1.   Documents sufficient to show all payments made to AmTrust under the Credit Agreement or Restated Agreement, as well as the current principal balance owed to AmTrust under the Credit Agreement and Restated Agreement.

2.   All documents relating to the decision of the Board, including the Audit Committee and/or the Special Committee, to enter into the Restated Agreement.

3.   All minutes of any meeting (including all draft minutes and agendas and exhibits to such minutes and agendas) of the Board, or any committee thereof (including without limitation the Audit Committee, the Special Committee, and the Investment Committee), during which any of the following topics were discussed or raised:

   a.   the Credit Agreement or the Restated Agreement;

   b.   the Quota Share Reinsurance Agreement with Maiden;

   c.   the Master Services Agreement with National General;

   d.   North-Dearborn;

   e.   Illinois Center;

   f.   NA Advisors;

   g.   Worldwide TechServices, LLC;

   h.   the Company's utilization of offshore reinsurance subsidiaries, and the Board's process or procedure for considering, evaluating, or approving such utilization;

   i.   the Company's accounting for its utilization of offshore reinsurance subsidiaries, and the Board's process or procedure for considering, evaluating, or approving such accounting;

   j.   the Company's financial statements and disclosures for 2014-2016, and the Board's process or procedure for considering, evaluating, or approving such financial statements and disclosures;

   k.   the Company's decision to replace BDO as auditor and/or to retain KPMG as auditor;

   l.   the Company's oversight of its auditors, including BDO and KPMG;

   m.   the Company's decision to create the position of Chief Accounting Officer in April 2017;

n.  the sufficiency of the Company's accounting personnel, including the Company's statement (2016 10-K, p. 90) that, "We did not have a sufficient complement of personnel, in certain geographic locations, with an appropriate level of knowledge and experience to help ensure proper selection and application of U.S. GAAP in the accounting for the areas stated above";

o.  the existence or adequacy of any internal controls in place to approve or monitor transactions with related parties, including parties owned or controlled by Karfunkel family members;

p.  the Company's statement (2016 10-K, p. 52) that its financial statements from 2014-2016 contain accounting errors;

q.  any accounting errors identified in the Company's 2016 10-K;

r.  the basis for the Company's retroactive increase to loss reserves by $18.6 million for 2014, $33.9 million for 2015, and $257.9 million for 2016;

s.  any SEC investigation into the Company;

t.  any NYDFS investigation into the Company;

u.  any reports, memoranda, or other documents or communications prepared by BDO;

v.  any reports, memoranda, or other documents or communications prepared by KPMG;

w.  the Company's investments in or financial obligations to any entity owned or controlled by Barry Zyskind, Leah Karfunkel, George Karfunkel, or any other member of the Karfunkel family;

x.  the Teferes Foundation;

y.  the Hod Foundation;

z.  Gevurah;

aa.  the Share Repurchase Program, including the decision to repurchase $150 million of AmTrust stock approved in December 2013 and the decision to expand this program by $200 million in April 2016;

bb.  Any of the matters discussed in the grounds supporting this Demand set forth in Sections I, II, III, IV, V, or VI, above.

4.      All documents reviewed, considered, or produced by the Board, or any committee thereof (including without limitation the Audit Committee, the Special Committee, and the Investment Committee) in connection with any meeting during which any of the items enumerated above in Request 3(a)-(bb) were discussed.

5.      Any and all communications between and among AmTrust's directors and officers/management in connection with any of the items enumerated above in Request 3(a)-(bb).

6.      Any and all communications between and among the AmTrust Board, or any committee thereof (including without limitation the Audit Committee, the Special Committee, and the Investment Committee) in connection with any of the items enumerated above in Request 3(a)-(bb).

7.      Documents reflecting any and all personal, familial, financial, or business relationships between or among any current director of the Company and any fellow director or any executive officer of the Company, other than their service as directors of the Company or its subsidiaries. This request is unlimited by any time period.

8.      All documents concerning discussions, communications, and decisions as to the nominations of the current members of the Board of Directors, and the placement of such directors on any committees (or subcommittees) of the Board.

9.      Documents sufficient to identify the net worth and annual income of each current member of the Board of Directors for the period encompassing his or her service as a member of the Board of Directors.

Pompano hereby demands that (1) originals or attested copies of the foregoing documents and records be made available for inspection and copying by Pompano, its designated representatives, or their attorneys or agents during usual business hours, beginning no later than five business days after the Company receives this letter, and continuing from day to day thereafter during usual business hours until the inspection is completed, or (2) the Company deliver copies of such records, within five business days after receipt of this letter, to the attention of Pompano's counsel, Michael J. Barry, at the law firm of Grant & Eisenhofer P.A., 123 Justison Street, Wilmington, Delaware 19801 (telephone: (302) 622-7000). Pompano will reimburse reasonable copy costs if the documents are sent to Pompano's counsel.

Please promptly advise me, as soon as possible, and in any event on or prior to the expiration of five business days after the date this demand is received by the Company, when and where the items demanded above will be made available to Pompano and its designated agents or, in lieu thereof, when copies of such items will be delivered to the undersigned.

I hereby declare and affirm under penalty of perjury, pursuant to the laws of the State of Delaware, that the foregoing is true and correct.

Sincerely

Michael J. Barry

MJB/rm
Enclosures

# EXHIBIT A

# AFFIDAVIT

STATE OF FLORIDA          )
                          ) ss:
COUNTY OF BROWARD         )

I, Paul O'Connell, being duly sworn, do hereby state that I am the Chairman of the

Pompano Beach Police & Firefighters' Retirement System ("Pompano"), and am familiar with

the securities owned beneficially by Pompano, which, in book entry form, are in the custody of

Comerica Bank as evidenced by its records kept in the ordinary course of business.

I further state that, as of May 8, 2017, Pompano beneficially owned and held a total of

23,593 shares of AmTrust Financial Services, Inc. common stock being held in Pompano's RBC

Global account with Comerica (1055050039), as shown by the annexed statements of said

account, which is a true and correct copy of the original records.

Further, affiant saith not.

Executed this 9th day of May, 2017.



_____
Paul O'Connell

Sworn to and subscribed before me
This 9th day of May, 2017

_____
Notary Public

JULIA ANNE KUNZ
MY COMMISSION #FF113516
EXPIRES June 14, 2018
(407) 398-0153   FloridaNotaryService.com



| CUSIP | Description | Units | Tax Cost | Market Value | Unrealized Gain / Loss |
|---|---|---|---|---|---|
| 032359309 | AMTRUST FINL SVCS INC | 23,593.00 | $525,565.17 | $364,983.71 | -$160,581.46 |

Market prices shown have been obtained from pricing services which we believe are reliable; however, we cannot guarantee their accuracy or that securities can be bought or sold for these prices.

| CUSIP | Description | Units | Tax Cost | Market Value | Unrealized Gain / Loss |
|-------|-------------|-------|----------|--------------|------------------------|
|       |             |       |          |              |                        |

Market prices shown have been obtained from pricing services which we believe are reliable; however, we cannot guarantee their accuracy or that securities can be bought or sold for these prices.

# EXHIBIT B

## POWER OF ATTORNEY

The undersigned, in my capacity as Chairman for the Pompano Beach Police &

Firefighters' Retirement System ("Pompano"), the beneficial owner of 23,593 shares of common

stock of AmTrust Financial Services, Inc. ("AFSI"), does hereby make, constitute and appoint

the law firm of Grant & Eisenhofer P.A. ("G&E"), and the partners, directors, associates,

employees, or other persons designated by them, acting singly or in combination, as Pompano's

true and lawful agent and attorney-in-fact with the power and authority to act in Pompano's

place and stead and on Pompano's behalf to make a demand pursuant to Section 220 of the

Delaware General Corporation Law to inspect certain books and records of AFSI as set forth in

the foregoing letter from G&E to AFSI, and to do all other things which Pompano could do

pursuant to Section 220 of the Delaware General Corporation Law.

Executed this 9th day of May, 2017.

_____
Paul O'Connell

Sworn to and subscribed before me
This 9th day of May, 2017

_____
Notary Public



JULIA ANNE KUNZ
MY COMMISSION #FF113516
EXPIRES June 14, 2018
(407) 398-0153    FloridaNotaryService.com