**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

IN RE AMTRUST FINANCIAL SERVICES, INC. DERIVATIVE LITIGATION

Case No. 1:17-CV-00553-GMS

**DEMAND FOR JURY TRIAL**

<u>**VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT**</u>

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
David Wales
John Vielandi
1251 Avenue of the Americas
44th Floor
New York, NY  10020
 (212) 554-1400
davidw@blbglaw.com
John.Vielandi@blbglaw.com

**SAXENA WHITE P.A.**
Joseph E. White, III
Jorge A. Amador
Adam D. Warden
5200 Town Center Circle
Suite 601
Boca Raton, Florida 33486
(561) 394-3382
jwhite@saxenawhite.com
jamador@saxenawhite.com
awarden@saxenawhite.com

Steven B. Singer
Joshua Saltzman
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
(914) 437-8576
ssinger@saxenawhite.com

*Counsel for Co-Lead Plaintiffs*

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer (Del I.D. No. 2864)
Michael J. Barry (Del I.D. No. 4368)
Kyle J. McGee (Del I.D. No. 5558)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000
jeisenhofer@gelaw.com
mbarry@gelaw.com
kmcgee@gelaw.com

*Counsel for Co-Lead Plaintiffs*

## TABLE OF CONTENTS

NATURE AND SUMMARY OF THE ACTION ........................................................ 1

JURISDICTION AND VENUE ........................................................................ 9

PARTIES ................................................................................................ 10

    I.      Plaintiffs ................................................................................. 10

    II.    Nominal Defendant ................................................................... 10

    III.   Officer Defendants ................................................................... 11

    IV.   Director Defendants ................................................................. 12

    V.     Relevant Non-Parties ............................................................... 16

SUBSTANTIVE ALLEGATIONS ..................................................................... 18

    I.      Defendants Both Encouraged and Failed to Address the Fraudulent Accounting Scheme ................................................................................. 18

         A.    Defendants Ignored Blatant Red Flags of Improper Accounting ............ 20

             1.     Geo Investing December 2013 Article ....................................... 20

             2.     Barron's February 2014 Article ................................................ 21

             3.     *Barron's* May 2014 Article ..................................................... 23

             4.     The Alistair Capital Letter ....................................................... 25

             5.     *Barron's* April 2016 Article .................................................... 29

         B.    Defendants Ignored Red Flags Regarding The Specific Fraudulent Accounting Practices, Internal Controls Weaknesses, and Auditor Deficiencies that Led to the 2017 Financial Restatements ...................... 30

             1.     Red Flags Concerning AmTrust's Auditor ................................... 30

             2.     Red Flags Regarding Internal Control ........................................ 31

             3.     Red Flags Regarding Reserves .................................................. 33

             4.     Red Flags Regarding Improper Accounting for Deferred Acquisition Costs ................................................................................... 35

    II.    DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY CAUSING THE COMPANY TO REPURCHCASE STOCK AT INFLATED PRICES, AND, IN THE CASE OF THE SELLING DEFENDANTS, BY SELLING STOCK TO THE COMPANY AT INFLATED PRICES .................................... 36

         A.    Defendants Caused AmTrust to Conduct a Massive Stock Repurchase Program ............................................................................... 37

         B.    The Insider Selling Defendants Unlawfully Profited at AmTrust's Expense By Selling Back Shares to the Company at Artificially Inflated Prices ................................................................................. 39

C.     In Repurchasing Stock, AmTrust relied on Defendants' False or Misleading Statements ................................................................ 42

III. DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5, AND BREACHED THEIR FIDUCIARY DUTIES, BY KNOWINGLY OR RECKLESSLY ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD ........................................................................................................ 44

A.     False Statements .................................................................... 45

     1.     First Quarter 2014 Financial Results ............................. 45

     2.     Second Quarter 2014 Financial Results ........................ 47

     3.     Third Quarter 2014 Financial Results ........................... 50

     4.     Fourth Quarter and Full Year 2014 Financial Results ................. 51

     5.     First Quarter 2015 Financial Results ............................. 54

     6.     Second Quarter 2015 Financial Results ........................ 56

     7.     Third Quarter 2015 Financial Results ........................... 58

     8.     Fourth Quarter and Full Year 2015 Financial Results ................. 59

     9.     First Quarter 2016 Financial Results ............................. 62

     10.     Second Quarter 2016 Financial Results ........................ 64

     11.     Third Quarter 2016 Financial Results ........................... 66

B.     False Accounting and Breaches of Fiduciary Duty Start to be Revealed ............................................................................... 67

     1.     February 27, 2017 Press Release ................................... 67

     2.     February 27, 2017 Conference Call ............................... 68

     3.     March 16, 2017 Press Release ...................................... 69

     4.     April 4, 2017 Disclosures ............................................. 70

C.     AmTrust's Financial Reporting Through the Relevant Period was Materially False and Misleading in Violation of GAAP and SEC Regulations Governing Financial Reporting ............................ 71

     1.     AmTrust Admitted Its Financial Statements Were Materially False and Misleading .................................................... 73

     2.     Defendants Overstated AmTrust's Reported Revenue ................. 76

     3.     Defendants Understated AmTrust's Reported Expenses ............. 77

         a.     Defendants Improperly Deferred Bonuses ....................... 78

         b.     Defendants Improperly Capitalized Certain Deferred Acquisition Costs ................................................................ 78

         c.     Defendants Improperly Capitalized Internal Software Costs and Other Expenses ........................................................ 79

4.      Defendants Improperly Accounted for Interest Expense.............. 80

      a.      Defendants Failed to Record Other Expense Items .......... 80

5.      Defendants' Other GAAP Violations ........................................... 81

      a.      Defendants' Improper Accounting and Reporting of Foreign Currency Gains and Losses ................................. 81

      b.      Defendants Improper Accounting of Certain Balance Sheet Items.................................................................................... 81

6.      AmTrust's Contravention of GAAP Violated SEC Regulations .................................................................................. 81

D.    AmTrust's Material Weaknesses in Internal Controls............................. 83

E.    Further Fallout from Defendants' Accounting Manipulation................... 87

1.      Wall Street Journal April 11, 2017 Article ................................. 87

2.      Keefe, Bruyette & Woods' May 2017 Note ................................ 88

F.    Additional Allegations Contributing to a Strong Inference of Scienter ...................................................................................................... 88

G.    Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrine Apply to Defendants' Misrepresentations ................................. 90

H.    The Group Pleading Doctrine Applies to Defendants' Misstatements and Omissions................................................................................................. 91

I.    Defendants' Misstatements and Omissions Caused Damage to AmTrust ................................................................................................... 92

DERIVATIVE ALLEGATIONS ............................................................................ 93

DEMAND IS EXCUSED AS FUTILE ................................................................... 93

I.    Demand is Excused as to the Control Group and Those That Lack Independence From It ............................................................................................................. 94

II.    Demand is Excused as to the Insider Selling Defendants.................................. 104

III.    Demand is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability on the Claims Asserted Herein................................... 105

IV.    Demand is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Related Violations of Federal Securities Laws ........................................................................................................... 108

PLAINTIFFS ATTEMPTED TO UTILIZE THE  220 PROCESS TO OBTAIN DOCUMENTS FROM AMTRUST ....................................................................... 110

DEFENDANTS WERE OBLIGATED TO SAFEGUARD  THE COMPANY'S INTERESTS AND COMPLY WITH APPLICABLE LAWS ........................................................ 111

I.    Duties of All Defendants .................................................................................. 111

II.    Conspiracy, Aiding and Abetting, and Concerted Action ................................. 113

III.    The Company's Code of Business Ethics.......................................................... 114

IV.     The Audit Committee ......................................................................................... 115

CLAIMS FOR RELIEF ............................................................................................................ 117

PRAYER FOR RELIEF ............................................................................................................ 127

JURY TRIAL DEMANDED ..................................................................................................... 130

Co-Lead Plaintiffs City of Lauderhill Police Officers' Retirement Plan, Pompano Beach Police & Firefighters' Retirement System, and West Palm Beach Police Pension Fund ("Plaintiffs"), stockholders of AmTrust Financial Services, Inc. ("AmTrust" or the "Company"), bring this action on AmTrust's behalf seeking relief under federal and state law for the misconduct perpetrated against the Company by the current and former officers and directors identified below (collectively, "Defendants") arising from AmTrust's long-running and wide-ranging accounting manipulation, leading the Company to understate the Company's loss reserves, overstate line items including revenue, total service and fee income, and net income, and misrepresent its loss reserve practices and financial results.[1]  Plaintiffs, through their counsel, have conducted an investigation into the facts supporting the allegations in this Complaint and believe discovery will elicit further evidentiary support for their allegations.[2]

## NATURE AND SUMMARY OF THE ACTION

1.     This stockholder derivative action arises from the actions of AmTrust's controlling stockholders (the "Control Group") to fraudulently misstate the company's financial performance. The Control Group's fraudulent conduct allowed the Company to raise enormous amounts of investor capital – which was used to grow the Company and the value of the Control Group's holdings – and engage in lucrative related party transactions.  Further, because the compensation of the CEO – who is a member of the Control Group family – was tied to the

---

[1] While AmTrust is named as a nominal defendant, any reference to "Defendants" does not encompass the Company.

[2] Plaintiffs' investigation included a review of: (i) filings by AmTrust with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and other publications disseminated by certain of the Defendants and other related non-parties; (iii) news articles, shareholder communications, conference call transcripts, and postings on AmTrust's website concerning the Company's public statements; and (iv) other publicly available information concerning AmTrust and the Defendants.

Company's financial results, the Control Group was incentivized to inflate the Company's financials, resulting in excessive compensation for the CEO.

2.      From at least December 12, 2013 to the present (the "Relevant Period"), AmTrust used a wide range of fraudulent techniques to understate the Company's loss reserves and overstate its financial results.  Defendants – who include the Company's CEO, CFO, controlling shareholders, and the three members of the Company's Audit Committee – either actively participated in the accounting manipulation or consciously disregarded it, to the point that, in 2017, the Company was forced to restate nearly three years' worth of revenue, total service and fee income, net income, and other important metrics by double-digit percentages.

3.      Certain of the Defendants, including Chief Financial Officer ("CFO") Ron Pipoly ("Pipoly"), actively participated in manipulating the Company's financials, while other Defendants, who sat on the Board and its Audit Committee, deferred to the Control Group and consciously abdicated their duties to ensure legal compliance and strong internal controls over financial reporting.  The Audit Committee members also failed to properly oversee the Company's auditor, BDO USA, LLP ("BDO"), who, based on evidence collected by a whistleblower within BDO, appears to have participated in the accounting fraud, and whose adequacy was called into doubt by a New York Department of Financial Services ("NYDFS") letter to AmTrust in late 2014.[3]

4.      In addition to causing massive and devastating financial restatements, Defendants' accounting manipulation has led to investigations of AmTrust by the Federal Bureau of Investigation ("FBI"), the United States Securities and Exchange Commission ("SEC") and

---

[3] BDO is also named as a co-Defendant in federal securities litigation against AmTrust and certain officers and directors of the Company.  *See In re AmTrust Financial Services, Inc. Securities Litigation*, No. 1:17-cv-01545-LAK (S.D.N.Y.).

NYDFS.  Defendants' misconduct has dramatically eroded the Company's stock price, caused securities fraud litigation, and harmed the Company's reputation and business.  It caused and is causing the Company to overpay to acquire its own stock by over $100 million and incur millions of dollars in expenses related to restating the Company's financials and defending (and in the future likely settling) securities fraud litigation.  Moreover, the misconduct caused insurance rating agency A.M. Best to revise its outlook on AmTrust's (and its subsidiaries') Long-Term Issuer Credit Rating from stable to negative.

5.     Further, certain Defendants not only actively participated in or willfully overlooked the Company's pervasive accounting manipulation, but profited from it at the Company's expense.  Specifically, the Board improperly approved stock buybacks that led AmTrust to repurchase over 8 million shares at artificially inflated prices.  In approving these buybacks at inflated prices, Defendants breached their fiduciary duties to the Company and wasted corporate assets.  In addition, three Defendants – CFO Ronald E. Pipoly, Jr. ("Pipoly"), and Audit Committee members Abraham Gulkowitz ("Gulkowitz") and Donald T. DeCarlo ("DeCarlo") – sold a combined $5.6 million worth of stock at inflated prices during the Relevant Period.  In selling their stock prior to the public disclosure of this restatement, defendants used their insider information to personally profit.

6.     The Company's culture of accounting manipulation and internal control weaknesses were fostered by AmTrust's controlling shareholder family – co-founder and director George Karfunkel ("G. Karfunkel"), director Leah Karfunkel ("L. Karfunkel"), and CEO and director Barry Zyskind ("Zyskind"), who is married to the daughter of L. Karfunkel and deceased co-founder Michael Karfunkel ("M. Karfunkel").  Together, these three own or control approximately 44% of the Company's common stock, and control and dominate the

Company's Board.  The Karfunkels and Zyskind have a long history of pushing the Company into transactions with related entities that they also control, for their own benefit, and of using those other entities to foster AmTrust's accounting manipulation and under-reserving.  The so-called "independent" directors on the Board have consistently rubber-stamped these transactions with little deliberation.  As such, they are incapable of evaluating a demand to bring the claims asserted herein because they are dominated by the conflicted Control Group and, as a result of their conscious disregard of the Company's fraudulent accounting, face a substantial likelihood of liability for violating federal securities law and breaching their fiduciary duties.

7.      In fact, throughout the Relevant Period, Defendants consciously disregarded a plethora of including red flags regarding the Company's internal controls over financial reporting, as well as red flags regarding that specifically warned Defendants about the issues that led to the 2017 restatements.  For example, on February 8, 2014, financial publication *Barron's* issued the first of three scathing articles about AmTrust's accounting, suggesting that management is using "complicated" accounting schemes to "make the business look much better than it really is."  The article, titled "An Insurer's Feat: Turning Losses Into Gains" discussed, *inter alia*, how AmTrust's management uses an intricate "web of related-party deals with the Karfunkels" to mask insurance losses and boost profits by "deferring costs more aggressively than the matching revenues" using a balance sheet line item called "deferred policy acquisition costs."  *Barron's* reporting about AmTrust's fraudulent accounting for deferred acquisition costs was ultimately proven correct, as it was one of the stated reasons for the Company's 2017 financial restatements.  Defendants not only obviously were aware of this article, but Defendant Zyskind specifically spoke with *Barron's* for purposes of the article.  Yet Defendants took no steps to remedy the issues raised by the article.

8.      On May 31, 2014, *Barron's* again questioned AmTrust's accounting, including the adequacy of its reserves, suggesting that AmTrust selected unusually low estimates for its eventual losses.  *Barron's* explained that AmTrust paid out a higher percentage of its original estimate for losses on accidents in the years 2006 through 2012 than its peers in the workers' compensation insurance industry.  This explained why the Company's premium revenue as of March 31, 2014 was more than five times tangible book value, an exorbitant rate considering the industry average was 1.4.  In spite of this red flag, Defendants took no action to investigate or remedy the issues raised.

9.      On September 16, 2014, the Company filed a Form 8-K with the SEC disclosing that NYDFS had, *inter alia*, indicated that BDO would no longer have the resources necessary to serve as the Company's auditor.  NYDFS had demanded that "[i]n light of AmTrust's growth and increased geographic footprint, AmTrust will engage an external auditing firm with corresponding global resources and skills beginning with the audit for the annual period ending December 31, 2015."  Yet AmTrust retained ignored the NYDFS and retained BDO for its 2015 audit and did not dismiss BDO until April 2016, when it replaced them with KPMG LLP ("KPMG").   KPMG's first audit of AmTrust would lead to the Company's 2017 financial restatements.

10.     On December 18, 2014, Alistair Capital Management, LLC ("Alistair Capital"), a sophisticated institutional investor, sent a 16-page letter (the "Alistair Capital Letter") directly to the Audit Committee of the Board, alerting them to a panoply of accounting issues.  The Alistair Capital Letter called into question: (i) the efficacy of AmTrust's internal accounting controls for financial reporting; (ii) AmTrust's accounting for deferred acquisition costs; (iii) AmTrust's valuation of life settlement contracts; (iv) the sizable difference between balance sheet accounts

reported by AmTrust and the amounts reported by a related-party for the corresponding accounts in its financial statements; (v) AmTrust's accounting for Luxembourg Reinsurance Captives; and (vi) AmTrust's accounting for loss and loss adjustment reserves in conjunction with acquisitions. Five pages of the letter were devoted to signs that the Company's overall internal controls over financial reporting were weak. These signs were "indicative of an environment in which an accounting fraud could be perpetuated if members of the Audit Committee fail to fulfill their duty of care in diligently monitoring the Company's control environment." This red flag warning was borne out by the Company's later disclosures and financial restatements. Indeed, on February 27, 2017, the Company disclosed that it had identified material weaknesses in its internal controls, as well as accounting problems relating to its deferred acquisition costs. Notably, prior to the Alistair Capital Letter, the Company had recently sued Alistair Capital for alleged defamatory statements, and Alistair Capital had sent the letter in response. After receiving the letter, AmTrust quietly dismissed its defamation suit, likely because it feared that the truth of Alistair Capital's claims would be revealed if the litigation continued.

11.   On April 23, 2016, after continued inaction and silence by AmTrust's Board, *Barron's* took the extraordinary step of questioning—for the third time—the adequacy of AmTrust's reserves and its accounting. In this article, *Barron's* asserted that "[t]he insurance filings of its subsidiaries show that the cost of settling claims for policies issued in the seasoned years 2007-13 have climbed hundreds of millions of dollars above the reserves that AmTrust initially set aside." *Barron's* further noted that even analysts at AmTrust's investment banker, Keefe, Bruyette & Woods, Inc. ("KBW"), wondered in various notes whether the insurer's underwriting margins were overstated. The Board not only failed to meaningfully acknowledge

the red flags raised in the *Barron's* articles and Alistair Capital Letter, but instead vehemently attacked their credibility and decided against proactively investigating these potential issues.

12.     In response to repeated questions regarding its accounting and the adequacy of its reserves, AmTrust consistently responded that its processes were rigorous and that it was more than adequately reserved.  Even worse, rather than investigating the myriad of issues outlined in the *Barron's* articles, the Board approved an increase in the Company's stock buyback program of $200 million in April 2016.  AmTrust proceeded to engage in a massive buying spree of Company stock at tremendously inflated prices over the next four months, purchasing nearly 5.5 million shares at a cost of $135 million from April to July 2016.

13.     As was inevitable, on February 27, 2017, AmTrust finally disclosed a litany of accounting issues in its fourth quarter 2016 earnings press release, including inadequate reserves, material weaknesses in its internal controls, and the need to make adjustments to previously issued financial statements.  For Q4 2016, AmTrust reported financial results that fell well short of Wall Street expectations in large part because of the $65 million reserve charge primarily related to strengthening prior-year loss and loss-adjustment reserves in its "Specialty Program" segment.  AmTrust also indicated it would be unable to timely file its annual report and that it had identified material weaknesses in its internal controls over financial reporting that existed as of December 31, 2016.  The Company not only warned that additional adjustments and/or material weaknesses could be identified but disclosed a multitude of accounting errors dating back to at least 2012 pertaining to improperly accrued bonuses, incorrect foreign exchange calculations, and wrongfully booked revenue.

14.     In reaction to these disclosures, AmTrust's share price plummeted $5.32 per share, or 19%, from $27.66 per share on Friday, February 24, 2017 to $22.34 per share on

Monday, February 27, 2017—wiping out over $900 million in market capitalization in one trading day.

15.     Just weeks later, on March 16, 2017, AmTrust disclosed that it needed additional time to complete its consolidated financial statements for fiscal year 2016.  The Company revealed that its consolidated financial statements for fiscal years 2014 and 2015 (including for each of the four quarters of 2015) as well as for the first three quarters of 2016 needed to be restated and should no longer be relied upon.  The Form 10-K filing delay and the restatements largely related to the timing of recognition of revenue.

16.     Investors were stunned by these disclosures and AmTrust's share price was punished anew as a result, dropping $4.03 per share, or 18.6%, from $21.61 per share on Thursday, March 16, 2017 to $17.58 per share on Friday, March 17, 2017—wiping out over $686 million in Company market capitalization.

17.     On April 4, 2017, the Company filed its 2016 Annual Report on Form 10-K which included restated financial statements for 2014 and 2015.  The restated financials reduced 2014 and 2015 net income by 7.2% and 11.2%, respectively.

18.     Then, on April 11, 2017, *The Wall Street Journal* reported that the SEC, the FBI, and the NYDFS, were each probing AmTrust's accounting practices.  According to *The Wall Street Journal*, a former BDO auditor-turned-whistleblower casually walked around BDO's offices in 2014 striking up conversations with colleagues about BDO's audits of AmTrust.  Unknown to his colleagues, the whistleblower was recording all conversations for the FBI.  The whistleblower claimed to be in possession of documents demonstrating that AmTrust shifted $277 million in losses to an "offshore affiliate from 2009 to 2012, bolstering AmTrust's operating income by that amount."  Although the FBI's investigation concerns whether BDO

tried to bury poor accounting practices in its AmTrust audits, the SEC's investigation is ultimately centered on AmTrust's accounting practices themselves.

19.     In reaction to *The Wall Street Journal* article, AmTrust's shares declined $3.57 per share, or 18.9%, from $18.87 per share on Monday, April 10, 2017 to $15.30 per share on Tuesday, April 11, 2017.

20.     In short, Defendants failed—repeatedly and brazenly—to serve the best interests of AmTrust and its stockholders.   Despite overwhelming and specific warnings about the Company's accounting, internal controls and related-party dealings, including a letter written directly to the Board's Audit Committee, Defendants failed to properly investigate these matters. By engaging in a massive stock repurchase program at inflated prices just months before ultimately revealing the very issues the Board was on notice about, Defendants caused enormous damage to the Company.   As a result of their misconduct, Defendants are liable to the Company for breaches of their fiduciary duties of care, good faith and loyalty under Delaware law, and for violations of Sections 10(b), 20A and/or 29(b) of the Securities Exchange Act of 1934 ("Exchange Act"), as well as other violations of state and federal law.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).   This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because AmTrust is incorporated in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.   In addition, pursuant to AmTrust's Amended and Restated By-Laws, all derivative proceedings brought on behalf of the corporation shall be litigated in a "state or federal court located within the State of Delaware."

## PARTIES

### I.     Plaintiffs

23.     Co-Lead Plaintiff City of Lauderhill Police Officers' Retirement Plan ("Lauderhill") is a current stockholder of AmTrust.  Lauderhill has continuously held AmTrust common stock since January 2014.

24.     Co-Lead Plaintiff Pompano Beach Police & Firefighters' Retirement System ("Pompano Beach") is a current stockholder of AmTrust.  Pompano Beach has continuously held AmTrust common stock since January 2014.

25.     Co-Lead Plaintiff West Palm Beach Police Pension Fund ("West Palm") is a current stockholder of AmTrust.  West Palm has continuously held AmTrust common stock since August 2014.

### II.     Nominal Defendant

26.     Nominal Defendant AmTrust Financial Services, Inc. ("AmTrust" or the "Company") is a Delaware corporation with its principal executive offices located at 59 Maiden Lane, 43rd Floor, New York, NY 10038.  AmTrust's shares trade on the NASDAQ under the ticker symbol "AFSI."

27.     AmTrust was founded in 1998 by brothers George and Michael Karfunkel ("G. Karfunkel" and "M. Karfunkel" respectively).  Defendant Barry Zyskind ("Zyskind"), son-in-

law of the late M. Karfunkel, and members of the Karfunkel family collectively own over 44% of AmTrust's common stock.

28.     AmTrust, through its subsidiaries, operates through three business segments: Small Commercial Business Insurance, Specialty Program Business Insurance, and Specialty Risk and Extended Warranty.

29.     The Company's Small Commercial Business segment provides worker's compensation to small businesses that operate in low and medium hazard classes, such as restaurants, retail stores, physicians and other professional offices.

30.     The Company's Specialty Program Business Insurance segment provides workers' compensation, general liability, commercial auto liability, excess surplus lines insurance programs and other specialty commercial property and casualty insurance through managing general agents.

31.     The Company's Specialty Risk and Extended Warranty segment provides custom designed coverage, such as accidental damage plans and payment protection plans sold in connection with the sale of consumer and commercial goods in the United States and Europe.

## III.    Officer Defendants

32.     Defendant Barry D. Zyskind has served as a director on the Company's Board since 1998 and as the Chairman of the Board since May 2016. Zyskind has also served as Chief Executive Officer ("CEO") and President of AmTrust since 2000. As of March 24, 2017, Zyskind beneficially owned 44,876,575 shares of AmTrust common stock, approximately 26.2% of the Company's issued and outstanding shares. Zyskind is a founding stockholder of the Company and is son-in-law of director Leah Karfunkel ("L. Karfunkel"). Zyskind signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period. As explained in more detail in paragraphs 276 to 278, a large portion of Zyskind's

compensation is directly tied to the Company's financial results. For the 2013, 2014, 2015, and 2016 fiscal years, Zyskind received total compensation of $4,916,858, $22,130,044, $13,942,205, and $4,902,193 respectively. As acknowledged by the Company, Zyskind is not an independent director under the NASDAQ listing rules.

33.     Defendant Ronald E. Pipoly, Jr. ("Pipoly") served as Executive Vice President and Chief Financial Officer of AmTrust from 2005 to June 5, 2017. As of March 24, 2017, Pipoly beneficially owned 593,358 shares of AmTrust common stock. A large portion of Pipoly's compensation is tied to the Company's financial results. Pipoly's employment agreement provides that each year, he will receive an annual bonus comparable to other senior executives subject to a cap of three times his annual salary. Moreover, Pipoly is eligible for an annual discretionary bonus as determined each year by the Compensation Committee. In 2013 and 2014, Pipoly received a bonus of $2.1 million, including a $300,000 discretionary bonus granted upon the recommendation of Zyskind, with one-third of the value paid in the form of restricted stock units. In 2015, Pipoly received a bonus of $2.5 million, including a $400,000 discretionary bonus granted upon the recommendation of Zyskind, with 44% of the value paid in the form of restricted stock units. Moreover, the Company attributed Pipoly's increased bonus in 2015 to "the increase in the size of our finance department and his contributions in overseeing updates to certain accounting systems." For the 2013, 2014, and 2015, fiscal years, Pipoly received total compensation of $2,685,521, $2,709.281, and $3,215,181, respectively.

34.     Defendants Zyskind and Pipoly are referenced collectively in this Complaint as the "Officer Defendants."

IV.     **Director Defendants**

35.     Defendant George Karfunkel has served as a director on the Company's Board since 1998. G. Karfunkel is a founding stockholder of the Company. According to the

Definitive Proxy Statement filed on Schedule 14A with the SEC on April 11, 2017 ("2017 Proxy Statement"), G. Karfunkel beneficially owns 32,438,408 shares of the Company's common stock, approximately 19.0% of the Company's issued and outstanding shares.  G. Karfunkel is the brother-in-law of Leah Karfunkel.  G. Karfunkel is not considered an independent director under the NASDAQ listing rules.  G. Karfunkel signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period.

36.     Defendant Leah Karfunkel ("L. Karfunkel") has served as a director since May 2016.  According to the 2017 Proxy, L. Karfunkel beneficially owns 22,252,098 shares of AmTrust common stock, approximately 13.0% of the Company's issued and outstanding shares.  L. Karfunkel is the sister-in-law of G. Karfunkel and the mother-in-law of Zyskind.  She is also the widowed wife of M. Karfunkel.  L. Karfunkel is not considered an independent director under the NASDAQ listing rules.

37.     Defendants Zyskind, G. Karfunkel, and L. Karfunkel (together, the "Control Group") act as a controlling group of the Company.  As such, Zyskind, G. Karfunkel, and L. Karfunkel file a Schedule 13D/As with the SEC indicating that each was a member of a "group" for purposes of reporting beneficial ownership under Section 13 of the Exchange Act.  According to the last such Schedule 13D/A filed on June 7, 2017, the Control Group collectively owns 84,062,519 shares of AmTrust common stock, or 44% of the total outstanding shares.  However, they owned 49% of the Company's outstanding shares prior to a May 25, 2017 private placement of $300 million of AmTrust stock, 24,096,384 shares, to undisclosed family members of the Control Group.  When these shares are added to the Control Group's shares as disclosed in SEC filings, the Karfunkel family owns approximately 55% of the Company's outstanding shares.

38.     AmTrust's most recent Form 10-K states in relevant part, that the Control Group "acting together, [has] the ability to control all matters requiring approval by our stockholders, including the election and removal of directors, amendments to our certificate of incorporation and bylaws, any proposed merger, consolidation or sale of all or substantially all of our assets and other corporate transactions."

39.     Defendant Abraham Gulkowitz ("Gulkowitz") has served as a director on the Company's Board since 2006.  At all relevant times, Gulkowitz has served as a member and the Chair of the Board's Audit Committee.   He is also a director of several of AmTrust's subsidiaries.  Gulkowitz signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period.   Moreover, Gulkowitz is a co-founder and partner of Brookville Advisory ("Brookville"), an investment fund specializing in credit analysis.  The Hod Foundation, a private foundation owned and controlled by the Control Group, was the beneficial owner of at least 10% of FrontPoint Brookville Credit Opportunities L.P. ("FrontPoint"). FrontPoint is managed by Brookville, which means that Gulkowitz personally benefited from the investment by the Control Group.

40.     Defendant Susan C. Fisch ("Fisch") has served as a director on the Company's Board since 2010, as well as a director of several AmTrust subsidiaries.  At all relevant times, Fisch has served as a member of the Board's Audit Committee.  She also currently serves as a member on the Board's Compensation Committee and Nominating and Corporate Governance Committee.  Fisch signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period.  Based on public disclosures by AmTrust, Fisch has not been employed since joining AmTrust's Board, nor has she served on the Board of any other

companies (beside AmTrust's subsidiaries).  As such, all of her publicly reported income is from AmTrust.

41.     Defendant Donald T. DeCarlo ("DeCarlo") has served as a director on the Company's Board since 2006.  At all relevant times, DeCarlo has served as a member of the Board's Audit Committee.  DeCarlo signed the Company's annual report, filed with the SEC on Form 10-K, each year during the Relevant Period.  DeCarlo is also a director of National General Holdings Corp. ("NGHC").

42.     Defendant Raul Rivera ("Rivera") has served as a Company director since August 2016.

43.     Defendant Jay Miller ("Miller") served as an AmTrust director from its founding in 1998 until August 1, 2016 and was AmTrust's corporate secretary from 1998-2005.  Miller has extremely close ties to the Karfunkel family.  Miller is the Chairman of the board of directors of Gulf USA Corporation, a property and natural resource company controlled by the Karfunkels.  Furthermore, Miller is the trustee of The George Karfunkel 2007 Grantor Retained Annuity Trust #1 and The George Karfunkel 2007 Grantor Retained Annuity Trust #2, of which G. Karfunkel is a beneficiary.  Miller was also a director of American Stock Transfer & Trust Company, which was founded and owned by the Karfunkel family, until the Karfunkels sold it in 2008.  Miller serves as an advisor to GK Acquisition, a private investment company co-founded by George Karfunkel.  Miller has also previously served as litigation counsel for the Karfunkel Family.

44.     Defendants Zyskind, G. Karfunkel, L. Karfunkel, Gulkowitz, Fisch, DeCarlo, Rivera, and Miller are collectively referred to hereinafter as the "Director Defendants."   In addition, Defendants Pipoly, Gulkowitz, and DeCarlo comprise the "Insider Selling Defendants."

**V.     Relevant Non-Parties**

45.     M. Karfunkel co-founded AmTrust in 1998 and served as the Company's Chairman of the Board from 1998 until his death in April 2016.  According to the Definitive Proxy Statement filed on Schedule 14A with the SEC on March 29, 2016 ("2016 Proxy Statement"), as of March 23, 2016, M. Karfunkel beneficially owned 2,192,824 shares of AmTrust common stock, approximately 1.3% of the Company's issued and outstanding shares. The Company also disclosed in the 2016 Proxy Statement that M. Karfunkel was not considered an independent director under the NASDAQ listing rules.  During the Relevant Period, and before his death, M. Karfunkel was involved in at least thirteen separate related-party transactions involving AmTrust and other entities he was affiliated with or owned in part, as outlined further herein.

46.     According to the 2016 Proxy Statement, M. Karfunkel was also a member of the controlling stockholder group, along with Zyskind, G. Karfunkel, and L. Karfunkel.  He was the husband of L. Karfunkel, brother to G. Karfunkel, and father-in-law to Defendant Zyskind.

47.     The Michael Karfunkel Family 2005 Trust (the "Karfunkel Trust") held 15,504,562 shares of the Company's common stock as of March 27, 2017, which represents approximately 9.06% of the Company's total shares of common stock.  The shares held by the Karfunkel Trust are beneficially owned and effectively controlled by L. Karfunkel and Zyskind. Defendants Zyskind and L. Karfunkel are co-trustees of the Karfunkel Trust, with the ultimate beneficiaries of the Karfunkel Trust being M. Karfunkel's children, one of whom is married to Defendant Zyskind.   The Karfunkel Trust is involved in several related-party transactions concerning AmTrust, as described below.

48.     Maiden Holdings, Ltd. ("Maiden") is a publicly held Bermuda insurance holding company that has various reinsurance and service agreements with AmTrust.  Maiden was

formed by M. Karfunkel and Defendants G. Karfunkel and Zyskind.  As of December 31, 2015, Defendant G. Karfunkel owned or controlled approximately 4.4% of the issued and outstanding capital stock of Maiden.  As of December 31, 2016, Defendants L. Karfunkel and Zyskind owned or controlled approximately 7.9% and 7.5%, respectively, of the issued and outstanding capital stock of Maiden.  Defendant Zyskind serves as chairman of Maiden's board of directors.

49.     Defendants Zyskind, L. Karfunkel, and G. Karfunkel are thus involved and interested in any related-party transactions involving the Company and Maiden.  For instance, in 2007, AmTrust and Maiden entered into a reinsurance agreement that required a Bermuda subsidiary of AmTrust to retrocede an amount equal to 40% of its premiums written for certain lines of business (net the cost of unaffiliated inuring reinsurance) to a Bermuda subsidiary of Maiden.  According to the 2017 Proxy, AmTrust recorded approximately $595.7 million of ceding commission under this agreement, which is effective until June 2019.  Additionally, there are at least four more related-party transactions involving Maiden and AmTrust, which are referenced on pages 42-44 of the 2017 Proxy Statement, and incorporated by reference herein.

50.     NGHC is a publicly held specialty personal lines insurance holding company that provides a variety of insurance products, including homeowners, umbrella, personal, and commercial automobile.  AmTrust has an approximately 12% ownership interest in NGHC.  The two largest stockholders of NGHC are the Karfunkel Trust and a grantor retained annuity trust controlled by L. Karfunkel.  M. Karfunkel served as NGHC's chairman and CEO until his death in April 2016.  M. Karfunkel's son, NGHC president Barry Karfunkel, replaced him as CEO. Defendants Zyskind and DeCarlo are also members of the Board of NGHC.

51.     Defendants Zyskind and L. Karfunkel are thus involved and interested in any related-party transactions involving the Company and NGHC.  For instance, AmTrust, pursuant

to a master services agreement, provides NGHC and its affiliates with information technology services in connection with the development and licensing of a policy management system, as well as additional administrative services in connection with the same.  In return, AmTrust receives 1.25% of National General's gross written premium, plus AmTrust's costs for development and support services.  In 2016, AmTrust earned over $46 million in fees related to the master services agreement with NGHC, up from $25.6 million in 2014 and $35.9 million in 2015.  As a director of both NGHC and AmTrust, DeCarlo was not independent and disinterested in approving this agreement.

52.     These figures do not correspond to NGHC's financial reporting.  For instance, in 2016, NGHC recorded $51.4 million in expenses related to the master services agreement with AmTrust.  Additionally, there are at least five more related-party transactions involving NGHC and AmTrust, which are referenced on pages 44-45 of the 2017 Proxy Statement, and incorporated by reference herein.

53.     ACP RE Ltd. ("ACP") is a privately held company solely owned by the Karfunkel Trust and thus is considered an AmTrust affiliate.  In 2014, ACP usurped a corporate opportunity from AmTrust when it acquired Tower Group International, Ltd. ("Tower") after AmTrust had already performed due diligence on Tower and submitted acquisition offers.

## SUBSTANTIVE ALLEGATIONS

**I.     Defendants Both Encouraged and Failed to Address the Fraudulent Accounting
        Scheme**

54.     Throughout the Relevant Period, Defendants knew or consciously disregarded that AmTrust lacked proper internal controls over its financial reporting, and that its financial statements were materially inflated by pervasive and wide-ranging accounting fraud.  Defendants manipulated AmTrust's financials by improperly accounting for, *inter alia*: i) warranty fee

revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  Further, Defendants were utilizing an array of complicated and fraudulent maneuvers that included chronic underreserving of liabilities and inconsistent reporting of ceded losses in reinsurance agreements between AmTrust and the other Karfunkel family's businesses.  Notwithstanding their significant obligations as members of the Board or as corporate officers, and as members of committees charged with overseeing AmTrust's corporate governance and other critical aspects of the Company's business and operations, Defendants failed to investigate, remedy or disclose the illicit accounting schemes or their significant impact on the Company.  This wholesale abnegation of their oversight responsibilities constituted a breach of the duties of loyalty and good faith.  Further, Defendant Pipoly, as the Company's CFO, breached his duties of loyalty, good faith, and care by actively participating in accounting manipulation and fraud.  These fraudulent practices ultimately harmed the Company, leading to investigations by the FBI, SEC and NYDFS, costly litigation against the company, harm to the Company's business and reputation, and erosion of its stock price.  It caused and is causing the Company to overpay to acquire its own stock by over $100 million and incur millions of dollars in expenses related to restating the Company's financials and defending (and in the future likely settling) securities fraud litigation.  Moreover, the misconduct caused A.M. Best to revise its outlook on AmTrust's (and its subsidiaries') Long-Term Issuer Credit Rating from stable to negative.

55.     Even as a series of articles and letters called various aspects of the Company's reserve accounting and financial statements into serious doubt, Defendants failed to take any action to uphold their fiduciary duties, instead ignoring or denying the problems until the Company was finally forced to restate nearly three years of financial statements in 2017.   The red flags Defendants received through these articles and letters not only put them on notice of the overall weaknesses of the Company's accounting, but of specific accounting problems that later contributed to the Company's need to restate its financial statements.   Nonetheless, the Defendants did nothing to comply with their fiduciary duties.

### A.     Defendants Ignored Blatant Red Flags of Improper Accounting

#### 1.     Geo Investing December 2013 Article

56.     On December 12, 2013, GEO Investing ("GEO") published an article accusing AmTrust of inflating earnings and net equity through the use of offshore entities.[4]   According to GEO, from 2009-2012, AmTrust failed to disclose a total of $276.9 million in losses ceded to Luxembourg subsidiaries.   Moreover, GEO accused the Company of improperly valuing its life settlement contracts "by using egregiously aggressive assumptions relative to peers despite lawsuit documents showing [AmTrust] holds many policies which are probably worthless."   The article stated that these accounting issues "could result in large losses and regulatory scrutiny for the company."   GEO estimated that using industry standard discount rates to value the life settlement contracts would result in a $90-$135 million impairment.

57.     In reaction to the GEO article, AmTrust's shares dropped $2.32, or 12%, from a close of $19.15 on December 11, 2013 to a close of $16.83 on December 12, 2013.   Defendant Zyskind publicly denied GEO's allegations, affirming that the Company had "never been

---

[4] The GEO article was titled "AmTrust Financial Services: A House of Cards?"

stronger" and was being targeted by short sellers looking to profit from a decline in AmTrust's share price.

2.      Barron's February 2014 Article

58.      On February 8, 2014, *Barron's* published an article questioning whether AmTrust's profits were the result of smart management or aggressive accounting.[5]  The article asserted that AmTrust's bookkeeping was likely not as sound as it appeared, noting that even one of the Company's own investment bankers, FBR Capital Markets, was confused about AmTrust's accounting practices.  The concerns expressed in the article were raised after "long interviews with AmTrust executives," and Bill Alpert, the article's author was left "with questions about some cost deferrals and reinsurance maneuvers that [other] critics highlighted."

59.      The article explored AmTrust's intricate web of deals with related-parties involving members of the Karfunkel family.  Specifically, *Barron's* discussed the streamlined commissions AmTrust received from Tower Group International, NGHC, and Maiden, as well as the Karfunkel family's ownership interest in each entity.  Because of AmTrust's various arrangements with these related-parties, certain AmTrust critics expressed serious doubts as to whether AmTrust's businesses were performing as well as the Company reported them to be: "We think that they're using a grab bag of ways to make the business look much better than it really is," says Mark Roberts, head of Off Wall Street.

60.      *Barron's* illustrated one example of the Company's questionable accounting scheme:

---

[5] *Barron's* February 8th article was titled "An Insurer's Feat: Turning Losses Into Gains" and subtitled "Insurer AmTrust has a key earnings call on Thursday.  Can it persuade investors its profits result from smart management, and not aggressive accounting?  Watch the stock."

Before AmTrust cedes business to outside reinsurers like Maiden, it sends premiums and losses to its wholly owned captive reinsurer in Bermuda called AmTrust International Insurance.  This captive in turn sends some losses to other reinsurance captives that AmTrust has in Luxembourg, where tax benefits can be gained by charging those losses against a particular kind of reserve that's not available under U.S. accounting rules.

61.    Through these "unusual" arrangements, AmTrust used the Luxembourg tax benefits to lower the Company's reported operating expenses by roughly $28 million from 2010 through 2012, a tactic that increased its pretax profits by half a percent.  The accounting irregularity, *Barron's* noted, stemmed from the fact that the profits from these transactions appeared in AmTrust's financial statements, while the Company's corresponding losses ceded to its Luxembourg subsidiaries did not.  AmTrust argued that "those losses are inflated 'artificially' or 'synthetically' and don't reflect the real world claims on its primary insurance subsidiaries."  Defendant Zyskind further justified this practice as "a way to draw down theses reserves," and that "[t]hey are self-created losses within our organization, so they get completely eliminated in consolidation."

62.    While AmTrust contended that this arrangement was proper under U.S. and Luxembourg accounting rules, in reality the Company was reporting "loss numbers to auditors and insurances commissioners that it acknowledges aren't authentic."  The article also expressed concerns with the way AmTrust calculated its profits by deferring costs more aggressively than its matching revenues.  *Barron's* wrote that the corresponding accounting ratios for these variables should be "more or less steady across time and comparable business—but in the years following AmTrust's IPO, its ratio of deferred acquisition costs to unearned premiums . . . has climbed from a below-average 17% to as high as 41%."

3.      *Barron's* May 2014 Article

63.    On May 31, 2014, Barron's published another article questioning "AmTrust's capital footing."[6] The article, in relevant part, asserted:

> Multimillion-dollar incongruities appear in AmTrust's various securities and insurance filings, for example, in inconsistent loss reserves that have the effect of flattering earnings and capital.  That's worrisome, because poorly controlled reserving can prove to be a snakebite to an insurer if growth slows–triggering a double whammy as underwriting losses demand new capital while rendering earnings less attractive to investors.  If AmTrust's accounting is found wanting, its tangible book multiple could drop back to the industry average of 1.4, bringing shares down below $15.

* * *

> Questions about whether the company is underreserved arise because of some puzzling accounting disparities: AmTrust and Maiden Holdings show a $400 million difference in their accounting for the same reinsurance activities; AmTrust's numbers for acquired reserves differ by $50 million in different parts of its financial reports; while the latest 10-K's tabulation of loss reserves leaves AmTrust with negative reserves for some years—an impossible accounting that would mean that policyholders would actually pay AmTrust millions for claims in those periods.

64.    According to *Barron's*, AmTrust's head of investor relations, Beth Malone, emphasized that "AmTrust is more than adequately reserved."

65.    Barron's also questioned AmTrust's relationship with Maiden, the publicly traded insurer controlled by the Karfunkel family.  The reinsurance relationship between AmTrust and Maiden is substantial, with the Company steering 40% of its premiums and losses to Maiden.  However, AmTrust's year-end balance sheet showed approximately $1.9 billion in assets receivable from Maiden, whereas Maiden's balance sheet showed that the liabilities due to AmTrust were less than $1.5 billion.  According to Barron's, "[t]hat $400 million variance seems to lie mainly in the companies' different reserve estimates for policyholder losses not yet

---

[6] *Barron's* May 31st article was titled "Balance-Sheet Risk Makes AmTrust Shares Vulnerable" and subtitled "Property and casualty insurer AmTrust has shone by growing faster with seemingly better margins than rivals.  But its accounting raises questions."

reported to the insurers.  But such a large disagreement invites the question of whether Maiden is understating its liabilities or AmTrust is overstating its assets."

66.     Barron's May 31, 2014 article also accused the Company of manipulating its financials by funneling losses through its subsidiaries, three of which had triggered multiple warning flags in the IRIS database operated by the National Association of Insurance Commissioners:

> State insurance filings of AmTrust units show that the Bermuda captive has lost about $400 million under its reinsurance agreements with its AmTrust counterparts in the last five years. The Bermuda unit's regulatory capital fell last year from $499 million to $416 million, a level just over two-times the minimum required for "solvency" under Bermuda's relatively lenient standards. By contrast, Maiden ended the year with more than four times Bermuda's capital requirement.

> AmTrust's Bermuda unit is more than adequately capitalized, says Malone, and its numbers shouldn't be compared with those of any other reinsurer. That's because it reinsures only stable, predictable risks, she says.

> In its 2013 10-K, AmTrust disclosed that three of the company's U.S. subsidiaries have triggered four or more warning flags in the IRIS database operated by the National Association of Insurance Commissioners. IRIS readings indicate abnormal financial ratios at those insurers, which AmTrust attributed to its reinsurance structure.

> AmTrust clearly has its own ways of counting.  As *Barron's* previously reported ("An Insurer's Feat: Turning Losses Into Gains," Feb. 10, 2014), AmTrust and its sister company National General have enhanced their operating margins by making more than $200 million in underwriting losses go unreported to investors. It did that by sending the losses to wholly-owned Luxembourg reinsurance companies.  After our story, the AmTrust restated its past financials to remove the operating profit boost.  Before National General's recent initial public offering, the Securities and Exchange Commission challenged its accounting for the Luxembourg transactions and National General restated its financials, while admitting in its SEC correspondence that its unusual Luxembourg accounting was "counterintuitive."  Businesses designed to lose money, like the Luxembourg reinsurers, had never been "contemplated by the accounting literature," the insurer told the SEC.

> Perhaps AmTrust and its sibling companies are just smarter than everyone else in the business.

67.     In reaction to Barron's May 31, 2014 article, AmTrust's stock price dropped $0.60 per share, or 2.81%, over the next two trading days, from $21.35 per share on Friday, May 30, 2014 to $20.75 per share on Tuesday, June 3, 2014.

68.     During the summer and fall of 2014, several investors sharply questioned the accounting and financial statements of AmTrust.   On December 11, 2014, AmTrust filed a summons and notice in New York State Supreme Court, New York County, against Alistair Capital and others alleging, *inter alia*, defamation for "dissemination of actionable false and misleading statements concerning plaintiff's business . . . ."

### 4.     The Alistair Capital Letter

69.     In response, on December 18, 2014, Alistair Capital sent a letter to the Audit Committee—Defendants Gulkowitz, DeCarlo, and Fisch—alerting them to "numerous instances of improper accounting and indications of material weaknesses in internal controls over financial reporting" at AmTrust.   The letter highlighted both of *Barron's* 2014 articles, as well as several reports published by the independent research firm Off Wall Street, raising "serious questions with respect to AmTrust's accounting practices."   In Alistair Capital's view, "management's responses to these articles have done little to refute the troubling assertions set forth therein.   In fact, the Company's responses appear to corroborate the detailed and specific allegations that AmTrust's accounting is severely flawed."   Instead of refuting these allegations, AmTrust has opted to "pursue litigation scare tactics designed to silence those who raise difficult questions about the Company's practices."   Given the "lengths to which management has gone in an attempt to silence its critics, one has to wonder what the Company is hiding.   As members of AmTrust's Board of Directors, and specifically its Audit Committee, we believe it is your duty to find out."

70.     The Alistair Capital Letter called into question: (i) the efficacy of AmTrust's internal accounting controls for financial reporting; (ii) AmTrust's accounting for deferred acquisition costs; (iii) AmTrust's valuation of life settlement contracts; (iv) the sizable difference between balance sheet accounts reported by AmTrust and the amounts Maiden reports for the corresponding accounts in its financial statements; (v) AmTrust's accounting for Luxembourg Reinsurance Captives; and (vi) AmTrust's accounting for loss and loss adjustment reserves in conjunction with acquisitions.

71.     Alistair Capital questioned the efficacy of AmTrust's internal controls over financial reporting for a number of reasons.  First, Alistair Capital was "concerned about the frequent and material differences between amounts reported in AmTrust's Forms 8-K . . . and amounts reported to the SEC in the Company's Forms 10-K and 10-Q."  Second, Alistair Capital believed that the Company's "loss reserve triangles indicate that either accident years 2008 and 2009 are woefully deficient (the reserve triangles negative remaining services) or, more likely, AmTrust's disclosures reflect flawed data that validate [Alistair Capital's] skepticism of the Company's reported financial statements."  Third, Alistair Capital noticed that "amounts disclosed in AmTrust's balance sheets, cash flow statements, and purchase price allocations 'for Accrued Expenses and Other Liabilities' appear to be irreconcilable."  Lastly, the Alistair Capital Letter noted that, during Defendant Pipoly's tenure as CFO of Maiden, PricewaterhouseCoopers concluded that Maiden had material weaknesses in its internal controls over financial reporting.

72.     The Alistair Capital Letter further highlighted that "AmTrust appears to understate its expense ratio, and therefore overstate its net income, as a result of a mismatch in the Company's recognition of acquisitions costs and premiums in a way that may violate U.S. GAAP."  When questioned by *Barron's* about this specific issue, AmTrust's management

provided a misleading answer, improperly comparing AmTrust's *net* deferred acquisition costs to *gross* unearned premiums, which artificially lowered the Company's expense ratio.  GAAP rules require that acquisition costs be recognized *proportionate to* a company's recognition of deferred revenue.

73.     Moreover, Alistair Capital informed the Audit Committee that AmTrust is improperly valuing its life settlement contracts "by ignoring readily available information about the inputs market participants use to value life settlement contracts."  AmTrust purportedly applies a significantly lower discount rate than industry peers to estimate the fair value of its life settlement contracts, thereby overvaluing the contracts.

74.     Another significant deficiency with respect to AmTrust's accounting, in Alistair Capital's view, "related to the sizeable differences between balance sheet accounts reported in AmTrust's financial statements and the amounts Maiden reports for the corresponding accounts in its financial statement."  As set forth in the chart below, there is a significant variance between AmTrust's Reinsurance Recoverable and Maiden's Unpaid Loss and LAE Reserves:

| Description | Amount (mm)[31] |
|---|---|
| AmTrust Reinsurance Recoverable (vis-à-vis Maiden) | $ 1,144.2 |
| Maiden Unpaid Loss & LAE Reserves (AmTrust Q.S. Segment) | $ 796.0 |
| **Difference in Loss & LAE Reserves Ceded (Assumed)** | **$ 348.2** |
| AmTrust Prepaid Reinsurance Premiums (vis-à-vis Maiden) | $ 739.7 |
| Maiden Unearned Premiums (AmTrust Q.S. Segment) | $ 687.4 |
| **Difference in Unearned Premiums Ceded (Assumed)** | **$ 52.4** |
| AmTrust Ceded Reinsurance Premiums Payable (vis-à-vis Maiden) | $ (393.9) |
| Maiden Reinsurance Balance Receivable (AmTrust Q.S. Segment) | $ (278.6) |
| **Difference in Ceded Premiums Payable (Assumed)** | **$ (115.4)** |
| AmTrust Net Assets (vis-à-vis Maiden) | $ 1,489.9 |
| Maiden Net Liabilities (AmTrust Q.S. Segment) | $ 1,204.8 |
| **Difference in Unearned Premiums Ceded (Assumed)** | **$ 285.2** |

75.     The Alistair Capital Letter accentuated that "[i]f AmTrust is over-estimating the amount it will recover from Maiden in proportion to AmTrust's gross reserves, then AmTrust's equity is directly over-stated by a material amount, particularly relative to tangible equity."  The Company would also be in violation of U.S. GAAP if its reinsurance recoverables and gross reserves are inconsistent.   Alistair Capital urged the Audit Committee to investigate this discrepancy in light of the important quota share agreement between the two companies and the related-party nature of its relationship—Defendant Zyskind is the Chairman of Maiden's Board of Directors.

76.     Alistair Capital further asserted that AmTrust's accounting for loss and loss adjustment reserves assumed in conjunction with its acquisitions was problematic given the $102 million irreconcilable difference between AmTrust's reserve reconciliation disclosure ($807.6 million) and its purchase price allocation disclosures ($705.3 million).

| Loss & LAE Reserves Assumed in Conjunction with Acquisitions | Gross Loss & LAE Reserves | Reinsurance Recoverable (Paid & Unpaid) | Net Loss & LAE Reserves | Source: |
|---|---|---|---|---|
| Purchase Price Allocation ("PPA") | $      761.3 | $      56.0 | $      705.3 | *From Above* |
| Financial Stmt Comparison | $      764.2 | $      63.8 | $      700.4 | *From Above* |
| Inorganic (Acquired) per Reserve Reconciliation | * | ** | $      807.6 | *2013 Form 10-K, Footnote 9* |
| Minimum Difference in Acquired Reserves | * | ** | $      102.3 | *Calculation* |
| *While the Reserve Reconciliation does not provide an amount for Gross Loss & LAE Reserves acquired, there should be no difference across methodologies.* | | | | |
| **Because the Reserve Reconciliation references <u>unpaid</u> losses only, it could slightly understate reinsurance recoverables. With that said, even if one were to assume that all Reinsurance Recoverables acquired (max: $63.8 million) related to losses already paid by AmTrust, one still would not be able to bridge the $104.8 million minimum difference in Net Loss & LAE calculated above.* | | | | |

77.     When confronted with Alistair Capital's detailed letter to the Audit Committee regarding accounting and financial irregularities at AmTrust, the Company quietly backed down from its lawsuit.  A review of the court docket shows no action was ever taken nor was any other filing made.  If AmTrust truly believed that the allegations were without basis, it would and should have pursued its lawsuit.  Instead, the Company and the Board knew the truth, that the detailed allegations were well founded.  The Defendants' action in this regard is an admission

that they knew the truth, which they would only admit years later with the 2017 financial restatement.

5.   *Barron's* April 2016 Article

78.   On April 23, 2016, *Barron's* once again challenged the adequacy of AmTrust's reserves and its accounting, asserting that "[t]he insurance filings of its subsidiaries show that the cost of settling claims for policies issued in the seasoned years 2007-13 have climbed hundreds of millions of dollars above the reserves that AmTrust initially set aside."[7]  As such, *Barron's* explained that the Company "has had to increase substantially its estimates of the cost of settling claims, in contrast with the decreases enjoyed by P&C insurance leaders like Chubb (CB) and Travelers (TRV)."  *Barron's* further noted that even analysts at AmTrust's investment banker, KBW, wondered whether the insurer's underwriting margins were overstated.

79.   The article also reexamined the Luxembourg accounting transactions. Specifically, the article asserted that even though the Company's insurance losses that were ceded to AmTrust's Luxembourg subsidiary "netted more than $900 million since 2008, according to AmTrust's filings with insurance regulators, [those losses] aren't reflected in the consolidated financials that AmTrust files" with the SEC.

80.   In reaction to Barron's April 23 article, AmTrust's stock price dropped $1.22 per share, or 5%, from $26.01 per share on Friday, April 22, 2016 to $24.79 per share on Monday, April 25, 2016.

81.   As a result of these articles, Defendants knew of AmTrust's fraudulent accounting scheme.  Defendants were unquestionably aware of the *Barron's* articles, as the Company

---

[7] *Barron's* April 23rd article was titled "Is AmTrust Stock Worth the Premium?" and subtitled "The property & casualty insurer has grown rapidly. But questions persist about its reserve adequacy and accounting."

publicly responded to the articles.   In addition, AmTrust's management provided written responses to ten questions posed by *Barron's* in 2014.[8]  The Alistair Capital letter was addressed directly to certain Defendants, namely Gulkowitz, DeCarlo and Fisch.

**B.**    **Defendants Ignored Red Flags Regarding The Specific Fraudulent Accounting Practices, Internal Controls Weaknesses, and Auditor Deficiencies that Led to the 2017 Financial Restatements**

82.    As a result of the above-discussed articles and letters, as well as other red flags, Defendants were directly on notice of the overall weakness of AmTrust's internal controls over its financial reporting, which, as the Alistair Capital Letter said, was "indicative of an environment in which an accounting fraud could be perpetuated."   Further, the red flags described below concerned the very same fraudulent and improper accounting practices that later led AmTrust to restate its financials and that subjected them to securities fraud lawsuits and investigations by government agencies.

1.    Red Flags Concerning AmTrust's Auditor

83.    On September 12, 2014, AmTrust filed a Form 8-K with the SEC disclosing certain details about NYDFS's approval of ACP's acquisition of Tower Group International, Ltd. ACP is a privately held company solely owned by the Karfunkel Trust and thus is considered an AmTrust affiliate.   Because of AmTrust's affiliation with ACP, NYDFS recommended and the

---

[8] On May 18, 2016, the Southern Investigative Reporting Foundation published a report, entitled "Barry Zyskind's High Stakes Three Card Monte Game," that further highlighted Zyskind and the Karfunkel family's persistent desire to navigate financial regulations for their own personal gain.  The report stated that Zyskind, in an attempt to avoid massive tax liabilities and simultaneously maintain his substantial ownership stake in the Company, transferred over $378 million of AmTrust stock to a purportedly phantom charitable foundation in 2016.  According to the report, a transfer of this magnitude, when taken together with the current AmTrust holdings of other charitable foundations, would violate IRS rules and require Zyskind and the Karfunkel family to sell over 23 million shares of AmTrust stock.  The report's author contacted various AmTrust representatives but no further investigation by the Company ensued.

Karfunkel Trust purportedly agreed that AmTrust would take certain actions due to "the significant recent growth in AmTrust's gross written premium and the likely further future growth resulting from its participation in transactions related to ACP's acquisition of Tower…." Among these was a statement implying that BDO was no longer sufficient as the Company's external auditor:

> In light of AmTrust's growth and increased geographic footprint, **AmTrust will engage an external auditing firm with corresponding global resources and skills beginning with the audit for the annual period ending December 31, 2015**. Before the engagement is undertaken, the selection of the auditing firm shall be subject to the review and prior approval of the Department.

(emphasis added).  In spite of not only receiving this red flag from NYDFS, but *agreeing* to replace its auditor, AmTrust maintained BDO as its external auditor for the year ended December 31, 2015, and did not replace them until April 2016, when it replaced BDO with KPMG.  A year later, the *Wall Street Journal* reported that a whistleblower at BDO had collected evidence of AmTrust's accounting manipulation regarding its reserves and had divulged the evidence to the FBI.

### 2.   Red Flags Regarding Internal Controls

84.   The December 18, 2014 Alistair Capital Letter devoted nearly five pages to addressing red flags about the *overall inadequacy* of AmTrust's internal accounting controls over financial reporting.  That section of the letter raised several significant reasons to doubt the efficacy of AmTrust's internal controls:

> First, we are concerned about the frequent and material differences between amounts reported in AmTrust's Forms 8-K, filed with the SEC in conjunction with quarterly earnings reports, and amounts reported to the SEC in the Company's Forms 10-K and 10-Q.  We believe these frequent and often material discrepancies indicate the Company is reporting inaccurate information in one or both of the filings for a given period.

> Second, we believe AmTrust's loss reserve triangles indicate that either accident years 2008 and 2009 are woefully deficient (the reserve triangles negative

remaining reserves) or, more likely, AmTrust's disclosures reflect flawed data that validate our skepticism of the Company's reported financial statements.

Third, we have noticed that amounts disclosed in AmTrust's balance sheets, cash flow statements, and purchase price allocations for "Accrued Expenses and Other Liabilities" appear to be irreconcilable, as discussed further below. In addition, the amount AmTrust reports for Accrued Expenses and Other Liabilities in the footnotes to the Company's financial statements does not even correspond to the amount reported in the balance sheet.

Fourth, we note that Ronald Pipoly, Jr., AmTrust's Chief Financial Officer ("CFO"), served as the CFO of Maiden Holdings, Ltd. ("Maiden") during the period that PricewaterhouseCoopers determined Maiden had "deficiencies which aggregate to a material weakness in internal control over financial reporting".

85.     The Alistair Capital Letter then elaborated on each of these issues in detail, providing specific examples from financial statements and other documents. Consequently, the letter determined, "these signs of weak internal controls for financial reporting purposes are *indicative of an environment in which an accounting fraud could be perpetuated if members of the Audit Committee fail to fulfill their duty of care* in diligently monitoring the Company's control environment" (emphasis added). As alleged further herein, such fraud was, indeed, perpetrated, and when Defendants could no longer continue to conceal the fraud, they were forced to restate several years' worth of financial statements, including 2012-2016. As part of AmTrust's February 27, 2017 press release, the Company specifically stated that it had "identified material weaknesses in its internal control over financial reporting that existed as of December 31, 2016, specifically related to ineffective assessment of the risks associated with the financial reporting, and an insufficient complement of corporate accounting and corporate financial reporting resources within the organization." Thus, the Alistair Capital Letter put Defendants on notice of the overarching and severe problems with the Company's internal controls and its related impact on the Company's financial reporting.

86.     Further, AmTrust's restatement of financials going back to 2012 not only corrected errors related to deferred acquisition costs *and* the understatement of expenses, but also corrected warranty services revenue and foreign exchange adjustment.  This led to several years' worth of wide-ranging restatements of everything from net income to cash.  Thus, the depth and breadth of the restatement validated Alistair's claims that AmTrust's "internal controls over financial reporting are materially deficient."

3.     <u>Red Flags Regarding Reserves</u>

87.     In addition to internal controls red flags—which put Defendants on notice of a problem underlying *all* of *Defendants'* accounting issues—Defendants also were made aware of red flags regarding improper accounting regarding reserves.

88.     For instance, a *May* 31, 2014 *Barron's* article questioned the Company's reserves, stating, "[m]ultimillion-dollar incongruities appear in AmTrust's various securities and insurance filings, for example, in inconsistent loss reserves that have the effect of flattering earnings and capital."  Specifically, the article noted that:

> Questions about whether the company is underreserved arise because of some puzzling accounting disparities: AmTrust and Maiden Holdings show a $400 million difference in their accounting for the same reinsurance activities; AmTrust's numbers for acquired reserves differ by $50 million in different parts of its financial reports; while the latest 10-K's tabulation of loss reserves leaves AmTrust with negative reserves for some years—an impossible accounting that would mean that policyholders would actually pay AmTrust millions for claims in those periods.

89.     In response, Beth Malone, head of investor relations, stated, "AmTrust is more than adequately reserved[.]"

90.     A subsequent April 23, 2016 *Barron's* article specifically addressed the inadequacy of AmTrust's reserves, stating that AmTrust's statutory filings on behalf of its insurance units "show it has consistently underestimated the cost of settling claims."  The article

continued, "[i]f the company reserved for claims as *conservatively* as some bigger insurers do, its profits would probably be lower, and so would its shares."  Defendants not only were aware of this red flag, but specifically responded to it in order to falsely deny it, stating that the Company's "reserving is conservative and rigorous."  Yet, a mere ten months later, on February 27, 2017, AmTrust announced that it was taking a reserve charge of $65.0 million, or approximately $0.24 per diluted share, due to the fact that "this [Specialty Program] segment has underperformed relative to our expectations, which led us to install new leadership and to adjust our approach to writing programs for commercial auto, general liability, and workers' compensation."  As *Barron's* pointed out in a subsequent March 4, 2017 article, titled "Our Skepticism on AmTrust Reserves Borne Out," this meant that their prior warnings about AmTrust's reserves had proven correct:

> On Monday, property and casualty insurer AmTrust Financial Services announced disappointing December-quarter earnings and a $65 million reserve charge that shouldn't have surprised anyone familiar with questions Barron's raised about its accounting and reserve levels (most recently in "Is AmTrust Stock Worth the Premium?"  April 23, 2016).[9]

91.    Defendants not only read this *Barron's* article, but issued a document on April 24, 2016 titled "AmTrust Response to 4/22/16 [sic] *Barron's* Article."  Thus, they were not only on notice of these red flags but responded to some of them within 24 hours.  Defendants' quick response also belies any suggestion that they thoroughly investigated the claims made in the article.

92.    Moreover, despite the $65 million charge in Q4 2016 and the restatements of its previously filed financial statements, Defendants continue to under-reserve.  A May 9, 2017 *Barron's* article highlighted the issue of under-reserving:

---

[9] http://www.barrons.com/articles/our-skepticism-on-amtrust-reserves-borne-out-1488611788

[A]nalysts asked a lot of questions about the adequacy of the insurer's loss reserves. That's because the March quarter showed a continuation of AmTrust's practice of setting aside seemingly-low reserves against future claims, despite a decade of state insurance filings that show "adverse development" in its reserves-- meaning that insurance losses have exceeded the company's earlier estimates.[10]

### 4.  Red Flags Regarding Improper Accounting for Deferred Acquisition Costs

93.     At least as early as February 2014, Defendants received red flags about problems with the way the Company accounted for its deferred acquisition costs – one of the accounting issues that was the subject of both the underlying fraud and the 2017 restatements.

94.     Specifically, a February 8, 2014 *Barron's* article titled "An Insurer's Feat: Turning Losses Into Gains" discussed, *inter alia*, the ways in which "AmTrust gets an even bigger profit boost by deferring costs more aggressively than the matching revenues":

> Insurers put a portion of their premium revenues into a balance sheet reserve called "unearned premiums," while deferring a matching portion of commissions and other premium-generating expenses into an asset called "deferred policy acquisition costs" —amortizing each over the course of the coverage. The ratio of these line items should be more or less steady across time and comparable businesses—*but in the years following AmTrust's IPO, its ratio of deferred acquisition costs to unearned premiums, net of reinsurance items, has climbed from a below-average 17% to as high as 41%*. Some of that rise surely reflects acquisition accounting, which puts the deferred costs of companies bought by AmTrust into the separate category of goodwill. But Off Wall Street suggests that *AmTrust has also been violating the matching principle by capitalizing costs more aggressively than revenues like the ceding commission that AmTrust gets from Maiden*.

> AmTrust's Chief Financial Officer Ronald Pipoly describes its deferral accounting as "very conservative." He notes that AmTrust didn't have to restate deferrals when accounting rules tightened in 2011, unlike some rivals. The company produced for Barron's a chart showing AmTrust's cost/revenue deferrals ratio as 18% in the September quarter, around the middle of its peers. *But the ratios used by the company were actually an apples-to-oranges comparison of net costs to gross revenues, in which the deferred cost numerator was reduced by reinsurance commissions. However, the unearned premium denominator was not reduced by the corresponding prepaid reinsurance premiums*. (emphasis added).

---

[10] http://www.barrons.com/articles/why-amtrust-financial-services-is-tumbling-1494360098

95.     This article was among the red flags that put Defendants on notice of the Company's improper accounting for deferred acquisition costs.   Further, Defendants were *already* on notice of this issue, as Zyskind specifically spoke with *Barron's* for purposes of the article and the Company provided *Barron's* with a chart purporting to show its cost/revenue deferrals ratio.   Improper deferral of acquisition costs throughout the Relevant Time Period was also one of the issues that caused Defendants to later restate the Company's financials.

## II.     DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES BY CAUSING THE COMPANY TO REPURCHCASE STOCK AT INFLATED PRICES, AND, IN THE CASE OF THE SELLING DEFENDANTS, BY SELLING STOCK TO THE COMPANY AT INFLATED PRICES

96.     In breach of their fiduciary duties to AmTrust and its stockholders, and, as explained below, in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, Defendants issued, and caused the Company to issue, statements that, in light of the illicit accounting scheme detailed above, were materially false or misleading when made.   Defendants' misrepresentations artificially inflated the price of AmTrust shares, causing the Company to purchase shares at artificially inflated prices, through its significant stock repurchase program.[11]

97.     Defendants' misconduct had at least three primary aims, ball of which were realized:

*First*, by causing AmTrust to conduct share repurchases, Defendants signaled to investors their purported belief that AmTrust shares were trading at a discount, which caused investors to purchase shares and thereby drive the price up.   This was particularly important to the Control Group which owned half of the Companies' shares.   Further, and relatedly, the Company's repurchasing of shares artificially inflated its financial metrics such as earnings per share, as the

---

[11] Defendants' materially false and misleading statements throughout the Relevant Period are documented in paragraphs 114 to 225.

repurchases resulted in fewer outstanding shares.  The artificial inflation of AmTrust shares helped mask the illicit accounting scheme (and thus helped perpetuate it);

*Second*, *as* detailed below, as a result of the artificial inflation of the price of AmTrust shares, the Insider Selling Defendants sold shares at higher prices, and in some instances sold them to the Company, thus reaped greater proceeds than they would have absent the artificial inflation; and

*Third,* as described in detail below, Zyskind, the CEO and a member of the Control Group, received tens of millions of dollars in compensation that was based in part on financial results that were later restated.

### A.     Defendants Caused AmTrust to Conduct a Massive Stock Repurchase Program

98.    AmTrust's Board periodically authorizes the Company to repurchase its own shares of common stock.  The Board authorized a series of share repurchases during the Relevant Period that, collectively, were substantially higher than any other repurchases in the Company's history.

99.    In December 2013, AmTrust's Board of Directors approved a $150 million share repurchase program.  In April 2016, the Board of Directors approved an increase of $200 million to the Company's existing stock repurchase authorization.  As detailed in the chart below, between June 2014 and August 2016, AmTrust repurchased approximately 8,045,787 shares of its stock, paying over $227 million for them:

| Month/Year of Repurchase | Shares Repurchased[12] | Weighted-Average Price | Amount |
|---|---|---|---|
| June 2014 | 266,886 | $41.08 | $10,963,677 |
| August 2014 | 1,771 | $42.50 | $75,268 |
| September 2014 | 841,131 | $39.83 | $33,502,248 |
| October 2014 | 367,379 | $39.69 | $14,581,273 |
| December 2014 | 92,448 | $56.25 | $5,200,200 |
| January 2015 | 10,505 | $55.00 | $577,775 |
| February 2015 | 37,783 | $55.60 | $2,100,735 |
| December 2015 | 184,898 | $30.79 | $5,693,009 |
| February 2016 | 658,552 | $24.90 | $16,397,945 |
| March 2016 | 5,539 | $24.96 | $138,253 |
| April 2016 | 2,096,017 | $24.79 | $51,960,261 |
| May 2016 | 448,506 | $25.93 | $11,629,761 |
| June 2016 | 1,031,337 | $24.57 | $25,339,950 |
| July 2016 | 1,899,645 | $24.39 | $46,332,342 |
| August 2016 | 103,390 | $24.34 | $2,516,513 |
| **Total** | **8,045,787** | | **$227,009,210** |

100.   After the April 11, 2017 *Wall Street Journal* article, the price per share of AmTrust stock fell to $15.30.  This reflected the true price per share of AmTrust stock had Defendants not engaged in the illicit accounting scheme detailed herein.  Therefore, any repurchases by the Company should have been made valuing their common stock at $15.30.  As

[12] Includes shares that were withheld to satisfy tax withholding amounts due from certain employees upon the vesting of previously issued restricted shares.

such, during the Relevant Period, AmTrust overpaid for repurchases of its own stock by approximately $104 million.

101.    In conducting share repurchases, Defendants falsely signaled to the public that they believed AmTrust's shares were undervalued and that the repurchases were the best use of the Company's cash.   The share repurchases also had the effect of growing the Company's earnings per share—as share repurchases lower the number of shares outstanding, on which earnings per share are based—as well as its return on assets, return on equity, and other metrics. Together, these actions helped inflate AmTrust's share price.

      **B.**     **The Insider Selling Defendants Unlawfully Profited at AmTrust's Expense By Selling Back Shares to the Company at Artificially Inflated Prices**

102.    During the Relevant Period, the Insider Selling Defendants (Pipoly, Gulkowitz, and DeCarlo) – who were the CFO and the majority of the Audit Committee – took advantage of the artificial inflation of AmTrust's shares caused by Defendants' false or misleading statements. These Defendants collectively sold or otherwise disposed of over $5,625,000 in AmTrust stock during that time, all while in the possession of material, non-public information.   The Company's share price was also lifted during that time by the share repurchase program, which was approved despite Defendants' knowledge or conscious disregard of the unlawful practices detailed in this Complaint.

103.    As detailed in the chart below, Defendant Pipoly sold or otherwise disposed of 89,780 shares of AmTrust common stock for a total of $3,152,561:

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 02/15/2014 | 2,045 | $33.33 | $68,160 |
| 02/15/2014 | 1,959 | $33.33 | $65,293 |

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 03/05/2014 | 1,812 | $38.16 | $69,146 |
| 03/22/2014 | 378 | $38.87 | $14,693 |
| 01/02/2015 | 14,393 | $56.029 | $806,425 |
| 01/02/2015 | 481 | $56.6358 | $27,242 |
| 02/15/2015 | 2,841 | $55.60 | $157,960 |
| 02/15/2015 | 2,770 | $55.60 | $154,012 |
| 03/05/2015 | 2,238 | $53.87 | $120,561 |
| 03/05/2015 | 2,288 | $53.87 | $123,255 |
| 01/04/2016 | 2,000 | $60.154 | $120,308 |
| 02/04/2016 | 4,000 | $27.3534 | $109,414 |
| 02/15/2016 | 3,970 | $25.05 | $99,449 |
| 03/04/2016 | 4,000 | $25.605 | $102,420 |
| 03/05/2016 | 4,475 | $25.73 | $115,142 |
| 03/05/2016 | 4,575 | $25.73 | $117,715 |
| 03/05/2016 | 3,241 | $25.73 | $83,391 |
| 04/04/2016 | 4,000 | $26.4044 | $105,618 |
| 05/04/2016 | 4,000 | $25.6055 | $102,422 |
| 01/03/2017 | 4,000 | $27.1845 | $108,738 |
| 02/03/2017 | 4,000 | $26.7312 | $106,925 |
| 03/03/2017 | 4,000 | $22.6708 | $90,683 |
| 03/05/2017 | 3,210 | $23.03 | $73,926 |
| 03/05/2017 | 3,282 | $23.03 | $75,584 |
| 03/05/2017 | 2,325 | $23.03 | $53,545 |

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 03/05/2017 | 3,497 | $23.03 | $80,536 |
| **Total** | **89,780** | | **$3,152,563**[13] |

104.    As detailed in the chart below, Defendant Gulkowitz sold or otherwise disposed of 22,251 shares of AmTrust common stock for a total of $859,600:

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 11/24/2015 | 7,125 | $61.84 | $440,610 |
| 12/20/2016 | 15,126 | $27.70 | $418,990 |
| **Total** | **22,251** | | **$859,600**[14] |

105.    As detailed in the chart below, Defendant DeCarlo sold or otherwise disposed of 46,673 shares of AmTrust common stock for a total of $1,613,795:

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 05/21/2014 | 21,689 | $44.4438 | $963,942 |
| 09/15/2016 | 2,200 | $26.5299 | $58,366 |
| 10/03/2016 | 3,114 | $26.1925 | $81,563 |
| 11/01/2016 | 3,200 | $25.8859 | $82,835 |
| 12/01/2016 | 3,420 | $25.7497 | $88,064 |

---

[13] As of April 11, 2017, Defendant Pipoly's ownership interest in AmTrust was worth $5,085,077.

[14] As of April 11, 2017, Defendant Gulkowitz's ownership interest in AmTrust was worth $595,445.

| Transaction Date | Number of Shares | Price per Share | Total Value |
|---|---|---|---|
| 01/03/2017 | 4,620 | $27.1896 | $125,616 |
| 02/01/2017 | 4,830 | $26.6686 | $128,809 |
| 03/01/2017 | 3,600 | $23.50 | $84,600 |
| **Total** | **46,673** | | **$1,613,795**[15] |

106.    At the time of these stock transactions, the Insider Selling Defendants knew about or consciously disregarded material, non-public information regarding the illicit accounting scheme, but nonetheless sold or otherwise disposed of AmTrust common stock on the basis of that information.

### C.    In Repurchasing Stock, AmTrust relied on Defendants' False or Misleading Statements

107.    In repurchasing shares in connection with the stock repurchase program, AmTrust relied on Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

108.    Throughout the Relevant Period, AmTrust justifiably expected Defendants to disclose material *information* as required by law and SEC regulations in the Company's periodic filings with the SEC.  AmTrust would not have repurchased its securities at artificially inflated prices had Defendants disclosed all material information then known to them, as detailed in this Complaint.  Thus, reliance by AmTrust should be presumed with respect to Defendants'

---

[15] As of April 11, 2017, Defendant DeCarlo's ownership interest in AmTrust was worth $1,711,121.40.

omissions of material information as established under the *Affiliated Ute* presumption of reliance.

109.    Additionally, the "fraud on the market" presumption applies to Defendants' misstatements of material fact or failures to disclose material facts.

110.    At all relevant times, the market for AmTrust's common stock was efficient, for the following reasons, among others:

a)    AmTrust's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b)    As a regulated issuer, AmTrust filed periodic reports with the SEC and the NASDAQ;

c)    AmTrust regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d)    AmTrust was followed by numerous securities analysts employed by major brokerage firms, who wrote reports that were distributed to those brokerage firms' sales force and certain customers, and each of those reports was publicly available and entered the public market place; and

e)    The market price of AmTrust's stock reacted rapidly to new information entering the market.

111.    As a result of the foregoing, the market for AmTrust's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of AmTrust's stock.  The foregoing facts indicate the existence of an efficient market for trading of AmTrust stock and support application of the fraud-on-the-market doctrine.

112.    AmTrust relied on the integrity of the market price for the repurchase of its stock and is entitled to a presumption of reliance with respect to Defendants' misstatements and omissions alleged in this Complaint.

113.   Had AmTrust known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' material misstatements, the Company would not have repurchased AmTrust stock at artificially inflated prices.

### III.   DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5, AND BREACHED THEIR FIDUCIARY DUTIES, BY KNOWINGLY OR RECKLESSLY ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

114.   Throughout the Relevant Period, Defendants engaged in fraudulent manipulation of a wide range of AmTrust's accounting metrics, in violation of GAAP, SEC regulations, and AmTrust's own internal policies.   Among other things, AmTrust failed to properly estimate its loss reserves, account for bonuses paid, adjust foreign currency transaction gains and losses, and recognize revenue.   Instead of properly and conservatively reserving for its losses as it had repeatedly claimed, Defendants fraudulently failed to adequately reserve for losses in the Company's Specialty Program segment. For each of the fiscal years discussed below (2014, 2015, and 2016), AmTrust has admitted to improperly accounting for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.   As a result, the Company has restated its annual financial results for each of the years 2014, 2015 and 2016, as well as its quarterly results for each quarter of 2015 and 2016.[16] These restatements included substantial downward revisions of net income attributable to common stockholders in 2014 and 2015 by 7.2% and 11.2%, respectively, as well as downward

---

[16] Because the Company has only restated its annual results, rather than each quarterly result individually, for 2014, Plaintiffs plead on information and belief that AmTrust's financials for each quarter of 2014 were false.

revisions of net income attributable to common stockholders for the first three quarters of 2016 by 19.38%, 6.00%, and 28.39%, respectively.  In addition, AmTrust was forced to take a $65 million reserve charge due to improper reserving practices in its Specialty Program segment.

115.   AmTrust's press releases, investor presentations and public filings with the SEC included material misstatements and/or omissions concerning the Company's financial results, which included consistently touting that it was adequately reserved.  These false and misleading statements created a false impression concerning AmTrust's business and operational status and future growth prospects and caused AmTrust to repurchase $227 million worth of stock at artificially inflated prices.

116.   Defendants' knowing or reckless issuance of these false statements inflated the Company's stock price throughout the Relevant Period.  These practices also defrauded the Company, as it repurchased approximately 8 million shares at inflated prices via its buyback program.

### A.   <u>False Statements</u>

#### 1.   <u>First Quarter 2014 Financial Results</u>

117.   On May 1, 2014, the Company issued a press release announcing its first quarter 2014 earnings results ("Q1 2014").  The Company reported total service and fee income of $91.0 million; net income of $101.7 million; net income attributable to AmTrust common stockholders of $99.9 million; and diluted earnings per share (EPS) of $1.27.  Gross written premium was $1.67 billion, an increase of $722.3 million, or 76.5%, from $943.9 million in the same prior year period.  The Company also reported loss and loss expense reserves of $4.75 billion.

118.   On May 12, 2014, the Company filed its Form 10-Q for Q1 2014 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.

119.    Defendants' financial results summarized in paragraphs 117 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  As a result of this fraudulent accounting, Defendants have been forced to restate their financials for the full year 2014, including the metrics in paragraph117.  In addition, Defendants fraudulently understated their loss reserves, which have already resulted in a $65 million reserve charge related to the Company's Specialty Program segment.  The details of each of these improper accounting items are discussed further below at paragraphs 200 to 225.

120.    In addition, the Q1 2014 Form 10-Q (and each of AmTrust's subsequent quarterly and annual reports filed with the SEC described herein) contained certifications signed by Defendants Zyskind and Pipoly pursuant to §302 of the Sarbanes-Oxley Act of 2002 ("SOX") attesting that the financial information contained in the filing was true, did not omit material facts, and that the Company's internal and disclosure controls were effective.

121.    For example, Defendants Zyskind and Pipoly certified in the Q1 2014 Form 10-Q (and each of AmTrust's subsequent quarterly and annual reports filed with the SEC described herein) that:

> [T]his report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

122.    With respect to AmTrust's reported financial information, Defendants Zyskind and Pipoly certified in the Q1 2014 Form 10-Q that:

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

123.    With respect to AmTrust's internal controls, Defendants Zyskind and Pipoly certified in the Q1 2014 Form 10-Q (and each of AmTrust's subsequent quarterly and annual reports filed with the SEC described herein) that they personally: (i) were responsible for establishing and maintaining disclosure controls and procedures; (ii) designed or caused AmTrust's controls or procedures to be designed to ensure that material information relating to AmTrust and its consolidated subsidiaries was made known to them by others within those entities; (iii) designed or caused AmTrust's controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP; (iv) evaluated the effectiveness of AmTrust's disclosure controls and procedures; and (v) presented in AmTrust's quarterly and annual filings their conclusions about the effectiveness of the disclosure controls and procedures.

124.    Defendants' statements cited in paragraphs 121 to 123 were false and misleading, because, as was later revealed in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period. Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized at paragraphs 206 to 225 below.

### 2.    Second Quarter 2014 Financial Results

125.    On August 7, 2014, AmTrust issued a press release announcing its second quarter 2014 earnings results ("Q2 2014"). The Company reported total service and fee income of $99.5

million; net income of $104.2 million; net income attributable to AmTrust common stockholders of $106.3 million; and diluted earnings per share (EPS) of $1.33.  In addition, "[l]oss and loss adjustment expense totaled $587.2 million in the second quarter 2014, compared to $364.1 million in the second quarter 2013 and resulted in a loss ratio of 67.1% compared with 67.9% for the second quarter 2013."  Loss and loss adjustment expense reserves were approximately $5.08 billion as of June 30, 2014.

126.   Defendants' financial results summarized in paragraph 125 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  As a result of this fraudulent accounting, Defendants have been forced to restate their financials for the full year 2014, including the metrics in paragraph 125.  In addition, Defendants fraudulently understated their loss reserves, which have already resulted in a $65 million reserve charge related to the Company's Specialty Program segment.  The details of each of these improper accounting items are discussed further below in paragraphs 200 to 225.

127.   On August 7, 2014, the Company held a conference call to discuss its financial results for the second quarter of 2014, wherein Defendants Pipoly and Zyskind discussed 2014 loss reserves:

**Ron Pipoly**

You know 2014, we evaluate our loss reserves in all of our lines of business on a monthly basis and we're certainly encouraged about the trends that we see in prior excellent years as low as the current excellent year at seven month of valuation period. We'd encouraged about the trends we see in frequency, trends we see in average severity. We are holding steady with our loss picks. And, again we

evaluate it on a monthly basis and have a lot of internal discussion about direction and the trends that we see and look to take advantage of the market.

**Barry Zyskind**

Just to add to it, as I said it in some previous call. [20]12, obviously, we started seeing a lot of improvement in the [20]12 compare to the [20]11 year, [20]13 was much improved over [20]12 and I would say [20]14 is tracking very similar to [20]13 and may be in some cases even better. So we're looking at the trends, we're seeing now for the [20]13, [20]14 and the [20]12 year and really we see very solid performance and again we think very conservative and discipline where we have to pick but we think that the performance is very, very solid and we think there's a lot of profitability in those lines.

128.    This statement was false and misleading because, in fact, Defendants were not "conservative" with respect to their loss reserves, but rather were deliberately and fraudulently under-reserving and manipulating the Company's accounting in order to hide this fact.

129.    On August 11, 2014, the Company filed its Form 10-Q for Q2 2014 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.  The Q2 2014 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP.   The Q2 2014 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The Q2 2014 Form 10-Q included Defendants Zyskind and Pipoly's certification pursuant to SOX, identical in all material aspects to the certifications quoted in paragraphs 121 to 122.

130.    Defendants' statements cited in paragraphs 127 to 129 were false and misleading, because, as was later revealed in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period. Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP described in detail below in paragraphs 206 to 225.

3.      Third Quarter 2014 Financial Results

131.    On November 3, 2014, AmTrust issued a press release announcing its third quarter 2014 earnings results ("Q3 2014").  For the quarter, the Company reported total service and fee income of $117.6 million; net income of $157.2 million; net income attributable to AmTrust common stockholders of $156.6 million; and diluted earnings per share (EPS) of $1.97.  In addition, "[l]oss and loss adjustment expense totaled $609.4 million in the third quarter 2014, compared to $410.6 million in the third quarter 2013 and resulted in a loss ratio of 66.6% compared with 66.9% for the third quarter 2013."  As of September 30, 2014, loss and loss adjustment expense reserves totaled $5.298 billion.

132.    Defendants' financial results summarized in paragraph 131 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  As a result of this fraudulent accounting, Defendants have been forced to restate their financials for the full year 2014, including the metrics in paragraph 131.  In addition, Defendants fraudulently understated their loss reserves, which have already resulted in a $65 million reserve charge related to the Company's Specialty Program segment.  The details of each of these improper accounting items are discussed further below in paragraphs 200 to 225.

133.    On November 10, 2014, the Company filed its Form 10-Q for Q3 2014 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.  The Q3 2014 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP.  The Q3 2014 Form 10-

Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting. The Q3 2014 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certifications quoted in paragraphs 121 to 122.

134.    Defendants' statements cited in paragraph 133 were false and misleading, because, as was later revealed in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period. Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in pargraphs 206 to 225.

### 4.    Fourth Quarter and Full Year 2014 Financial Results

135.    On February 11, 2015, AmTrust issued a press release announcing its fourth quarter and full year 2014 earnings results ("Q4 2014"). For the quarter, AmTrust reported service and fee income of $101.7 million; net income of $83.5 million; net income attributable to AmTrust common stockholders of $71.6 million; and diluted earnings per share (EPS) of $0.88. In addition, "[l]oss and loss adjustment expense totaled $587.5 million in the fourth quarter 2014, compared to $470.4 million in the fourth quarter 2013 and resulted in a loss ratio of 64.7% compared with 66.5% for the fourth quarter 2013." As of December 31, 2014, loss and loss adjustment expense reserves totaled $5.66 billion.

136.    For the full year 2014, the Company reported total service and fee income of $409.7 million; net income of $446.6 million; net income attributable to AmTrust common stockholders of $434.3 million; and diluted earnings per share (EPS) of $5.45.

137.    Defendants' financial results summarized in paragraphs 135 to 136 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee

revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  The details of each of these improper accounting items are discussed further below in paragraphs 200 to 225.  In addition, Defendants fraudulently understated their loss reserves, which have already resulted in a $65 million reserve charge related to the Company's Specialty Program segment.

138.    Indeed, as described further in paragraphs 186 to 225, Defendants subsequently admitted, via the Company's 2017 financial restatements, that their financials were dramatically overstated for 2014, including, *inter alia*, net income attributable to common stockholders, which was overstated by 7%, or $31.3 million; and total service and fee income for 2014, which was overstated by 10.8%, or $44.38 million.

139.    With respect to AmTrust's accounting for warranty fee revenue, the 2014 Form 10-K stated as follows:

> Warranty Fee Revenue – The Company promotes and markets extended service plans ("ESP") to consumers through retailers and certain other marketing organizations usually with terms of coverage ranging from one to three years, commencing at the expiration of the manufacturers' warranty, if applicable.  The Company generally insures the obligations under ESPs through contractual liability insurance issued by one of its insurance company subsidiaries.  Under the terms of service agreements with various retailers, the Company provides for marketing and administrative services related to ESP.  These agreements are generally for one-year terms and can be canceled by either party with thirty days advance notice.   The Company recognizes revenue related to promotion, marketing and administration services at the time of the sale of ESP. ***However, the Company defers a portion of service revenue based upon an estimate of administrative services to be provided in future periods.*** (emphasis added).

140.     This statement was false and/or misleading because, as was later revealed, the Company was fraudulently recognizing excessive amounts of warranty fee revenue up front and not deferring sufficient portions of the revenue.

141.     On February 11, 2015, AmTrust held a conference call with analysts and investors to discuss Q4 and full year 2014 financial results.   During the call, Defendant Zyskind commented on AmTrust's loss reserves:

> Again, I think, you get kind of the fourth quarter as if you think about exiting the year 2014, I am not suggesting that a 12-month period makes it a seasoned book of business but you start to see trends emerging in terms of loss cost and claim focus of ratio and the thing that as you move through the year, you get more comfortable from a loss pick perspective.   So I think that the fourth quarter benefits on a quarterly basis from any revisions you make during that quarter. So I really think when you look at the loss ratios, I think that the year is more reflective of our overall view of where we're at, but again we as I mentioned we continue to look at our reserves on a monthly basis.   ***We like where we are from a -- think we're very conservative from actuarial pick perspectives, as I mentioned we've added over $800 million of net reserves.***   Our IBNR is really nearly 50% of our gross reserves as we sit here at December 31st 2014.   Again I think things are encouraging thought price environment continues to remain firm.   We like the trends that we see in comp package some of our other commercial products specialty risk and extended warranty, so I think 2015 is shaping up to be a very solid year from a loss pick perspective.   (emphasis added).

142.     This statement was false because, in fact, the Company was not "conservative" with respect to its reserving but rather engaged in fraudulent under-reserving practices.

143.     On March 2, 2015, the Company filed its Annual Report on Form 10-K for the period ending December 31, 2014, which was signed and certified by Defendants and reiterated AmTrust's previously reported financial results.   The 2014 Form 10-K represented that AmTrust's financial results were accurate and presented in accordance with GAAP.   The 2014 Form 10-K also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.   The 2014

Form 10-K included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certifications quoted in paragraphs 121 to 122.

144.    These statements were false and misleading because, as was later revealed, in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period.   Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 206 to 225.

5.    <u>First Quarter 2015 Financial Results</u>

145.    On May 5, 2015, AmTrust issued a press release announcing its first quarter 2015 earnings results ("Q1 2015").   For the quarter, AmTrust reported total service and fee income of $112.9 million; net income of $164.1 million; net income attributable to AmTrust common stockholders of $154.7 million; and diluted earnings per share (EPS) of $1.85.   In addition, "[l]oss and loss adjustment expense totaled $613.3 million in the first quarter 2015, compared to $558.6 million in the first quarter 2014, and resulted in a loss ratio of 64.6% compared with 67.4% for the first quarter 2014."   As of March 31, 2015, loss and loss adjustment expense reserves totaled $5.886 billion.

146.    Defendants' financial results summarized in paragraph 145 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.   Indeed, as revealed by the Company's 2017 financial

restatements: service and fee income was later revised downward by \$10.767 million, or 9.5%; net income was revised downward by \$21.179 million, or 12.9%; net income attributable to common stockholders was revised downward by \$21.179 million, or 13.7%, and diluted earnings per share was revised downward by \$0.13, or 14%. The details of each of these improper accounting items are discussed further below in paragraphs 200 to 225. In addition, Defendants fraudulently understated their loss reserves, which have already resulted in a \$65 million reserve charge related to the Company's Specialty Program segment.

147. On May 5, 2015, AmTrust held a conference call with analysts and investors to discuss Q1 2015 financial results. During the conference call, Defendant Zyskind commented on the Company's loss reserves, stating in pertinent part:

> I don't think there is any one event or anything. I think we do believe they are based on where we are now, that it's definitely, in our opinion, cash flowing positive. ***And as we mentioned in the last call, we think we have sufficient, if not, excess reserves in terms of a lot of reserves we've put up against contestability in these things.*** So we think we're in very good position on the portfolio.

148. During the May 5 conference call, Defendant Pipoly also emphasized AmTrust's conservative approach in estimating loss reserves: "Well, yes, I think at the end of the day, when you look at reserves and consistent with our practice over the years, we've taken a conservative approach as we enter these new accident years."

149. The statements in paragraphs 147 to 148 were false and misleading, because, in fact, Defendants were using fraudulent methods to understate their reserve needs and under-reserve for losses.

150. On May 11, 2015, the Company filed its Form 10-Q for Q1 2015 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results. The Q1 2015 Form 10-Q represented that AmTrust's financial results

were accurate and presented in accordance with GAAP.  The Q1 2015 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The Q1 2015 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certifications quoted in paragraphs 121 to 122.

151.   These statements were false and misleading because, as was later revealed, in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period.  Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 206 to 225.

6.   <u>Second Quarter 2015 Financial Results</u>

152.   On August 4, 2015, AmTrust issued a press release announcing its second quarter 2015 earnings results ("Q2 2015").  For the quarter, AmTrust reported total service and fee income of $107.7 million; net income of $80.7 million; net income attributable to AmTrust common stockholders of $70.7 million; and diluted earnings per share (EPS) of $0.84.  In addition, "[l]oss and loss adjustment expense totaled $638.5 million in the second quarter 2015, compared to $587.2 million in the second quarter 2014, and resulted in a loss ratio of 65.9% compared with 67.1% for the second quarter 2014."  As of June 30, 2015, loss and loss adjustment expense reserves totaled $6.38 billion.

153.   Defendants' financial results summarized in paragraph 152 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration

owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables. Indeed, as revealed by the Company's 2017 financial restatements: service and fee income was later revised downward by $11.577 million, or 10.7%; net income was revised downward by $24.962 million, or 30.9%; net income attributable to common stockholders was revised downward by $24.962 million, or 25.3%, and diluted earnings per share was revised downward by $0.15, or 35.7%. The details of each of these improper accounting items are discussed further below in paragraphs 200 to 225. In addition, Defendants fraudulently understated their loss reserves, which have already resulted in a $65 million reserve charge related to the Company's Specialty Program segment.

154. On August 10, 2015, the Company filed its Form 10-Q for Q2 2015 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results. The Q2 2015 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP. The Q2 2015 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting. The Q2 2015 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in paragraphs 121 to 122.

155. These statements were false and misleading because, as was later revealed, in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period. Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly

allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 206 to 225.

7.   <u>Third Quarter 2015 Financial Results</u>

156.   On November 3, 2015, AmTrust issued a press release announcing its third quarter 2015 earnings results ("Q3 2015").  For the quarter, AmTrust reported total service and fee income of $126.1 million; net income of $193 million; net income attributable to AmTrust common stockholders of $182.7 million; and diluted earnings per share (EPS) of $2.17.  In addition, "[l]oss and loss adjustment expense totaled $709.6 million in the third quarter 2015, compared to $609.4 million in the third quarter 2014, and resulted in a loss ratio of 67.9% compared with 66.6% for the third quarter 2014."  As of September 30, 2015, loss and loss adjustment expense reserves totaled $6.69 billion.

157.   Defendants' financial results summarized in paragraph 156 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  The details of each of these improper accounting items are discussed further below in paragraphs 200 to 225.  Indeed, as revealed by the Company's 2017 financial restatements: service and fee income was later revised downward by $13.22 million, or 10.5%; net income was revised upward by $3.349 million, or 1.7%; net income attributable to common stockholders was revised upward by $3.349 million, or 1.4%, and diluted earnings per share was revised upward by $0.02, or 1.4%.

58

158.     In addition, Defendants fraudulently understated their loss reserves, which have already resulted in a $65 million reserve charge related to the Company's Specialty Program segment.

159.     On November 9, 2015, the Company filed its Form 10-Q for Q3 2015 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.  The Q3 2015 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP.  The Q3 2015 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The Q3 2015 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in paragraphs 121 to 122.

160.     These statements were false and misleading because, as was later revealed, in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period.  Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 200 to 225.

### 8.     Fourth Quarter and Full Year 2015 Financial Results

161.     On February 10, 2016, AmTrust issued a press release announcing its fourth quarter and full year 2015 earnings results.  For the quarter, AmTrust reported total service and fee income of $131.4 million; net income of $72.6 million; net income attributable to AmTrust common stockholders of $63.9 million; and diluted earnings per share (EPS) of $0.37.  In addition, "[l]oss and loss adjustment expense totaled $720.8 million in the fourth quarter 2015, compared to $587.5 million in the fourth quarter 2014, and resulted in a loss ratio of 68.1%

compared with 64.7% for the fourth quarter 2014." As of December 31, 2015, loss and loss adjustment expense reserves totaled $7.2 billion.

162. For the full year 2015, the Company reported service and fee income of $478.2 million; net income of $510.5 million; net income attributable to AmTrust common stockholders of $472 million; and diluted earnings per share (EPS) of $2.80.

163. Defendants' financial results summarized in paragraphs 161 and 162 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables. The details of each of these improper accounting items are discussed further below in paragraphs 200 to 225. Indeed, as revealed by the Company's 2017 financial restatements: for the fourth quarter service and fee income was later revised downward by $14.499 million, or 11%; net income was revised downward by $10.097 million, or 13.9%; net income attributable to common stockholders was revised downward by $10.097 million, or 15.8%, and diluted earnings per share was revised downward by $0.06, or 16.2%.

164. In addition, Defendants fraudulently understated their loss reserves, which have already resulted in a $65 million reserve charge related to the Company's Specialty Program segment.

165. Indeed, as described further in paragraphs 186 to 225, Defendants subsequently admitted that their financials were dramatically overstated for 2015, including, *inter alia*, net

income attributable to common stockholders, which was overstated by 11%, or $52.9 million; and total service and fee income for 2014, which was overstated by 10.5%, or $50 million.

166.    On February 10, 2016, AmTrust held a conference call with analysts and investors to discuss Q4 and full year 2015 financial results.  During the call, Defendant Pipoly discussed "loss picks for 2016":

> **But I think we are talking a conservative view at where we are on the trend**. And I think that's really reflected in the fact that as we sit here at December 31, 2015, 53.3% of our total gross reserves were in IBNR, which is up over 4% from year-end 2015. **So I think we are taking a conservative view towards loss picks for 2016.** But we continue to be encouraged by the trends that we see and discuss on a monthly basis.

167.    The statements in paragraph 166 were false and misleading, because, in fact, Defendants were using fraudulent methods to understate their reserve needs and under-reserve for losses.

168.    On February 29, 2016, the Company filed its Annual Report on Form 10-K for the period ending December 31, 2015, which was signed and certified by Defendants and reiterated AmTrust's previously reported financial results.   The 2015 Form 10-K represented that AmTrust's financial results were accurate and presented in accordance with GAAP.  The 2015 Form 10-K also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The 2015 Form 10-K included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in paragraphs 121 to 122.

169.    These statements were false and misleading because, as was later revealed, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period. Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather

deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 206 to 225.

9.   <u>First Quarter 2016 Financial Results</u>

170.   On May 3, 2016, AmTrust issued a press release announcing its first quarter 2016 earnings results ("Q1 2016").  For the quarter, AmTrust reported total service and fee income of $144.2 million; net income of $113 million; net income attributable to AmTrust common stockholders of $100.3 million; and diluted earnings per share (EPS) of $0.56.  In addition, "[l]oss and loss adjustment expense totaled $715.1 million in the first quarter 2016, compared to $613.3 million in the first quarter 2015, and resulted in a loss ratio of 66.6% compared with 64.6% for the first quarter 2015."  As of March 31, 2016, loss and loss adjustment expense reserves totaled $7.516 billion.

171.   Defendants' financial results summarized in paragraph 170 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  The details of each of these improper accounting items are discussed further below in paragraphs 200 to 225.  Indeed, as revealed by the Company's 2017 financial restatements: service and fee income was later revised downward by $15.396 million, or 10.7%; net income was revised downward by $16.279 million, or 14.4%; net income attributable to common stockholders was revised downward by $16.279 million, or 16.2%, and diluted earnings per share was revised downward by $0.09, or 16.1%.  In addition, Defendants

62

fraudulently understated their loss reserves, which have already resulted in a $65 million reserve charge related to the Company's Specialty Program segment.

172.    On May 3, 2016, AmTrust held a conference call with analysts and investors to discuss Q1 2016 financial results.  During the call, Defendant Pipoly expressed that AmTrust was taking "a conservative view on our current accident year," and discussed the following:

> I think at the end of the day and maybe the commentary we gave on the third quarter call and the fourth quarter call last year, hopefully would have led to this kind of idea of somewhere in the low 90s from a combined ratios. If you think about any reserve movement that you may have within a truncated period whether from the third quarter, fourth quarter of last year, I mean expect those loss ratios in that quarter, so I think what you see is really stabilizing of the overall loss ratio and I think that reflects where we think we are at from a pricing environment not only in US workers comp, but in Italian med mal. So I think we are very comfortable at the 66.6% loss ratio we are able to achieve and I think expenses remain virtually unchanged at 24.6 which really is consistent with you know there hasn't been a significant shift in business mix.

173.    The statements in paragraph 172 were false and misleading, because, in fact, Defendants were using fraudulent methods to understate their reserve needs and under-reserve for losses.

174.    On May 10, 2016, the Company filed its Form 10-Q for Q1 2016 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.  The Q1 2016 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP.   The Q1 2016 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The Q1 2016 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in paragraphs 121 to 122.

175.    These statements were false and misleading because, as was later revealed in connection with the Company's 2017 financial restatements, AmTrust had a material weakness

in its internal controls throughout the Relevant Time Period.  Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 206 to 225.

10.    Second Quarter 2016 Financial Results

176.    On August 2, 2016, AmTrust issued a press release announcing its second quarter 2016 earnings results ("Q2 2016").  For the quarter, AmTrust reported total service and fee income of $138.3 million; net income of $152.2 million; net income attributable to AmTrust common stockholders of $134.8 million; and diluted earnings per share (EPS) of $0.78.  In addition, "[l]oss and loss adjustment expense totaled $784.4 million in the second quarter 2016, compared to $638.5 million in the second quarter 2015, and resulted in a loss ratio of 66.4% compared with 65.9% for the second quarter 2015."  As of June 30, 2016, loss and loss adjustment expense reserves totaled $9.097 billion.

177.    Defendants' financial results summarized in paragraph 176 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  The details of each of these improper accounting items are discussed further below in paragraphs 200 to 225.  Indeed, as revealed by the Company's 2017 financial restatements: service and fee income was later revised downward by $13.965 million, or 10.1%; net income was revised downward by $7.635 million, or 5.0%; net income attributable to common stockholders was revised downward by $7.635 million, or 5.7%, and diluted earnings

per share was revised downward by $0.04, or 5.1%.  The details of each of these improper accounting items are discussed further below in paragraphs 200 to 225.  In addition, Defendants fraudulently understated their loss reserves, which have already resulted in a $65 million reserve charge related to the Company's Specialty Program segment.

178.    On August 2, 2016, AmTrust held a conference call with analysts and investors to discuss Q2 2016 financial results.  During the call, Defendant Zyskind touted AmTrust's ability to properly calculate loss reserves:

> Again on an overall basis I think we do a very good job of setting reserves at adequate levels in order to take the claims to conclusion. I mean you'll see pockets of movements within Officer lines of business on an aggregate basis, there was no any material adverse development related to prior accident years.

179.    This statement was false and misleading, because, in fact, Defendants were using fraudulent methods to understate their reserve needs and under-reserve for losses.

180.    On August 9, 2016, the Company filed its Form 10-Q for Q2 2016 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.  The Q2 2016 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP.   The Q2 2016 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The Q2 2016 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in paragraphs 121 to 122.

181.    These statements were false and misleading because, as was later revealed in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period.  Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly

allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 206 to 225.

11.      Third Quarter 2016 Financial Results

182.    On November 3, 2016, AmTrust issued a press release announcing its second quarter 2016 earnings results ("Q3 2016").  For the quarter, the Company reported total service and fee income of $146.6 million; net income of $118.1 million; net income attributable to AmTrust common stockholders of $103.6 million; and diluted earnings per share (EPS) of $0.60. In addition, "[l]oss and loss adjustment expense totaled $811.0 million in the third quarter 2016, compared to $709.6 million in the third quarter 2015, and resulted in a loss ratio of 67.8% compared with 67.9% for the third quarter 2015."  As of September 30, 2016, loss and loss adjustment expense reserves totaled approximately $9.428 billion.

183.    Defendants' financial results summarized in paragraph 182 were false and misleading because Defendants improperly and fraudulently accounted for: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii) unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.  The details of each of these improper accounting items are discussed further below in paragraphs 200 to 225.  Indeed, as revealed by the Company's 2017 financial restatements: service and fee income was later revised downward by $12.754 million, or 8.7%; net income was revised downward by $22.9 million, or 19.4%; net income attributable to common stockholders was revised downward by $22.9 million, or 22.1%, and diluted earnings per share was revised downward by $0.01, or 1.7%.  In addition, Defendants fraudulently

understated their loss reserves, which have already resulted in a $65 million reserve charge related to the Company's Specialty Program segment.

184.    On November 14, 2016, the Company filed its Form 10-Q for Q3 2016 with the SEC, which was signed and certified by the Officer Defendants and reiterated AmTrust's previously reported financial results.  The Q3 2016 Form 10-Q represented that AmTrust's financial results were accurate and presented in accordance with GAAP.  The Q3 2016 Form 10-Q also represented that the Company's internal controls were effective and disclosed any material changes to the Company's internal controls over financial reporting.  The Q3 2016 Form 10-Q included Defendants Zyskind and Pipoly's certifications pursuant to SOX, identical in all material aspects to the certification quoted in paragraphs 121 to 122.

185.    These statements were false and misleading because, as later revealed in connection with the Company's 2017 financial restatements, AmTrust had a material weakness in its internal controls throughout the Relevant Time Period.  Further, Defendants failed to ensure that AmTrust's financial reporting was accurate, but rather deliberately or recklessly allowed the Company's financial reporting to be false and misleading, including the violations of GAAP summarized in paragraphs 206 to 225.

**B.    False Accounting and Breaches of Fiduciary Duty Start to be Revealed**

1.    February 27, 2017 Press Release

186.    On February 27, 2017, AmTrust reported fourth quarter 2016 earnings that fell well short of Wall Street expectations due, in large part, to a $65 million reserve charge primarily related to strengthening of prior year loss and loss adjustment reserves in its "Specialty Program" segment.  The Company also identified and corrected errors during the three months ended December 31, 2016 related to prior periods in 2015 and 2016.  These errors included accruing for bonuses paid (which also impacted prior periods), adjusting foreign currency transactions gains

and losses and deferring a portion of warranty contract revenue associated with administration services previously recognized upfront. AmTrust also disclosed that it expected to make corrections "to errors in its financial statements for fiscal years ended December 31, 2015 and 2014 and certain financial information for fiscal years ended December 31, 2013 and 2012 for inclusion in the Form 10-K and these processes have not been completed."

187.    The February 27, 2017 press release also revealed that AmTrust would be unable to timely file its annual report and that it had identified material weaknesses in its internal controls over financial reporting that existed as of December 31, 2016 relating to its ineffective assessment of the risks associated with the financial reporting and an insufficient complement of corporate accounting and corporate financial reporting resources within the organization. The Company also warned that additional adjustments and/or material weaknesses could be identified.

### 2. February 27, 2017 Conference Call

188.    On February 27, 2017, the Company held a conference call with analysts and investors to discuss its financial results for the fiscal quarter ended December 31, 2016. During the conference call, Defendant Pipoly discussed AmTrust's internal controls over financial reporting:

> Additional time is needed for us to conclude our consolidated financial statements and assess internal controls over financial reporting for fiscal year 2016. And as a consequence for KMPG to complete its audit procedures and to audit the consolidated financial statements included in Form 10-K we will need a little additional time. As such, we expect to file our 10-K on or before March 16th, which we can still be considered a timely filer for SEC reporting purposes.
>
> In addition as part of our year-end close work, we've reviewed our internal controls of our financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002 and identify material weaknesses in our internal control structure over financial reporting.

These specifically relate to ineffective assessment of risk associated with financial reporting in an insufficient complement of corporate accounting and corporate financial reporting resources within the organization.

We expect to complete the remaining work quickly and file the 10-K within all ot 15 day expansion period.  We've started the process to improve our internal controls over financial reporting.  We are expanding and enhancing our senior financial leadership team so we have the expertise and resources AmTrust needs.

189.    In reaction to these disclosures, AmTrust's stock plummeted $5.32 per share, or 19.23%, from $27.66 per share on Friday, February 24, 2017 to $22.34 per share on Monday, February 27, 2017—wiping out over $900 million in Company market capitalization in one trading day.

3.    <u>March 16, 2017 Press Release</u>

190.    On March 16, 2017, after the close of the financial markets, the Company announced that it would need additional time to complete its consolidated financial statements and assessment of internal controls over financial reporting for the fiscal year ended December 31, 2016.  The Company also disclosed that its consolidated financial statements for 2014 and 2015 (including for each of the four quarters of 2015) as well as for the first three quarters of 2016 needed to be restated and should no longer be relied upon.  The press release stated that the Form 10-K filing delay and restatement "largely relate to the timing of recognition of revenue . . . in the Company's service and fee business."  These errors related to the upfront recognition of a portion of warranty contract revenue and bonuses that were expended in the year paid but that should have been accrued in the year earned.

191.    On this news, AmTrust's share price fell $4.03, or almost 19%, from $21.61 per share on Thursday, March 16, 2017 to $17.58 per share on Friday, March 17, 2017.

4.      April 4, 2017 Disclosures

192.    On April 4, 2017, AmTrust informed investors that the impact of the restatements, which primarily involve the timing of recognition of revenue in the Company's service and fee business, "to net income attributable to common stockholders in 2014 and 2015 was a decline of 7.2% and 11.2%, respectively. Net income attributable to common stockholders in fiscal years 2014, 2015, and 2016, was $402.9 million, $419.1 million, and $363.1 million, respectively."

193.    On that same date, the Company filed its 2016 Annual Report on Form 10-K with the SEC explaining "the impact of the Restatement on the Consolidated Statements of Income primarily resulted in decreased service and fee income, increased acquisition costs and other underwriting expenses, and decreased interest expense, which ultimately resulted in decreases to net income."  With regards to the Company's balance sheets, the restatements "resulted in an increase of premiums receivable and other assets, a reduction of deferred policy acquisition costs and property plant and equipment, an increase in accrued expenses and other liabilities, and a decrease in stockholders' equity." The restatements also decreased previously reported stockholders' equity by $88.4 million as of December 31, 2013.

194.    As part of the restatements, AmTrust made adjustments to correct errors in: (i) warranty fee revenue; (ii) accrual of bonuses; (iii) deferred acquisition costs; (iv) foreign exchange measurements; (v) capitalized software costs; (vi) imputed interest on contingent consideration owed as a result of certain business acquisitions; (vii) internal brokerage commissions paid from one subsidiary to another; (viii)  unaccrued liabilities; and (ix) certain balance sheet items, including premium receivables.

## C.    **AmTrust's Financial Reporting Through the Relevant Period was Materially False and Misleading in Violation of GAAP and SEC Regulations Governing Financial Reporting**

195.    During the Relevant Period, defendants violated GAAP and SEC regulations governing the reporting of AmTrust's financial results and the maintenance of an effective system of internal control over financial reporting and public disclosure.[17]   Throughout the Relevant Period, AmTrust issued to investors and filed with the SEC, financial statements that the Officer Defendants and the Director Defendants falsely represented were prepared in conformity with GAAP.

196.    At issue in this case are the Company's financial statements for years ended December 31, 2012 through December 31, 2015, along with each of the quarters included therein, as well as the first three quarters of fiscal year 2016.

197.    AmTrust violated GAAP standards and SEC rules because, as AmTrust has admitted, the financial statements contained in AmTrust's SEC filings were not prepared in conformity with applicable GAAP and SEC requirements, nor was the financial information a fair presentation of the Company's operations.

198.    Indeed, AmTrust has now admitted that the financial statements issued to investors during the Relevant Period were materially false and misleading and "***should no longer be relied upon***." (emphasis added).

---

[17] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.   SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states ***that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate***, despite footnote or other disclosure.   Regulation S-X requires that interim financial statements must also comply with GAAP.

199.    In fact, AmTrust has acknowledged that the Company's Relevant Period financial statements were riddled with accounting errors and/or financial manipulations, resulting in overstatements of net income attributable to stockholders by as much as 13% in certain years.

200.    AmTrust has restated multiple years of its financial statements to correct myriad GAAP violations and financial reporting improprieties, including:

(a) <u>Warranty Fee Revenue</u> – During the preparation of its financial statements for the year ended December 31, 2016, management became aware of a potential misapplication of the revenue recognition guidance in relation to its accounting for warranty contract revenue associated with promotion, marketing and administration services (collectively, "administration services") provided as part of extended service plans ("ESPs").  The Company has historically recognized the majority of revenue related to administration services at the time of the sale of ESP. However, the Company revised its application of the revenue recognition guidance to record revenue related to administration services on a straight-line basis over the term of the ESP contracts.  This correction of an error, which created an overstatement of service and fee income and an overstatement of other expenses that were also recognized upfront in current periods, required a restatement of the Company's previously issued financial statements.

(b) <u>Accrual of Bonuses</u> – In prior years, the Company had expensed discretionary bonuses paid to its employees in the year the bonuses were paid because the Company did not consider the discretionary bonuses to be "probable," which is the standard required for accrual.  Upon review of ASC 270, Interim Reporting, and ASC 450, Contingencies, management determined that its application was incorrect because, even though the bonuses were discretionary, the bonuses should have been estimated and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.  This created an error resulting in an overstatement of acquisition costs and other underwriting expenses, requiring a restatement of the Company's previously issued financial statements.

(c) <u>Deferred Acquisition Costs</u> – The Company corrected errors in its calculation of deferred acquisition costs related to (i) the over-amortization of certain deferred acquisition costs in 2015, resulting in an overstatement of expenses in 2015, (ii) the capitalization of certain salaries and consulting fees that were not eligible for deferral, resulting in an understatement of expenses, (iii) the treatment of certain costs in the Company's U.K. operations as both underwriting expenses and salary and benefit expenses, resulting in the duplication of the amount capitalized and deferred, and (iv) the inclusion of deferred warranty administration fees and obligor liabilities associated with the administration services provided to our ESPs.

(d) <u>Foreign exchange gain/(loss)</u> – The Company corrected errors related to the re-measurement of monetary balances denominated in foreign currencies into their functional currencies that were recorded as other comprehensive income. Given the monetary nature of some of these assets, the re-measurement impact should have been recorded as foreign currency transaction gain/(loss) in our income statements.

(e) <u>Capitalized software</u> – The Company capitalized certain internally developed software costs that did not meet criteria for deferral under ASC 350, Intangibles - Goodwill and Other.   This error resulted in an over-capitalization of certain software expenses, and an understatement of expenses.

(f) <u>Imputed interest</u> – The Company corrected an error related to interest imputed on contingent consideration owed as a result of certain business acquisitions, which resulted in an understatement of interest expense in 2015.

(g) <u>Intercompany eliminations</u> – The Company corrected an error related to internal brokerage commissions paid from one of its subsidiaries to another subsidiary, which should have been eliminated in consolidation, thereby causing an overstatement of commission income in 2015.

(h) <u>Other Items</u> – The Company corrected other errors that impacted the 2014 and 2015 consolidated financial statements, including unaccrued liabilities, uncollectible other receivables, accrued commissions, unrecognized amortization expense, unrealized loss on investments, and proper year end cut-off related to premiums and claims.

(i) <u>Balance Sheet Items</u> – The Company historically recorded certain receivables (premium and other) net of commissions and now records the receivables on a gross basis, with the associated commission payable in other accrued expenses and liabilities.  In addition, the Company corrected a classification error involving short term investments and cash/cash equivalents, and fixed assets and other investments in the Consolidated Balance Sheets.

1.   <u>AmTrust Admitted Its Financial Statements Were Materially False and Misleading</u>

201.    AmTrust's March 16, 2017 press release and Form 8-K revealed that the Company's previously issued consolidated financial statements for 2014 and 2015 (including for each of the four quarters of 2015) as well as for the first three quarters of 2016 should be restated and "should no longer be relied upon."

202.    AmTrusts's Form 10-K filed April 4, 2017 confirmed and expanded the numerous and varied violations of GAAP and financial reporting improprieties necessitating the restatement of AmTrust's financial statements for the following ten consecutive reporting periods: (1) years ended December 31, 2012; (2) December 31, 2013; (3) December 31, 2014; (4) December 31, 2015; as well as the quarters ended (5) March 31, 2015; (6) June 30, 2015; (7) September 30, 2015; (8) March 31, 2016; (9) June 30, 2016; and (10) September 30, 2016. Defendants perpetrated these improprieties by deliberately employing a host of accounting schemes and manipulations, the majority of which can be generally classified under the following categories: (a) overstatement of reported revenues; (b) understatement of reported expenses; and (c) other GAAP violations that the Company's deficient controls did not and could not prevent.

203.    There is no dispute that AmTrust's Relevant Period financial statements were false.  Nor is there any dispute that those false financial statements were reported in AmTrust's quarterly and annual SEC filings, and included in the various offering documents issued during the Relevant Period.

204.    Defendants have restated AmTrust's prior financial results and admitted that they were materially false as to, among other things: (i) AmTrust's Income before other income (expense), provision for income taxes, equity in earnings of unconsolidated subsidiaries and non-controlling interest; (ii) net income; and (iii) earnings per share, as detailed in AmTrust's 2016 Form 10-K.  The restatement reveals that the reported net income attributable to AmTrust common stockholders was overstated for years ended December 31, 2012 through December 31, 2015:

**Net Income attributable to AmTrust common stockholders**
($000)

| Year | Reported | Adjusted | Restated | Diff. |
|------|----------|----------|----------|-------|
| 2012 | $177,987 | ($22,786) | $155,201 | -13% |
| 2013 | $286,874 | ($38,056) | $240,181 | -14% |
| 2014 | $434,276 | ($31,334) | $402,942 | -7% |
| 2015 | $472,004 | ($52,889) | $419,115 | -11% |

205.    The fact that AmTrust restated its previously issued financial statements is an admission that (i) the financial results as originally reported during the Relevant Period and its public statements regarding those results were materially false and misleading; and (ii) the financial statements reported during the Relevant Period were incorrect based on information available to defendants at the time the results were originally reported.

206.    As noted by the SEC, GAAP only allows a restatement of prior financial statements based upon information "that existed at the time the financial statements were prepared," and "restatements should not be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared."[18] The Financial Accounting Standards Board ("FASB"), the governing body that promulgated the accounting rules regarding restatements of prior financial statements, has defined "restatement" as "the process of revising previously issued financial statements to reflect the correction of an error in those financial statements." *See* FASB Accounting Standards Codification ("ASC") Topic 250-10-20, *Accounting Changes and Error Corrections*. FASB also defines "errors" that may be corrected through a restatement as: "an error in recognition, measurement, presentation, or disclosure in financial statements resulting

---

[18]    *In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.- (S.D. Fla. filed Feb. 22, 2002), SEC *Amicus Curiae* Brief regarding Defendants Motion *In Limine* to Exclude Evidence of the Restatement and the Restatement Report at 11, ECF No. 870.

from mathematical mistakes, mistakes in the application of [GAAP], or oversight or misuse of facts that existed at the time that the financial statements were prepared." *Id*.

### 2.   Defendants Overstated AmTrust's Reported Revenue

207.   Defendants violated GAAP and SEC regulations by engaging in certain practices that overstated AmTrust's reported revenues, in particular the Company's Service and Fee Income.  First, AmTrust improperly accelerated the recognition of Warranty fee revenue, rather than recognizing it ratably over the term of the ESP contracts.

208.   GAAP permits the recognition of revenue only if the following criteria are met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the vendor's fee is fixed or determinable; and (iv) collectibility is probable.  SEC Staff Accounting Bulletin ("SAB") No. 104.  Moreover, in order for revenue to be recognized, it must be earned and realized or realizable.  Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶ 83, ASC 605-10-25-1(a).  Revenues are earned when the reporting entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.  *Id*.  Revenues are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash.  *Id*.  If collectibility is not reasonably assured, revenues should be recognized on the basis of cash received.  Concepts Statement No. 5, ¶ 84g; *see also* ASC 605-10-25-1.  If payment is subject to a significant contingency, revenue recognition is improper.  ASC 450-30-25-1, *Loss Contingencies*.

209.   Second, defendants overstated AmTrust's total revenues during the Relevant Period in violation of GAAP by improperly accounting for certain intercompany transactions.  ASC Topic No. 810, *Consolidation*, provides that intercompany profits and losses are to be eliminated from consolidated financial statements.  But in contravention of GAAP, AmTrust improperly recognized internal brokerage commissions paid from one of its subsidiaries to

another subsidiary, which should have been eliminated in consolidation, thereby causing an overstatement of commission income in 2015.

210.    In improperly recognizing warranty fees and commission income, Defendants overstated AmTrust's revenues, specifically Service Fee Income during the Relevant Period.

| (in thousands) | Year Ended December 31, | | | |
|---|---|---|---|---|
| Service and fee income | 2015 | 2014 | 2013 | 2012 |
| As originally reported | $478,206 | $409,743 | $331,559 | $172,174 |
| As restated | 428,143 | 365,356 | 287,254 | 138,662 |
| $ Change | (50,063) | (44,387) | (44,305) | (33,512) |
| % Change | -10.5% | -10.8% | -13.4% | -19.5% |

### 3.    Defendants Understated AmTrust's Reported Expenses

211.    In violation of some of the most basic and fundamental rules of accounting, defendants repeatedly devised ways to artificially overstate AmTrust's net income by improperly, systematically and continually understating expenses throughout the Relevant Period.  GAAP requires expenses to be recorded in the period they are incurred.  *See* FASB Statement of Financial Accounting Concepts No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶¶ 85-87, and ASC Topic 450-20, *Loss Contingencies*.  This concept, that expenses be recorded in the same period in which the corresponding benefit is realized, is one of, if not the, most basic tenet underlying accrual accounting.  But defendants deliberately ignored this most basic rule and instead systematically engaged in a scheme of improper timing of expense recognition, typically understating its expenses in a current period and/or improperly delaying expense recognition for as long as possible.

212.    Defendants overstated the Company's net income by improperly deferring current period expenses to subsequent periods, as follows:

a)      improperly deferred bonuses and commissions;

b) improperly capitalized certain expenses as Deferred Acquisition Costs;

c) improperly capitalized internal software costs and other expenses;

d) improperly accounted for interest expense; and

e) failed to record expenses impacting fiscal years 2014 and 2015.

### a. Defendants Improperly Deferred Bonuses

213. Defendants admittedly failed to record bonus expenses on a timely basis.  In prior years, the Company had improperly expensed discretionary bonuses paid to its employees in the year the bonuses were paid rather than in the period the bonus expense was incurred.  ASC 270, *Interim Reporting*, and ASC 450, *Contingencies*, require companies to estimate bonuses and assign the expense to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

### b. Defendants Improperly Capitalized Certain Deferred Acquisition Costs

214. AmTrust also admitted that it improperly capitalized certain expenses as Deferred Acquisition Costs, such as (a) salaries and consulting fees that were not eligible for deferral, resulting in an understatement of expenses, (b) the treatment of certain costs in the Company's U.K. operations as both underwriting expenses, and salary and benefit expenses, resulting in the duplication of the amount capitalized and deferred, and (c) the inclusion of deferred warranty administration fees and obligor liabilities associated with the administration services provided to our ESPs.

215. ASC Topic No. 944, *Financial Services – Insurance*, establishes specific limitations on the deferral of those costs incurred in acquiring insurance contracts and notes that any such deferred costs are to be expensed over time via amortization.

216. In improperly accounting for Deferred Acquisition Costs, Defendants overstated AmTrust's assets and earnings during the Relevant Period.

c. Defendants Improperly Capitalized Internal Software Costs and Other Expenses

217. AmTrust improperly capitalized software development costs and failed to disclose a change in accounting principle related to these costs. These actions caused AmTrust to overstate its assets by approximately $13.6 million at December 31, 2015. According to GAAP, in ASC Topic No. 350, *Intangibles – Goodwill and Other*, to properly capitalize software development costs, the costs must be measurable and relate to a product that has reached technological feasibility. AmTrust admitted that it improperly capitalized internally developed software expenses as assets that did not meet the criteria for deferral, and improperly amortized them over time rather than properly expensing them at the time they were incurred and, and thereby overstating net income, assets, and stockholders' equity. But as reflected in the table below, Defendants also improperly capitalized expenses related to Land and Building.

| Property and Equipment, Net at December 31, 2015 | | | |
|---|---|---|---|
| (in thousands) | As Originally Reported | As Restated | $ Change |
| Land | $ 21,068 | $ 18,618 | $ (2,450) |
| Building | 97,667 | 84,090 | (13,577) |
| Software | 144,920 | 131,356 | (13,564) |
| Computer equipment | 62,160 | 62,160 | - |
| Other equipment | 57,767 | 57,767 | - |
| Leasehold improvements | 31,613 | 31,613 | - |
| | 383,582 | 353,991 | (29,591) |
| Less: Accumulated depreciation and amortization | (133,739) | (128,476) | 5,263 |

|  |  |  |
|---|---|---|
| $ 249,843 | $ 225,515 | $(24,328) |

218.    Indeed, the restatement reflects that defendants not only improperly capitalized software costs, but also land and building costs amounting to approximately $16 million.  ASC Topic 360, *Property, Plant, and Equipment*, states that property and equipment are tangible property used in a productive capacity that will benefit the company for a period exceeding one year.   Concepts  Statement  No.  6  states  that  a  company  shall  capitalize  costs  that  provide "probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events."[19]  As part of the restatement, defendants admitted that these costs did not provide probable future economic benefit.

### 4.    Defendants Improperly Accounted for Interest Expense

219.    AmTrust admitted that it improperly accounted for interest expense related to interest imputed on contingent consideration owed as a result of certain business acquisitions, which resulted in an understatement of interest expense in 2015 of approximately $7.3 million, in violation of ASC Topic 835, *Interest*.

### a.    Defendants Failed to Record Other Expense Items

220.    AmTrust also admitted that it had failed to properly record expenses impacting the  2014  and  2015  consolidated  financial  statements,  including  unaccrued  liabilities, uncollectible other receivables, accrued commissions, unrecognized amortization expense, and unrealized loss on investments.

*         *         *

---

[19] Concepts Statement No. 6, *Elements of Financial Statements - A Replacement of FASB Concepts Statement No. 3 (Incorporating an Amendment of FASB Concepts Statement No. 2)* ¶ 25.

221.    As a result of Defendants' improper, systematic and continual violations of GAAP, AmTrust understated expenses in excess of $27 million between 2012 and 2015.

      5.    Defendants' Other GAAP Violations

          a.    Defendants' Improper Accounting and Reporting of Foreign Currency Gains and Losses

222.    AmTrust admitted that its financial statements during the Relevant Period were presented in violation of GAAP by improperly accounting for foreign currency gains and losses. ASC Topic No. 830, *Foreign Currency Matters*, states that gains and losses on monetary balances ensuing from changes in currency exchange rates are generally required to be included in determining net income for the period in which the exchange rate changes.  In contravention of GAAP, however, AmTrust reported the re-measurement of monetary balances denominated in foreign currencies into their functional currencies as other comprehensive income, rather than as a foreign currency transaction gain/(loss) in the Company's income statements.

          b.    Defendants Improper Accounting of Certain Balance Sheet Items

223.    The Company historically recorded certain receivables (premium and other) net of commissions and now records the receivables on a gross basis, with the associated commission payable in other accrued expenses and liabilities.  In addition, the Company corrected a classification error involving short term investments and cash/cash equivalents, and fixed assets and other investments in the Consolidated Balance Sheets.

      6.    AmTrust's Contravention of GAAP Violated SEC Regulations

224.    By failing to file financial statements with the SEC that complied with GAAP as discussed herein, AmTrust disseminated financial statements that were presumptively misleading and inaccurate according to SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)).  In addition, the

Officer Defendants, and the Director Defendants violated the dictates of §13 of the Exchange

Act, which provides:

> Every issuer which has a class of securities registered pursuant to section 12 of this title and every issuer which is required to file reports pursuant to section 15(d) of this title shall –

> A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

> B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

>> i.    transactions are executed in accordance with management's general or specific authorization;

>> ii.    transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

>> iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

>> iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

225.    In addition, the Company's Form 10-Ks and 10-Qs filed with the SEC during the

Relevant Period were also materially false and misleading in that they failed to disclose known

trends, demands, commitments, events, and uncertainties that were reasonably likely to have a

material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

**D.     AmTrust's Material Weaknesses in Internal Controls**

226.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(a) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit [the] preparation of financial statements in conformity with [GAAP]."  These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.  *SEC v. World-Wide Coin Invs.*, Ltd., 567 F. Supp. 724, 746, 750 (N.D. Ga. 1983).  But as admitted by the Company, AmTrust did not have a sufficient complement of personnel, in certain geographic locations, with an appropriate level of knowledge and experience to help ensure proper selection and application of U.S. GAAP in the following areas: (i) Warranty Fee Revenue; (ii) Accrual of Bonuses; (iii) Deferred Acquisition Costs; (iv) Foreign exchange gain/(loss); (v) Capitalized software; (vi) Imputed interest; (vii) Intercompany eliminations; (viii) Other Items; and (ix) Balance Sheet Items.

227.    Internal control is a process designed by, or under the supervision of, the CEO and CFO and carried out by a company's board of directors, management and other personnel, to provide reasonable assurance that, among other things, the financial statements are reliable and accurate and that a company complies with applicable laws and regulations.

228.    As acknowledged in the Company's SEC filings, management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in §§13a-15(f) and 15d-15(f) under the Exchange Act.

229.    Under §302 of the SOX, Defendants Zyskind and Pipoly were required to certify that:  (i) they are responsible for establishing, maintaining and regularly evaluating the effectiveness of the issuer's internal controls; (ii) they have made certain disclosures to the issuer's auditors and the audit committee of the board of directors about the issuer's internal controls; and (iii) they have included information in the issuer's quarterly and annual reports about their evaluation.

230.    Under §906 of the SOX, Defendants Zyskind and Pipoly were required to certify each periodic report containing financial statements filed by an issuer with the SEC pursuant to §§13(a) or 15(d) of the Exchange Act, 15 U.S.C. §78m(a) or §78o(d), and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer.

231.    Under Item 308, *Internal Control Over Financial Reporting*, of Regulation S-K, management is required to provide a report of the registrant's internal control over financial reporting (as defined in Rule 13a-15(f) or Rule 15d-15(f) under the Exchange Act) that contains: (a) a statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the registrant; (b) a statement identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting as required by paragraph (c) of §13a-15 or §15d-15 under the Exchange Act; (c) management's assessment of the effectiveness of the registrant's internal control over financial reporting as of the end of the registrant's most recent fiscal year, including a statement

as to whether or not internal control over financial reporting is effective – this discussion must include disclosure of any material weakness in the registrant's internal control over financial reporting identified by management, and management is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting; and (d) a statement that the registered public accounting firm that audited the financial statements included in the annual report containing the disclosure required by this Item has issued an attestation report on management's assessment of the registrant's internal control over financial reporting.

232.    AmTrust has admitted that its internal controls over financial reporting were plagued with material weaknesses.  A material weakness is a "deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis," as defined by Public Company Accounting Oversight Board ("PCAOB") Auditing Standard ("AS") No. 5 ¶A7.

233.    Among the key controls AmTrust has admitted were improperly designed or implemented are controls over the preparation, analysis, and review of significant balances and closing adjustments necessary to achieve appropriately stated consolidated account balances and disclosures.  Specifically, management did not appropriately assess the risks associated with the financial reporting of foreign exchange, deferred acquisition costs, goodwill impairment, warranty administration services revenue, capitalized costs, period-end expense accruals and the statements of cash flows and other comprehensive income.

234.     AmTrust further admitted that there were material weaknesses in its internal control over financial reporting relating to (i) warranty services revenue, (ii) accrual of bonuses, (iii) foreign exchange adjustments, (iv) deferred acquisition costs, (v) and period-end accruals.

235.     With regard to the calculation of deferred acquisition costs, AmTrust improperly (a) over-amortized certain deferred acquisition costs in 2015, resulting in an overstatement of expenses in 2015, (b) capitalized certain salaries and consulting fees that were not eligible for deferral, resulting in an understatement of expenses, (c) treated certain costs in the Company's U.K. operations as both underwriting expenses and salary and benefit expenses, resulting in the duplication of the amount capitalized and deferred, and (d) included deferred warranty administration fees and obligor liabilities associated with the administration services provided to its ESPs.

236.     Further, the material weakness resulting from business process level control activities affected the consolidation process and preparation of financial statements, specifically subsidiary close and consolidation adjustments, segregation of duties related to the creation and posting of a discrete number of journal entries, foreign exchange, deferred acquisition costs, goodwill impairment, warranty administration services revenue, capitalized costs, period-end expense accruals and the statements of cash flows and other comprehensive income, and associated disclosures.

237.     Additionally, the Company admitted that its "internal control[s] over financial reporting was not effective as of December 31, 2015."

238.     Accordingly, AmTrust violated §13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning its expenses and net income.   Moreover, AmTrust's

inaccurate and false records were not an isolated or unique instance because they were improperly maintained for multiple years and reporting periods.

239.    In addition, AmTrust violated §13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities.  For example, AmTrust failed to ensure that controls were in place to develop necessary accounting policies and procedures, to properly account for (i) warranty services revenue, (ii) accrual of bonuses, (iii) foreign exchange adjustments, (iv) deferred acquisition costs, and (v) period-end accruals.  It failed to ensure that transactions were reported in accordance with its own policies and with GAAP.

240.    Zyskind and Pipoly provided the required SOX certifications described in paragraphs 121 to 122, as well as the report of their "assessment" of the effectiveness of the Company's internal controls during each quarter of the Relevant Period.

### E.    Further Fallout from Defendants' Accounting Manipulation

#### 1.    Wall Street Journal April 11, 2017 Article

241.    On April 11, 2017, *The Wall Street Journal* reported that the FBI, SEC, and NYDFS were probing AmTrust's accounting practices.  One of AmTrust's prior auditors is assisting the FBI in its investigation.  Although the status of the FBI probe, which is focused on whether BDO tried to bury poor practices in AmTrust's audits, is unclear, the SEC's investigation into AmTrust's accounting scheme is ongoing.

242.    According to the former BDO auditor quoted by *The Wall Street Journal*, "AmTrust has overstated its profits and financial health by understating what it may need to pay policyholders in the future."  In that regard, *The Wall Street Journal* article asserted:

> To mask this, they contend, the company has used complicated financial maneuvers, some involving related offshore companies.

In a 2013 submission to the SEC, which has been reviewed by the Journal, the group claimed it used internal documents gathered by the whistleblower to calculate that $277 million in losses had been shifted to an offshore affiliate from 2009 to 2012, bolstering AmTrust's operating income by that amount. This accounted for 38% of net income in 2012 alone, the group calculates.

In a presentation that the group says it gave to the FBI and federal prosecutors in 2014, Mr. Markopolos's team called one set of alleged accounting moves "The Washing Machine" for its purported cleansing effect on the bottom line, and another "The Loss Cemetery," for its alleged effectiveness in burying losses in offshore affiliated entities.

In reaction to *The Wall Street Journal* article, AmTrust's shares declined $3.57 per share, or 18.9%, from $18.87 per share on Monday, April 10, 2017 to $15.30 per share on Tuesday, April 11, 2017.

### 2. Keefe, Bruyette & Woods' May 2017 Note

243. On May 2, 2017, KBW stressed that investor confidence in AmTrust could only be rebuilt if the Company takes a reserve charge in the hundreds of millions of dollars and commits to providing more in-depth disclosures. KBW analyst Meyer Shields noted that he was "very uncomfortable" with AmTrust's reserves because its 2016 underwriting results seemed inconsistent with management's guidance. Shields further asserted that a review of loss triangles suggest a substantial deficiency, meaning that AmTrust will likely have to strengthen reserves in the near future.

244. KBW also recommended that AmTrust increase the size of its Board, reconstitute the Audit Committee, and select an investor friendly management team.

### F. Additional Allegations Contributing to a Strong Inference of Scienter

245. As described further in, *supra* paragraphs 56 to 95, Defendants were repeatedly put on notice of myriad examples of improper accounting in the Company as well as overall weaknesses in the Company's internal controls over financial reporting.

246.     Defendants Gulkowitz, Fisch and DeCarlo, as the members of the Audit Committee, were in direct receipt of the Alistair Capital Letter, which was addressed to them. As such, they had extensive notice of problems with the Company's internal controls as well as numerous other examples of improper accounting.  Defendants on the Audit Committee were also likely to be made aware of the *Barron's* articles, inasmuch as the Company issued press releases responding to them, and inasmuch as they addressed accounting issues.

247.     Defendant Zyskind was not only aware of the *Barron's* articles, but communicated with *Barron's* regarding them.  Further, the Company publicly responded to the May 31, 2014 and April 23, 2016 *Barron's* articles via press releases.  In addition, AmTrust's management provided written responses to ten questions posed by *Barron's* in 2014.

248.     AmTrust's Audit Committee Charter specifically charged the committee's members with monitoring: "1) the accounting and financial reporting processes of AmTrust Financial Services, Inc. and its subsidiaries…and the audits of its financial statements; 2) the independent auditor's qualifications and independence; 3) the performance of the Company's internal audit function and independent auditors; and 4) the compliance by the Company with legal and regulatory requirements."[20]

249.     Indeed, the Audit Committee members had extensive duties relating to overseeing and interacting with the Company's auditor, and had the ability to recommend selection and dismissal of independent auditors.  This is particularly significant since, here, the Company's independent auditor, BDO, has been implicated in the Company's accounting manipulation by a whistleblower, and further, Defendants were informed by NYDFS in September 2014 that they needed to replace their auditor, and *agreed* to do so (but did not do so).

_____

[20] The duties outlined in the Audit Committee Charter are described in further detail below in paragraphs 319 to 321.

250.    Two of the three Audit Committee members – Gulkowitz and DeCarlo – were also Insider Selling Defendants, and thus benefitted directly from the fraud by selling their shares back to the Company at prices they knew were inflated by the Company's false statements.

251.    Defendant Pipoly, as the Company's CFO, signed the Company's financial statements that contained the accounting errors, and was thus directly involved in the Company's accounting manipulations.  Pipoly also took advantage of the stock prices he knew were inflated by the accounting manipulation by selling over $3 million worth of his stock at inflated prices.

252.    Finally, improper accounting practices were so pervasive and widespread in the Company that Defendants could not plausibly have been unaware of them; indeed, as reported by the *Wall Street Journal*, a whistleblower within BDO collected evidence that even the Company's auditor was aware of fraudulent accounting taking place in the Company.

**G.    Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrine Apply to Defendants' Misrepresentations**

253.    Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded in this Complaint.  None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about AmTrust's present financial condition and its internal controls, among other things.

254.    Alternatively, to the extent any of the false or misleading statements pleaded in this Complaint could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, to the extent

the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false or misleading statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of AmTrust or a Defendant who knew the statement was materially false or misleading when made.

### H.     The Group Pleading Doctrine Applies to Defendants' Misstatements and Omissions

255.    While this Complaint identifies Defendant signatories or speakers with respect to the false or misleading statements identified above (*see, e.g.,* ¶¶ 121, 122, 127-29, 133, 139-43, 147-50, 154, 159, 166-68, 172-74, 178-80 & 184), the group pleading doctrine also applies to render Defendants responsible for statements as to which they are not explicitly identified as the speaker or signatory.  Defendants participated in the drafting, preparation, or approval of the various stockholder and investor reports and other communications concerning AmTrust identified in this Complaint, and were aware of or recklessly disregarded the misstatements contained in those reports and other communications as well as the omissions from them, and were aware of their materially false and misleading nature.  Each Defendant, by virtue of his or her position(s) at AmTrust, had access to adverse undisclosed information about the Company's business prospects and financial condition and performance as alleged in this Complaint, and knew or recklessly disregarded that those adverse facts rendered the subject statements materially false or misleading when made.

256.    Defendants, because of their positions of control and authority as officers or directors of AmTrust, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Relevant Period. Each Defendant was provided with copies of the documents alleged in this Complaint to be false

or misleading prior to or shortly after their issuance, or had the ability or opportunity to prevent their issuance or to cause them to be corrected.  Accordingly, each Defendant is responsible for the accuracy of the public reports, releases, and other statements detailed in this Complaint, and is therefore primarily liable for the misrepresentations in them or misleading omissions from them.

## I.     **Defendants' Misstatements and Omissions Caused Damage to AmTrust**

257.  Throughout the Relevant Period, the price of AmTrust's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.  Defendants engaged in a scheme to deceive the market and a course of conduct that operated as a fraud or deceit on AmTrust, which repurchased shares at artificially inflated prices.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of AmTrust stock fell as the prior artificial inflation dissipated.  As a result of its purchases of AmTrust shares during the Relevant Period, the Company suffered damages under the federal securities laws.  *See* ¶¶ 99-101.

258.  The decline in AmTrust's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to the market.  The timing and magnitude of the decline in the Company's share price negates any inference that the losses suffered by AmTrust were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

259.  On May 8, 2017, AmTrust held a conference call with analysts and investors to discuss Q1 2017 financial results.  During the call, Defendants Zyskind and Pipoly each stated that AmTrust incurred estimated costs of $17 million associated with the Company's restatement of its financials during the first quarter of 2017.  These additional costs for professional services

were a direct result of the Defendants' misconduct described herein and have damaged the Company as a result.

260.    In addition to causing massive and devastating financial restatements, Defendants' accounting manipulation has led to investigations of AmTrust by the FBI, the SEC, and NYDFS.  It also caused and is causing the Company to overpay to acquire its own stock by over $100 million and incur millions of dollars in expenses related to defending (and in the future likely settling) securities fraud litigation.  Moreover, the misconduct caused A.M. Best to revise its outlook on AmTrust's (and its subsidiaries') Long-Term Issuer Credit Rating from stable to negative.

## DERIVATIVE ALLEGATIONS

261.    Plaintiffs bring this action derivatively in the right and for the benefit of AmTrust to redress the breaches of fiduciary duty and other violations of law by the Defendants, as alleged herein.

262.    Plaintiffs will adequately and fairly represent the interests of AmTrust and its stockholders in enforcing and prosecuting the Company's rights.  Plaintiffs have retained counsel experienced in prosecuting this type of derivative action.

263.    Plaintiffs have owned AmTrust shares since prior to AmTrust's disclosure that it issued false and misleading financial statements and continue to hold shares of AmTrust stock.

## DEMAND IS EXCUSED AS FUTILE

264.    Plaintiffs did not make a demand on the Board to bring suit asserting the claims set forth herein because pre-suit demand would have been futile.  The facts alleged herein show that, at a minimum, reasonable doubt exists as to whether a majority of the Board lacks the requisite disinterest to determine fairly whether these claims should be pursued.

265.    At the time of the filing of this action, the Board consisted of the following seven directors:  Defendants Zyskind, G. Karfunkel, L. Karfunkel, Gulkowitz, Fisch, Rivera and DeCarlo.  To establish demand futility, Plaintiffs need only to allege that demand is excused as futile as to four of these seven directors.   However, as explained below, Plaintiffs have sufficiently alleged that none of these seven directors are capable of independently and fairly evaluating a demand.

## I.    Demand is Excused as to the Control Group and Those That Lack Independence From It

266.    AmTrust has been controlled by the Karfunkel family since it was founded in 1998 by brothers George and Michael, along with Michael's son-in-law Barry Zyskind.  Currently, the Control Group consists of Defendants Zyskind, L. Karfunkel (M. Karfunkel's Widow), and G. Karfunkel, who, in addition to their close familial connections, consider themselves a "group" for SEC-required beneficial ownership reporting purposes.  According to the most recent Schedule 13D filed by the Control Group with the SEC, as of May 25, 2017, the Group collectively owned 84,062,519 shares of AmTrust common stock, or 44% of the total outstanding shares.[21]

267.    In its Form 10-K for the fiscal year ended December 31, 2016, AmTrust admits that the Control Group has "the ability to control our business" as well as "all matters requiring approval by our stockholders, including the election and removal of directors, amendments to our certificate of incorporation and bylaws, any proposed merger, consolidation or sale of all or

---

[21] The true ownership of the Karfunkel family is higher than 44%.  On May 25, 2017, AmTrust sold 24,096,384 shares of common stock for $12.45 per share, or a total of $300 million, to undisclosed certain members of the families of Barry Zyskind and G. Karfunkel.  The Control Group's SEC filings did not count these shares in its calculation of the Control Group's ownership.  Counting these shares, the Karfunkel family owns approximately 55% of AmTrust's outstanding stock.

substantially all of our assets and other corporate transactions."   Given their control over the Company, AmTrust admits in its annual proxy filings that the members of the Control Group are not independent directors and as such cannot impartially evaluate a demand to bring the claims asserted herein.

268.    The Control Group has dominated the Company since its inception and the members of the Board have made clear that they will not act independently from the Control Group.   For example, the Company is currently a party to an inordinate amount of agreements with parties related to the Control Group, including Maiden and NGHC.   This includes a reinsurance agreement with Maiden that has been in place since 2007 and under which the Company recorded approximately $596 million of "ceding commissions" in 2016 alone, a loan from Maiden with an outstanding balance of $168 million, and a master services agreement with NGHC where AmTrust recorded $46 million in fee income in 2016.   All told, AmTrust's 2017 annual proxy statement disclosed at least 22 related party deals with Control Group-related entities.   This does not even include a September 2017 agreement whereby AmTrust sold a personal lines policy management system and related intellectual property to NGHC for $200 million.   The sheer volume and size of these related party transactions show how the Company's purportedly independent directors simply accede to the demands of the Control Group.   Attached as Exhibits 1, 2 and 3 are the relevant pages of the 2015, 2016 and 2017 proxies, respectively, listing the inordinate number and value of the related party transactions.

269.    The Control Group's domination of the Board is perhaps best illustrated by the events surrounding the acquisition of Tower by ACP, which is wholly owned by the Control Group.   During 2013, Tower experienced a significant decline in its business, making it an acquisition target.   In the fall of 2013, AmTrust itself submitted an indication of interest whereby

it would acquire certain of Tower's business units and make a preferred equity investment in Tower.  Shortly thereafter, AmTrust amended its proposal and offered to acquire the entirety of Tower for $5.50 per share in cash, or in excess of $500 million.  Thereafter, AmTrust engaged in due diligence of Tower.  However, by the end of 2013, Tower was told that AmTrust was withdrawing its proposal and the Control Group-owned ACP would be making an acquisition proposal instead.

270.    Those parties would sign a merger agreement on January 3, 2014 where ACP acquired Tower for only $3 per share.[22]  Therefore, the Control Group usurped a corporate opportunity from AmTrust, misappropriated AmTrust's due diligence, and relied on AmTrust's financial advisor, all with the blessing of the purportedly independent directors.  Moreover, the Control Group forced AmTrust and NGHC to enter into a series of related agreements in support of ACP's acquisition of Tower, including agreements whereby ACP foisted Tower's poorest performing business segment onto AmTrust for $125 million.[23]

271.    Not only did the Control Group steal this corporate opportunity from AmTrust and force AmTrust to enter into suspect related transactions, but as a result, the NYDFS imposed requirements on AmTrust, including the retention of a new independent auditor, before it approved ACP's acquisition.

272.    The Board did nothing to protect the interests of AmTrust's public stockholders and simply rubber stamped the Control Group's machinations based solely on a presentation by the patently conflicted Zyskind.  The Company's board minutes indicate that the Board did not

---

[22] This purchase price would later be reduced to $2.50 per share.

[23] This transaction structure would later be modified so that ACP acquired ownership of Tower's business units, but AmTrust and NGHC each provided ACP with $125 million in financing to complete the deal and agreed to cover excess losses of up to $250 million incurred by a former Tower subsidiary.

even discuss the Control Group's conflicts of interest related to the Tower deal before blessing it. Notably, despite the fact that the Audit Committee, which consisted of the same directors as it does now (Defendants DeCarlo, Fisch, and Gulkowitz), is required to oversee all related party transactions, it abdicated its responsibility.  Instead, the Audit Committee allowed the Board, which was comprised of a majority of directly conflicted individuals, to conduct all key deliberations.  Immediately after the conflicted Board blessed the deal on January 3, 2014, and mere hours before the initial merger agreement was signed, the Audit Committee then met for only fifteen minutes, without independent legal or financial advisors, to rubber stamp a transaction that had already been structured and agreed to.  The minutes from that Audit Committee meeting indicate that the Committee failed to even review the transaction documents. Shockingly, Defendant DeCarlo was permitted to participate in that Audit Committee meeting despite the fact that he is also a director of NGHC, which was a party to the transactions related to the Tower deal.[24]  He would only belatedly recuse himself months later shortly before the Audit Committee approved a revised transaction structure.

273.    Unsurprisingly, the Control Group's flagrant abuses of their fiduciary duties in connection with the Tower deal led to the filing of a derivative complaint in the Delaware Court of Chancery captioned *Cambridge Retirement System v. DeCarlo, et al.,* C.A. No 10879-CB (Del. Ch.).  On June 16, 2016, Chancellor Bouchard denied the motion to dismiss filed by one of the Company's purportedly independent directors from the bench, expressed deep skepticism regarding the actions of the Audit Committee, and stated that what the Audit Committee did "doesn't really look like a bona fide process."

---

[24] When the parties renegotiated the terms of the signed deal in May 2014, the Audit Committee finally retained a financial advisor.  However, its choice of advisor, Griffin Partners, was conflicted as it was simultaneously advising NGHC on the same transactions.

274.    Based on the repeated acquiescence of Defendants DeCarlo, Gulkowitz, and Fisch to the Control Group, the Control Group exercises control over them so that all of its members are incapable of considering a pre-suit demand to bring the claims asserted herein so long as the Control Group itself is incapable of considering such demand.

275.    Moreover, the Control Group was incentivized to perpetuate the Company's fraudulent accounting practices and false statements during the Relevant Period so as to render its members incapable of impartially evaluating a pre-suit demand.

276.    *First*, Barry Zyskind, as the Company's CEO during the Relevant Period, was incentivized to keep AmTrust's financial results and stock price artificially high so that he could personally benefit through excessive executive compensation.  In each of the Company's annual proxy statements since at least 2013, AmTrust stated that "[w]e believe that bonuses should be dependent on and tied to our financial performance, and should be paid only when we have met pre-determined performance criteria.  Our annual profit bonus program is designed to reward each named executive officer for his contributions to our profitability for the fiscal year."

277.    Specifically, Zyskind's employment agreement currently entitles him to an annual profit bonus so long as the Company's pre-tax profit exceeds $75 million.  If AmTrust reaches that threshold in any given year, then Zyskind receives 2% of the Company's pre-tax profit subject to an annual cap equal to four times his base salary.[25]  Additionally, Zyskind is also entitled to receive annual incentive awards based on the Company's performance as measured by

---

[25] Notably, Zyskind's employment agreement was amended twice to increase his potential annual profit bonus.  Initially, on October 6, 2010, Zyskind's employment agreement was amended to increase the pre-tax threshold to trigger a bonus payment from $29.3 million to $75 million and to increase the multiplier on the cap from 2.5x to 3x his base salary.  Then, on March 22, 2013, Zyskind's employment agreement was amended to increase the multiplier on the cap from 3x to 4x his base salary.  The increased cap on Zyskind's profit bonus allowed him to further profit from the Company's fraudulent accounting practices.

three financial metrics: operating earnings, combined ratio, and return on equity.  As shown in the chart provided below, Zyskind, and through him the Control Group, has profited enormously by artificially inflating the Company's performance.

| Year | Profit Bonus | Incentive Award | Total Compensation |
|------|-------------|-----------------|--------------------|
| 2013 | $3,900,000 | $8,469,750 | $4,916,858[26] |
| 2014 | $3,900,000 | $7,680,000 | $22,130,044[27] |
| 2015 | $3,900,000 | $9,000,015 | $13,942,205 |
| 2016 | $2,000,000 | $0 | $4,902,193[28] |
| **Total** | **$13,700,000** | **$25,149,765** | **$45,891,300** |

278.    As such, Zyskind, and through him the rest of the Control Group, is directly incentivized to artificially inflate the Company's profit to ensure he receives the highest bonus possible.

---

[26] The Company's incentive award program was not in place until 2014.  The incentive award figure listed in this table for 2013 is the value of a performance share award the Company paid Zyskind in restricted stock based on the Company's performance in both 2012 and 2013.  The Company included the full value of this award in its calculation for Zyskind's 2012 compensation.  As such, the total compensation column for 2013 does not reflect the value of this incentive performance share award.

[27] In addition to his Profit Bonus and Incentive Award, in February 2014, the Compensation Committee decided to grant Zyskind a discretionary award of 250,000 restricted stock units worth $9.54 million "in recognition of significant domestic and foreign acquisitions in 2012 and 2013."

[28] Notably, Zyskind was eligible to receive a $3.9 million profit bonus and a $6 million incentive bonus in 2016.  However, Zyskind and the Company agreed that he would forgo any bonus beyond the $2 million he was already paid in September 2016 "solely as a matter of good corporate governance."  Given the fact that the Company's compensation committee paid him $2 million of his bonus just a few months before the Company admitted its financial statements were fraudulent, it is fair to infer that Zyskind agreed to forgo his remaining bonus for public relations purposes to merely create the appearance of a concern for good corporate governance.

279.     Furthermore, Zyskind owes fiduciary duties to AmTrust in his role as the Company's CEO, in addition to his role as a director.  In his capacity as CEO, he, at a minimum, was grossly negligent by failing to ensure that AmTrust issued accurate financial statements and, as such, breached his duty of care.  Although directors of AmTrust cannot be held monetarily liable for breaches of their duty of care due to the Company's exculpatory Section 102(b)(7) charter provision, corporate officers, such as Zyskind, are not protected from such liability. Therefore, Zyskind faces a substantial likelihood of liability as a result of his breaches of his duty of care as an AmTrust officer.

280.     *Second*, during the time the Company's financial statements were artificially inflated, AmTrust engaged in numerous debt and equity offerings.  Specifically, solely since the beginning of 2013 and excluding certain note and stock exchange transactions, AmTrust issued: (i) $115 million of 6.75% Non-Cumulative Series A Preferred Stock on June 10, 2013; (ii) $250 million of 6.125% notes due 2023 on August 15, 2013; (iii) $105 million of depository shares representing interests in its 7.25% Non-Cumulative Preferred Stock, Series B on July 1, 2014; (iv) $80 million of depository shares representing interests in its 7.625% Non-Cumulative Preferred Stock, Series C on September 16, 2014; (v) $76 million of 2.75% notes due 2044 on December 11, 2014; (vi) $172.5 million of common stock in January and February 2015; (vii) $182.5 million of depository shares representing interests in its 7.50% Non-Cumulative Preferred Stock, Series D on March 19, 2015; (viii) $150 million of 7.25% notes due 2055 on June 18, 2015; (ix) $135 million of 7.5% notes due 2055 on September 16, 2015; (x) $320 million of common stock in November and December 2015; (xi) $143.75 million of depository shares representing interests in its 7.75% Non-Cumulative Preferred Stock, Series E on March 15, 2016;

and (xii) $287.5 million of depository shares representing interests in its 6.95% Non-Cumulative Preferred Stock, Series F on September 27, 2016.

281.   These offerings, totaling over $2 billion, resulted in significantly higher proceeds than the Company could have received had it issued accurate financial statements.  As a result, the offerings substantially increased the value of AmTrust by allowing it to grow through numerous acquisitions and broaden the Company's operations.  For example, these offerings helped fuel an enormous growth in AmTrust's gross written premiums from $2.75 billion in 2012 to $7.95 billion in 2016, a 189% increase.  In turn, the Control Group benefited through an increase in the value of its AmTrust holdings and by allowing it to run a much larger company. Although AmTrust's fraudulent accounting was revealed before they could fully take advantage of it, any controlling stockholder, including the Control Group, is incentivized to grow the Company as much as possible and to maximize the perceived value of its holdings so that it can eventually exit the Company through a sale of its stock at a profit.  As such, the Control Group directly benefited from the Company's failure to issue accurate financial statements and cannot impartially consider a pre-suit demand.

282.   *Third*, a portion of AmTrust's many accounting improprieties resulted from its accounting treatment of its warranty business, a portion of which was a public company called Warrantech before AmTrust acquired it in 2010.  Prior to its acquisition by AmTrust, Warrantech was admonished by the SEC for improperly accelerating the recognition of revenue on service contracts.  As a result, Warrantech was forced to restate its financial statements and change its accounting practices.  After AmTrust acquired Warrantech, it then proceeded to utilize the very same practices that led to the SEC admonishment and prior restatement.  Unsurprisingly, these

improper accounting practices were among those that led to the AmTrust restatement at issue herein.

283.   The Control Group was incentivized to artificially inflate the revenues from this warranty business because it was looking to sell the business or spin it off.  For example, at a November 15, 2016 Investor Day, in response to a question concerning whether the Company was looking to sell or spin off the warranty business, Defendant Zyskind said "[w]e're always open.  We're always looking at that."  Then, on February 27, 2017, Zyskind admitted that AmTrust had talked to third parties about the value of the business, which he pegged at over $2 billion, and that AmTrust "continuously evaluate[s] strategic options for this business to unlock shareholder value."  Finally, on August 8, 2017, Zyskind expressly acknowledged that AmTrust was looking to monetize this business, stating "[w]e continue to explore our options here, including the potential sale of a stake in parts of this highly valuable business."  Any sale or spin-out of the warranty business would have been very lucrative to the Control Group.

284.   The Company finally achieved its goal of monetizing this portion of its business on November 6, 2017, when it announced that it reached an agreement with Madison Dearborn Partners ("MDP") to sell 51% of certain of its U.S-based fee businesses in a transaction that values the businesses at $1.15 billion.[29]  All told, AmTrust will receive gross cash proceeds of approximately $950 million at closing.  In commenting on the deal, Defendant Zyskind stated: "For AmTrust, it delivers on our stated objective to unlock the value of our Fee Businesses, while also enabling AmTrust to participate in the future success of the new company and

---

[29] The fee based businesses included in the deal provide warranty and services contracts for the automotive, consumer products, and specialty equipment industries, among others, and administer niche workers' compensation and contractor liability coverage in the United States on behalf of AmTrust and other carriers.

ongoing upside as a significant shareholder." If AmTrust was able to sell this business before its fraudulent accounting was revealed, it likely would have generated even larger proceeds.

285. *Fourth*, as explained above, AmTrust engaged in numerous related party transactions with entities affiliated with the Control Group in order to disguise the true state of the Company's financials. For example, Maiden was formed by members of the Control Group, who still own approximately 15% of Maiden's outstanding shares. Zyskind serves as Maiden's Chairman and Yehuda Neuberger, G. Karfunkel's son-in-law, serves as a Maiden director. Since 2007, AmTrust and Maiden have engaged in numerous related party transactions, including a Reinsurance Agreement that has been in place since 2007. Under this agreement, during just 2016, AmTrust recorded approximately $596 million of "ceding commissions." Maiden also served as a creditor to AmTrust. As of December 31, 2016, AmTrust owed Maiden $168 million and AmTrust recorded $2.4 million in interest expense.

286. Therefore, as a result of these related party transactions, the Control Group was able to simultaneously artificially inflate AmTrust's performance and increase the value of their personal holdings in companies such as Maiden by stripping revenue from AmTrust in favor of Maiden.

287. In light of the numerous ways the Control Group benefited from the Company's fraudulent accounting practices, as well as the Company's admission that its members are not independent and the substantial liability Zyskind faces for his breaches of fiduciary duty as an officer of AmTrust, the members of the Control Group could not impartially evaluate a pre-suit demand to bring the claims asserted herein. As such, demand is excused with respect to its members.

288.    Furthermore, as demand is excused with respect to the Control Group, demand is also excused with respect to any other director that lacks independence from the Control Group, *i.e.,* Defendants DeCarlo, Gulkowitz, and Fisch, as exhibited by their past acquiescence to the Control Group as explained above.  Moreover, at least two directors have personal ties to the Control Group so as to render them not independent.

289.    Specifically, Defendant Gulkowitz is a co-founder and partner of Brookville Advisory ("Brookville"), an investment fund specializing in credit analysis.  The Hod Foundation, a private foundation owned and controlled by the Control Group, was the beneficial owner of at least 10% of FrontPoint Brookville Credit Opportunities L.P. ("FrontPoint"). FrontPoint is managed by Brookville, which means that Gulkowitz personally benefited from the investment by the Control Group.  Additionally, Defendant DeCarlo has served as a director of NGHC since it was founded by members of the Control Group in 2010.  As a director of NGHC, DeCarlo earns annual director fees of approximately $120,000 per year.  He owes that income to his relationship with the Control Group.   As a result, neither Gulkowitz nor DeCarlo are independent of the Control Group and demand is excused as to them.

## II.    Demand is Excused as to the Insider Selling Defendants

290.    While the Company's stock price was artificially inflated by the issuance of inaccurate and fraudulent financial statements, Defendants DeCarlo and Gulkowitz sold large amounts of AmTrust stock during the Relevant Period, thus reaping an undeserved windfall. From December 12, 2013, the date of the GeoInvesting Report, until the Company announced it was restating its financial statements, DeCarlo and Gulkowitz sold stock for proceeds of $1.6 million and $860,000 respectively.  Moreover, these sales occurred during the period when the Company was repurchasing its own stock in the market at inflated prices.  Therefore, they

personally profited from the Company's accounting failures and their improper approval of stock repurchases.  As such, they cannot fairly and independently consider a pre-suit demand.

### III.   Demand is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability on the Claims Asserted Herein

291.   A majority of the members of the Board face a substantial likelihood of liability for the claims asserted herein because they: (i) consciously disregarded known red flags concerning the Company's improper accounting practices; and/or (ii) failed to exercise valid business judgment when they actively approved the Company's accounting practices and related actions.

292.   The misconduct at the heart of Plaintiffs' allegations is the Board's failure to ensure the Company was accurately reporting its financial results despite being on notice since no later than December 2014 that AmTrust's financial statements were not reliable.  Specifically, the Board was aware of numerous articles and other information that made clear the Company was not issuing accurate financial statements, including:

- A December 12, 2013 public report issued by GeoInvesting, LLC that questioned the Company's accounting practices in detail, including the apparent understatement of losses by failing to properly account for losses related to intercompany transactions;

- A February 8, 2014 article in *Barron's* titled "Turning Losses Into Gains" that attributed AmTrust's financial performance to creative bookkeeping and the use of related party transactions rather than legitimate superior operations and noted AmTrust's own investment bankers at FBR Capital Markets were confused by the Company's accounting;

- A May 31, 2014 article in *Barron's* titled "Balance Sheet Risk Makes AmTrust Shares Vulnerable" that again questioned AmTrust's accounting and noted that "[m]ultimillion-

dollar incongruities appear in AmTrust's various securities and insurance filings, for example, in inconsistent loss reserves that have the effect of flattering earnings and capital" and that there were "puzzling accounting disparities" with respect to related party transactions;

- The September 12, 2014 decision by the NYDFS to condition its approval of the acquisition of Tower by ACP on AmTrust agreeing to hire a new auditor to replace BDO even though AmTrust was not a party to that acquisition as ACP is a separate private company wholly owned by the Control Group;

- A December 18, 2014 extremely detailed public letter issued by Alistair Capital to AmTrust's Audit Committee in response to the Company's frivolous defamation lawsuit explaining "numerous instances of improper accounting and indications of material weaknesses of internal controls over financial reporting," including irreconcilable discrepancies in AmTrust's public filings (some of which imply accounting impossibilities), and demanding the Audit Committee launch an investigation into AmTrust's accounting; and

- An April 23, 2016 article in *Barron's* titled "Is AmTrust Stock Worth the Premium?" that again questioned AmTrust's accounting practices and highlighted significant discrepancies in the Company's regulatory filings.

293.    Those members of the Board who were directors at the relevant times, *i.e.,* Defendants Zyskind, G. Karfunkel, Gulkowitz, Fisch, and DeCarlo were aware of all of these red flags as the Company issued public responses to each one of them.  Moreover, the Alistair Capital letter caused AmTrust to abandon its frivolous defamation lawsuit.  Nonetheless, in response to these red flags, these directors acted in bad faith by consciously disregarding their

fiduciary duties and doing nothing to ensure the Company issued accurate financial statements until the Company announced it would have to restate its financial statements on March 16, 2017.   Any Board acting in good faith would have immediately launched an independent investigation to determine if the allegations in the *Barron's* articles and the Alistair Capital letter were accurate.   However, the AmTrust Board did nothing.   As a result, Defendants Zyskind, G. Karfunkel, Gulkowitz, Fisch, and DeCarlo breached their fiduciary duties and face a substantial likelihood of liability for the claims asserted herein, and, as such, cannot impartially consider a pre-suit demand, and such demand is excused. [30]

294.   Alternatively, if these directors did not sit idly by as the Company continued to defraud the public with inaccurate financial statements, then they acted in bad faith by affirmatively approving the continued use of improper accounting in order to artificially inflate the Company's performance.   Breaking the law is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.   Accordingly, demand on the Board is excused.   Similarly, it is not a valid exercise of business judgment to:

- Authorize the issuance of false financial statements in bad faith;

- Continue to rely on BDO's past audits of the Company's financial statements, and allow it to continue to conduct future audits, after the NYDFS stated on September 12, 2014

---

[30] At a minimum, the members of the Audit Committee (Defendants DeCarlo, Fisch, and Gulkowitz) received the December 18, 2014 letter issued by Alistair Capital as it was specifically addressed to them.   Moreover, as explained in paragraphs 391 to 321 below, members of the Audit Committee have a heightened obligation to ensure the Company's accounting practices are proper and its financial statements are accurate.   Thus, at least these directors were warned about the Company's improper accounting practices by December 2014 and took no steps whatsoever to correct them.   As such, at least these three directors face a substantial likelihood of liability for consciously disregarding red flags and failing to adequately oversee BDO, and cannot fairly and impartially consider a pre-suit demand to bring the claims asserted herein.   Moreover, as explained in paragraphs 264 to 295, the members of the Audit Committee have made clear through their past actions, or lack thereof, that they are unwilling or unable to act independently from the Control Group.

that it would only approve the acquisition of Tower by ACP, a private company entirely

owned by the Control Group, if the Company agreed to hire a new auditor beginning with

the audit for the 2015 fiscal year;[31] and

- Utilize a $150 million share repurchase program approved in December 2013 and authorize a new $200 million share repurchase program in April 2016 under which AmTrust repurchased millions of shares of stock for $227 million at artificially inflated prices resulting in overpayments of approximately $104 million.

295.    By authorizing actions that were not the valid exercise of business judgment, a

majority of the members of the Board breached their fiduciary duties and face a substantial

likelihood of liability for the claims asserted herein.  Therefore they cannot impartially consider

a pre-suit demand and such demand is excused.

## IV.    Demand is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability for Related Violations of Federal Securities Laws

296.    Throughout the Relevant Period, AmTrust issued numerous false and misleading

statements concerning its finances.  For example, in connection with the Company's November

2015 $320 million common stock offering and its September 2016 $287.5 million preferred

stock offering, the Company filed prospectus supplements (the "Prospectus Supplements") that

included and/or incorporated its then current inaccurate financial statements.  Each prospectus is

considered part of a shelf registration statement the Company filed with the SEC on June 11,

2015 (the "2015 Registration Statement").  The Registration Statement was signed by a majority

---

[31] Additionally, on April 11, 2017, *The Wall Street Journal* published an article revealing that BDO actively tried to bury AmTrust's poor accounting practices, ignored the fact that AmTrust provided it with inconsistent figures, signed off on audits before completing important checks, and manipulated the electronic metadata of certain documents so as to deceptively misstate the date a document was created.

of the current Board: Defendants Zyskind, DeCarlo, Fisch, Gulkowitz, and G. Karfunkel (collectively, the "Section 11 Defendants").

297.    Section 11 of the Securities Act of 1933 ("Section 11") provides a private cause of action to security purchasers if any part of a Registration Statement covering such securities is materially false or misleading.  Section 11 provides for strict liability and does not require defendants to act with scienter.  Rather, a plaintiff need only prove that statements in a Registration Statement are materially false or misleading in order to establish liability under Section 11.

298.    As explained above, the Company later admitted the financial statements contained in the Prospectus Supplements were materially false and misleading and thus issued a restatement.  This admission subjects the Section 11 Defendants, as well as any other persons who signed the Registration Statement, to substantial liability for losses incurred by purchasers in the November 2015 and September 2016 Offerings.  In fact, purchasers in those offerings have instituted a putative class action captioned *In re AmTrust Financial Services, Inc. Securities Litigation*, C.A. No.: 1:17-cv-01545-(LAK) (S.D.N.Y.) against, among others, the Section 11 Defendants in order to recover damages resulting from the false statements.

299.    Because Section 11 does not contain a scienter requirement and the Company has already admitted its financial statements were materially false and misleading, the Section 11 Defendants, who comprise a majority of the Board, face a substantial risk of liability in connection with the Company's failure to issue accurate financial statements and maintain adequate controls over financial reporting, which forms the basis of the claims asserted herein. Therefore, a majority of the Board is incapable of impartially and fairly assessing a pre-suit demand to bring the claims asserted herein.

\*     \*     \*

300.    For the reasons stated above, a majority of the Board is incapable of fairly and impartially evaluating a pre-suit demand to bring the claims asserted herein.  As such, demand is excused.

## PLAINTIFFS ATTEMPTED TO UTILIZE THE
## 220 PROCESS TO OBTAIN DOCUMENTS FROM AMTRUST

301.    On May 16, 2017, Plaintiff Pompano served a books and record demand on AmTrust, pursuant to 8 Del. C. § 220.  Pompano sought documents concerning, *inter alia*, AmTrust's related-party transactions with Maiden and NGHC, respectively.  On May 24, 2017, despite the opportunity this demand presented the Board to produce exculpatory documents evidencing the fairness of the Company's transactions with other Karfunkel-dominated companies, the Board refused to produce anything in response to Pompano's demand.

302.    On June 5, 2017, Plaintiff Lauderhill served a books and records demand on AmTrust, pursuant to 8 Del. § 220.  It was an extremely narrowly tailored demand, seeking only Board minutes and materials concerning (i) the Board's reaction to, assessment of and investigation concerning the *Barron's*, *Wall Street Journal* and GEO articles and the Alistair Capital Letter; and (ii) the Board's decision to terminate BDO as its auditor in April 2016.  The demand was designed to give the Board an opportunity to present documents showing it acted appropriately in the face of serious allegations and when confronted by its auditor immediately prior to a restatement.  Instead, the Company stonewalled.  By letter dated June 13, 2017, the Company refused Lauderhill's demand.

303.    In light of the fact that the Board met 8, 12, 15, and 9 times in 2013, 2014, 2015 and 2016 respectively and the Audit Committee met 8, 15, 17, and 14 times in 2013, 2014, 2015, and 2016 respectively, the Company's failure to produce any exculpatory documents showing

the Board took any action whatsoever to ensure the Company issued accurate financial statements is telling and gives rise to an inference that no such documents exist, further demonstrating the Board's breaches of their duty. *See In re China Agritech, Inc. S'holder Deriv. Litig.,* 2013 WL 2181514, at *20 (Del. Ch. May 21, 2013) (denying motion to dismiss pursuant to Rule 23.1; noting that the complaint supported its allegations "with references to books and records obtained using Section 220, and with inferences that this Court can reasonably draw from the *absence* of books and records that the Company could be expected to produce"); *In re Tyson Foods, Inc. Consol. S'holder Litig.,* 919 A.2d 563, 578 (Del. Ch.2007) (explaining that "it is more reasonable to infer that exculpatory documents would be provided [in response to a Section 220 demand] than to believe the opposite: that such documents existed and yet were inexplicably withheld").

304.    It is clear that the Control Group is blocking stockholders' efforts to ensure their board of directors act in compliance with its fiduciary duties.  In light of the Control Group's stonewalling and divergent interests, as well as the exigencies created by the ongoing multiple federal investigations into the Company's accounting practices, Plaintiffs were forced to file this complaint.

## DEFENDANTS WERE OBLIGATED TO SAFEGUARD
## THE COMPANY'S INTERESTS AND COMPLY WITH APPLICABLE LAWS

I.    **Duties of All Defendants**

305.    By reason of their positions as officers or directors of AmTrust and because of their ability to control the business, corporate, and financial affairs of the Company, Defendants owed AmTrust and its stockholders the duty to exercise due care and diligence in the management and administration of the affairs of the Company, including ensuring that AmTrust operated in compliance with all applicable federal and state laws, rules, and regulations.

Defendants were and are required to act in furtherance of the best interests of AmTrust and its stockholders so as to benefit all stockholders equally and not in furtherance of Defendants' personal interest or benefit.  Each director and officer owes to AmTrust and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

306.     Because of their positions of control and authority as directors or officers of AmTrust, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts detailed in this Complaint.  Due to their positions with AmTrust, Defendants had knowledge of material non-public information regarding the Company.

307.     To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Company.  By virtue of such duties, the officers and directors of AmTrust were required to, among other things:

a)     Manage, conduct, supervise, and direct the employees, businesses, and affairs of AmTrust in accordance with laws, rules, and regulations, as well as the charter and by-laws of AmTrust;

b)     Ensure that AmTrust did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

c)     Remain informed as to how AmTrust was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

d)     Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by AmTrust, and to examine and evaluate any reports of examinations or investigations concerning the practices, products, or conduct of officers of the Company;

e)     Preserve and enhance AmTrust's reputation as befits a public corporation;

f)      Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business; and

g)      Refrain from unduly benefiting themselves and other AmTrust insiders at the expense of the Company.

308.    Defendants also owed to AmTrust and its stockholders the duty of loyalty, mandating that each favor the interests of AmTrust and its stockholders over their own personal interests, and refrain from using their positions, influence or knowledge of the affairs of the Company to gain personal advantage.

309.    Because of their advisory, executive, managerial, and directorial positions with the Company, Defendants had access to adverse, non-public information about the Company.

310.    Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AmTrust.

## II.    Conspiracy, Aiding and Abetting, and Concerted Action

311.    In committing the wrongful acts complained of herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective fiduciary duties.

312.    During all times relevant hereto, Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was manipulating its financial metrics, including loss reserves, revenue, and net income; (ii) facilitate Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections

10(b) and 14(a) of the Exchange Act; (iii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iv) artificially inflate AmTrust's stock price while the Company repurchased its own stock and the Insider Selling Defendants engaged in lucrative insider sales.

313.     Defendants engaged in a conspiracy, common enterprise, and/or course of conduct during the Relevant Period.  During this time, Defendants concealed the true fact that AmTrust was misrepresenting its financial results.

314.     Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by reviewing, participating in, and/or allowing the Company to purposefully or recklessly engage in an improper and illegal course of conduct.  Because the actions described herein occurred under the authority of the Board, each of the Director Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise and/or common course of conduct alleged herein.

315.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## III.     The Company's Code of Business Ethics

316.     The Company's Code of Business Conduct and Ethics (the "Code of Ethics") "applies to all AmTrust employees, officers, directors and contractors" and "sets out the values and principles to guide all employees, directors and officers."

317.     Specifically, with regard to "maintaining accurate books and records," the Code of Ethics states, in pertinent part:

We are required to maintain accurate books and records in accordance with the securities and accounting laws of the U.S., the countries in which our subsidiaries are incorporated, as well as the countries in which we operate. These documents form the basis of our earning statements, financial reports and other public disclosures and should be maintained accurately, completely, and in a timely and understandable manner. In addition, they guide our Company's business actions and decisions. Each of us is responsible for keeping accurate records. In addition, we must comply with AmTrust's system of internal controls for financial reporting.

We may never make a false representation in our Company's books or otherwise mischaracterize such information. This means we cannot:

- Intentionally distort or disguise the true nature of a transaction in any accounting entries;

- Make a representation, whether in a document or verbally, that is not fully accurate;

- Establish any undisclosed or unrecorded funds or assets, such as "slush funds," for any purpose.

318.   Defendants, however, violated the Company's Code of Ethics by affirmatively adopting, implementing, and condoning a business strategy based on deliberate and widespread violations of applicable laws.

## IV.   The Audit Committee

319.   The Board's Audit Committee is currently comprised of Defendants DeCarlo (Chair), Fisch, and Gulkowitz. According to the Audit Committee Charter, the Committee shall provide assistance to the Board with respect to its oversight of:

- the accounting and financial reporting processes of AmTrust and its subsidiaries and the audits of its financial statements;

- the independent auditor's qualifications and independence;

- the performance of the Company's internal audit function and independent auditors; and

- the Company's compliance with legal and regulatory requirements.

320.    Moreover, the Audit Committee is responsible for preparing the audit committee reports in the Company's annual proxy statements that, among other things, stated the Audit Committee recommended to the Board that the audited financial statements of the Company be included in the Annual Report on Form 10-K for each year during the Relevant Period.

321.    The Audit Committee is also tasked with the obligation to oversee and monitor the Company's compliance with laws and regulations.  The Audit Committee Charter in effect during the Relevant Period specifically provides that the Audit Committee "shall be directly responsible for the compensation and oversight of the work of the independent auditor . . . for the purpose of preparing or issuing an audit report or related report."  With respect to financial statements and disclosure matters, the Audit Committee Charter explicitly requires the Audit Committee to:

a)    Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

b)    Review and discuss annually reports from the independent auditors on:

i.    All critical accounting policies and practices to be used in the audit.

ii.    All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

iii.    Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

c)    Review and discuss with management and the independent auditor any major issues regarding accounting principles and financial statement

presentation, including any significant changes in the Company's selection or application of accounting principles, any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, and the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

d)     Discuss with the independent auditor the matters required to be discussed by Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 1301 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

e)     Review disclosures made to the Audit Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal control over financial reporting or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

f)     To consider questions of possible conflicts of interest; to review, approve and oversee all related party transactions as defined in applicable rules of the national securities exchange on which the Company's securities are listed; to discuss with the independent auditor significant related party transactions, and the auditor's evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties, as required by PCAOB Auditing Standard No. 2410; and to develop policies and procedures for the Committee's approval of related party transactions.

## CLAIMS FOR RELIEF

### COUNT I
**Breach of Fiduciary Duty Against the Director Defendants**

322.     Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

323.     Each of the Director Defendants owed and owe fiduciary duties to AmTrust and its stockholders.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe AmTrust the highest obligation of good faith, fair dealing, loyalty, and due care in

the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

324.    Each of the Director Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, and loyalty by either intentionally causing the Company to issue false financial statements or consciously ignoring numerous red flags that the Company's accounting practices were fraudulent and that it lacked adequate internal controls.

325.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

326.    Additionally, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the Code of Conduct and the charters of various Board committees that, had they been discharged in accordance with Director Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

327.    Accordingly, to the extent AmTrust's exculpatory provision applies to the Director Defendants' acts or omissions while acting in their capacity as directors, it cannot immunize them from (i) any non-monetary liability, (ii) monetary liability for their breaches of the duty of loyalty, (iii) monetary liability for acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law, or (iv) monetary liability in connection with any transaction from which they derived an improper personal benefit. As detailed in this Complaint, the Director Defendants' misconduct with respect to the illicit accounting scheme (i) involved breaches of their duty of loyalty; (ii) involved acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law; and (iii) at least with respect to the Insider Selling Defendants, occurred in connection with a transaction from which those

Defendants derived improper personal benefits.   AmTrust's exculpatory provision therefore cannot immunize the Director Defendants from liability for that misconduct.

328.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, AmTrust has sustained and continues to sustain significant damages.   In addition to causing massive and devastating financial restatements, the Director Defendants' accounting manipulation has led to investigations of AmTrust by the FBI, the SEC and NYDFS. The Director Defendants' misconduct has dramatically eroded the Company's stock price, invited securities fraud litigation, and harmed the Company's reputation and business.   It caused and is causing the Company to overpay to acquire its own stock by over $100 million and incur millions of dollars in expenses related to restating the Company's financials and defending (and in the future likely settling) securities fraud litigation.   Moreover, the misconduct caused A.M. Best to revise its outlook on AmTrust's (and its subsidiaries') Long-Term Issuer Credit Rating from stable to negative.

329.    As a result of the misconduct alleged in this Complaint, the Director Defendants are liable to the Company.

## COUNT II
### Breach of Fiduciary Duty Against the Officer Defendants

330.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.   This Count is brought against Defendants Zyskind and Pipoly solely in their capacity as officers.

331.    Each of the Officer Defendants owed and owe fiduciary duties to AmTrust and its stockholders.   By reason of their fiduciary relationships, the Officer Defendants specifically owed and owe AmTrust the highest obligation of good faith, fair dealing, loyalty, and due care in

the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

332.    The Officer Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, and loyalty by either intentionally causing the Company to issue false financial statements or consciously ignoring numerous red flags that the Company's accounting practices were fraudulent and that it lacked adequate internal controls.

333.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

334.    Additionally, the Officer Defendants are not entitled to claim any immunity under Section 102(b)(7) to the extent this claim is asserted against them in their capacity as officers of the Company.

335.    As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, AmTrust has sustained and continues to sustain significant damages.  In addition to causing massive and devastating financial restatements, the Officer Defendants' accounting manipulation has led to investigations of AmTrust by the FBI, the SEC and NYDFS. The Officer Defendants' misconduct has dramatically eroded the Company's stock price, invited securities fraud litigation, and harmed the Company's reputation and business.  It caused and is causing the Company to overpay to acquire its own stock by over $100 million and incur millions of dollars in expenses related to restating the Company's financials and defending (and in the future likely settling) securities fraud litigation.  Moreover, the misconduct caused A.M. Best to revise its outlook on AmTrust's (and its subsidiaries') Long-Term Issuer Credit Rating from stable to negative.

336.    As a result of the misconduct alleged in this Complaint, the Officer Defendants are liable to the Company.

## COUNT III
### Unjust Enrichment Against All Defendants

337.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

338.    During the Relevant Period, Defendants received bonuses, stock options, stock, or similar compensation from AmTrust that was tied to the Company's financial performance, or otherwise received compensation that was unjust in light of Defendants' bad faith conduct, violation of the Company's code of ethics, and self-dealing.

339.    Plaintiffs, as stockholders and representatives of AmTrust, seek restitution from Defendants and seek an order of this Court disgorging all profits, benefits, and other compensation—including any salary, options, performance-based compensation, and stock— obtained by Defendants due to their wrongful conduct alleged in this Complaint.

## COUNT IV
### Breach of Fiduciary Duty for Insider Selling and Misappropriation of Confidential Information Against the Insider Selling Defendants

340.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

341.    At the time of the stock sales set forth in paragraphs 102 to 106, the Insider Selling Defendants—Pipoly, Gulkowitz, and DeCarlo—knew or consciously disregarded the information described in this Complaint regarding the illicit accounting scheme and sold AmTrust common stock on the basis of that information.

342.    The information described above was proprietary non-public information concerning the Company's unlawful conduct associated with its accounting.  The information

was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold AmTrust common stock.

343.    The Insider Selling Defendants' sales of AmTrust common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

344.    Because the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT V
### Violations of Section 10(B) of the Exchange Act and Sec Rule 10b-5 Promulgated Thereunder Against All Defendants

345.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

346.    During the Relevant Period, in connection with AmTrust's repurchases of AmTrust shares, Defendants disseminated or approved false or misleading statements about AmTrust, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

347.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by Defendants, Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to Defendants' false or misleading statements.  Defendants engaged in a scheme to defraud AmTrust by causing the Company to purchase at least $227 million in shares of AmTrust stock at artificially inflated prices.

348.    Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon AmTrust in connection with the Company's purchases of AmTrust stock during the Relevant Period.

349.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of AmTrust stock, which were intended to, and did: (a) deceive AmTrust regarding, among other things, its accounting practices, the Company's internal controls and compensation practices, and the Company's financial statements; (b) artificially inflate and maintain the market price of AmTrust stock; and (c) cause AmTrust to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known. Throughout the Relevant Period, Defendants were in possession of material, adverse non-public information regarding the illicit accounting scheme.

350.    Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

351.    As described above, Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint were either known to Defendants or were so obvious that Defendants should have been aware of them. Throughout the Relevant Period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

352.    Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock, both by the Company itself and by the Insider Selling Defendants.

353.    As a result of Defendants' misconduct, AmTrust has and will suffer damages in that it paid artificially inflated prices for AmTrust common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the illicit accounting scheme were disclosed beginning in February 2017.  AmTrust would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Defendants' false or misleading statements.

354.    As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of AmTrust stock during the Relevant Period. By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

355.    Plaintiffs brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

## COUNT VI
### Violations of Section 20a of the Exchange Act Against the Insider Selling Defendants

356.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

357.     The Insider Selling Defendants, by reason of their relationship with the Company as officers and directors of the Company, had access, directly or indirectly, to material information about the Company not available to the public.

358.     The Insider Selling Defendants knowingly traded on this material, non-public information about the Company.

359.     The Insider Selling Defendants sold AmTrust securities with actual knowledge that the value of these securities was inflated as a result of Defendants' false and misleading statements and other fraudulent activities detailed in this Complaint.

360.     As part of AmTrust's publicly disclosed share repurchase program, the Company purchased over 8 million shares of its common stock throughout the Relevant Period.  AmTrust was a contemporaneous purchaser of AmTrust securities, pursuant to Section 20A of the Exchange Act, when the Insider Selling Defendants sold AmTrust securities, as set forth above.

361.     As a contemporaneous purchaser, AmTrust was damaged by the actions of the Insider Selling Defendants, as alleged in this Complaint, in that (i) in reliance on the integrity of the market, the Company paid artificially inflated prices as a result of the violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5; and (ii) the Company would not have purchased the securities at the prices it paid, or at all, had it been aware that the market prices had been artificially inflated by Defendants' false or misleading statements.  At the time of the purchase of the securities by the Company, the fair and true market value of the securities was substantially less than the price paid by the Company.

<u>**COUNT VII**</u>
**Violations of Section 29(B) of the Exchange Act Against the Officer Defendants**

362.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph.

363.    As a result of their conduct, as alleged in this Complaint, the Officer Defendants violated Sections 10(b) and 14(a) of the Exchange Act during the time they entered into contracts with AmTrust regarding their compensation.

364.    AmTrust has a compensation clawback policy that allows the Company to claw back compensation in certain circumstances.

365.    If AmTrust attempts to claw back compensation from the Officer Defendants, the Officer Defendants might assert a breach of contract claim.

366.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

367.    The Officer Defendants violated provisions of the Exchange Act while performing their duties arising under various employment and other contracts they entered into with AmTrust.

368.    AmTrust was and is an innocent party with respect to the Officer Defendants' Exchange Act violations.

369.    Plaintiffs, on behalf of AmTrust, seek rescission of the contracts between the Officer Defendants and AmTrust due to Defendants' violations of the Exchange Act while performing their job duties.

370.    Even if the contracts are not rescinded by the Court as a result of the Officer Defendants' Exchange Act violations, the Court can and should award equitable remedies in the

form of injunctive relief barring the Officer Defendants from asserting breach of contract by AmTrust in any action by Plaintiffs on behalf of AmTrust to claw back compensation from the Officer Defendants.

371.     Plaintiffs seek only declaratory, injunctive, and equitable relief in this claim.

## COUNT VIII
### Corporate Waste Against All Defendants

372.     Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

373.     The Director Defendants have a fiduciary duty to protect AmTrust's assets from waste.

374.     By approving the stock repurchase program, the Director Defendants breached this fiduciary duty and have caused AmTrust to waste its corporate assets on the repurchase of stock at artificially inflated prices.

375.     As a result of the Director Defendants' corporate waste, the Company has suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand for a judgment as follows:

A.     Determination that this action is a proper derivative action maintainable under the law and that demand was excused as futile;

B.     Declaring that Defendants have breached their fiduciary duties to AmTrust;

C.     Declaring that the Defendants have been unjustly enriched;

D.     Declaring that the Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5;

E.   Declaring that the Insider Selling Defendants violated Section 20A of the Exchange Act;

F.   Declaring that the other Defendants violated Section 29(b) of the Exchange Act;

G.   Declaring that the Defendants committed waste;

H.   Determining and awarding to AmTrust the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

I.   Directing AmTrust to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described in this Complaint, including putting forward for a stockholder vote resolutions for amendments to the Company's by-laws or articles of incorporation, and taking such other actions as may be necessary to place before stockholders for a vote the following corporate governance policies:

   1.   a proposal to strengthen Board oversight and supervision of AmTrust's financial reporting procedures;

   2.   a proposal to strengthen the Company's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public;

   3.   a proposal to ensure that all Board members take appropriate action to rid the Company of its lawless culture; and

4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board.

J.      Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiffs, on behalf of AmTrust, have an effective remedy;

K.      Awarding to AmTrust restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants, including the proceeds of insider transactions made in violation of federal and state securities laws;

L.      Ordering an accounting of all compensation awarded to the Officer Defendants during the Relevant Period;

M.      Increasing the size of AmTrust's Board of Directors and reconstituting the Audit Committee;

N.      Awarding to Plaintiffs costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

O.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: November 7, 2017

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

David Wales
John Vielandi
1251 Avenue of the Americas
44th Floor
New York, NY  10020
 (212) 554-1400
davidw@blbglaw.com
John.Vielandi@blbglaw.com

**GRANT & EISENHOFER P.A.**

*/s/ Michael J. Barry*
Jay W. Eisenhofer (Del I.D. No. 2864)
Michael J. Barry (Del I.D. No. 4368)
Kyle J. McGee (Del I.D. No. 5558)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000
jeisenhofer@gelaw.com
mbarry@gelaw.com
kmcgee@gelaw.com

*Counsel for Co-Lead Plaintiffs*

**SAXENA WHITE P.A.**

Joseph E. White, III
Jorge A. Amador
Adam D. Warden
5200 Town Center Circle
Suite 601
Boca Raton, Florida 33486
(561) 394-3382
jwhite@saxenawhite.com
jamador@saxenawhite.com
awarden@saxenawhite.com

Steven B. Singer
Joshua Saltzman
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
(914) 437-8576
ssinger@saxenawhite.com

*Counsel for Co-Lead Plaintiffs*